UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:

Purified Renewable Energy, LLC,

Debtor.

Case No. 13-41446

Chapter 11 Case

---

**NOTICE OF HEARING AND MOTION FOR ORDER (I) GRANTING EXPEDITED RELIEF, (II) AUTHORIZING DEBTOR TO SELL ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES TO BUYER IN ACCORDANCE WITH ASSET PURCHASE AGREEMENT; (III) APPROVING THE ASSUMPTION AND ASSIGNMENT OR REJECTION OF CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS; AND (IV) GRANTING OTHER AND FURTHER RELIEF**

---

TO:     The Parties in Interest as Specified in Local Rule 9013-3(a)(2).

1.      The above-captioned debtor and debtor in possession (the "Debtor") moves the Court for the relief requested below and gives notice of a hearing.

2.      The Court will hold a hearing (the "Sale Approval Hearing") on this motion at **2:00 p.m. on August 15, 2013**, in Courtroom No. 2C, at the United States Courthouse, at the United States Courthouse, 316 North Robert Street, St. Paul, Minnesota.

3.      Local Rule 9006-1(b) provides deadlines for responses to this motion. However, given the emergency nature of the relief sought in the motion, the Debtor does not object to responses being provided on or before August 12, 2013, which is three days before the time set for the hearing.  **UNLESS A RESPONSE OPPOSING THE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING**.

4.      This court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334, Fed. R. Bankr. P. 5005 and Local Rule 1070-1.  This proceeding is a core proceeding.  The petition commencing this chapter 11 case was filed on March 25, 2013 (the "Filing Date"). The case is now pending in this Court.

5.      This motion arises under 11 U.S.C. §§ 105, 363, 365, and 541 and Fed. R. Bankr. P. 2002(a)(2), 6004, and 6006.  This motion is filed under Fed. R. Bankr. P. 9014 and Local Rules 9013-1 through -3.  The Debtor seeks authority to sell substantially all of its assets and the assumption and assignment of certain unexpired leases and executory contracts to the successful bidder at an auction.

## I.      Background

6.      Since the Filing Date, the Debtor has continued in possession of its assets and the management of its business as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      The Debtor owns and, until shortly before the Filing Date, operated a fuel ethanol facility in Buffalo Lake, Minnesota.  The Debtor was created in February 2012 to potentially purchase the facility from Minnesota Energy, a Minnesota cooperative, which had not operated the plant since 2010.  The Debtor and Minnesota Energy entered into an agreement in April 2012 under which the Debtor would operate the facility starting in June 2012 with an option to purchase the facility later, which the Debtor exercised on November 15, 2012.  Minnesota Energy provided approximately $5.5 million in second-position seller financing.  West Ventures, LLC, is the senior secured lender who provided approximately $17.8 million in first-priority secured funding.  West Ventures and Minnesota Energy are parties to an intercreditor agreement.

8.      The Debtor operated the plant under a certain Asset Management Agreement dated April 10, 2012 (the "Agreement") with Tenaska BioFuels, LLC ("Tenaska").  Under the Agreement, Tenaska provided corn, natural gas, and denaturant to the plant and took the ethanol and distillers grains that the plant produces.  The Agreement provides that all the corn, denaturant, ethanol, and distillers grains are Tenaska's property.  Tenaska removed what little

corn remained at the plant prior to the bankruptcy filing and Tenaska removed the remaining distillers grains by March 28, 2013.

9.    The Debtor faces environmental compliance challenges, some of which arose prior to the Debtor's purchase of the plant.  The Debtor operates under permits issued by the Minnesota Pollution Control Agency ("MPCA") to the prior owner, Minnesota Energy.  The MPCA conducted water tests at the facility in October and November 2012 and air quality tests in December 2012.  As a result of this testing, the MPCA cited the Debtor and Minnesota Energy for discharge of pollutants from a cooling tower and from a storm water collection pond into a county ditch, failure to provide proper training and quality assurance procedures, and failure to report discharges in excess of permitted limits, hazardous waste handling violations, and inadequate record-keeping, among other things.  The Debtor had been implementing the MCPA's directives to remediate these non-compliance issues before the Filing Date, though its ability to fund such remediation during this chapter 11 case has been severely constrained. Minnesota Energy may be liable with the Debtor for the environmental issues arising prepetition.

10.    During the periods when the plant operated, it produced ethanol at a rate of about 1 million gallons per year, or less than 4% of capacity.  Tenaska stopped supplying inputs in March 2013, causing the Debtor to cease production of ethanol.  The plant had been maintained in a "hot idle" state in order to prevent freezing but was throttled back as the weather warmed.

11.    Up to the Filing Date, the Debtor retained its full contingent of 23 employees in order to maintain the facility.  On March 26, 2013, the day after the Filing Date, the Debtor laid off 13 employees and retains 10 employees to maintain and protect the equipment and perform the administrative services necessary keep the plant in suspended operations and assist with the bankruptcy case.

12.     On March 15, 2013, the Debtor engaged IR1 Group, LLC, to assist in operating the plant and assess the sale value or costs of recapitalizing and restarting production at the facility.   IR1 Group specializes in all facets of biofuel manufacturing.   IR1 Group provides biofuels industry clients with complete project development, engineering, construction and operations services.   Its Director of Operations, Joe Winckler, has been working at the facility and is assisting with the bankruptcy case.

13.     During the chapter 11 case the Debtor has dewatered the storm water pond to allow Minnesota Energy to remediate the contaminated sediment.   The Debtor has attended to the administration of the bankruptcy case, including responding to requests from creditors and the Committee, obtaining DIP financing, and meeting reporting requirements.   The Debtor has also preserved and secured the ethanol plant and initiated this sale process.

## II.     Bidding Procedures and Sale Process

14.     On May 31, 2013, the Court entered an order (the "Bidding Procedures Order") [dkt. no. 126] authorizing the Debtor to conduct an auction and approving certain bidding procedures (the "Bidding Procedures") [dkt. no. 123].   The Bidding Procedures established important milestones in the auction process including a credit bid deadline of July 15, 2013, a general bid deadline of July 31, 2013 (recently postponed to August 5, 2013) and an auction date of August 8, 2013.   The Bidding Procedures set forth the requirements for potential bidders to receive due diligence materials and requirements for bids to be considered "Qualified Bids" and bidders to be "Qualified Bidders" such that they can participate in the auction.

15.     Pursuant to the Bidding Procedures Order and Bidding Procedures, the Debtor has undertaken an extensive marketing and sale process.   The Debtor has engaged IR1 Group to act as sales agent and IR1 Group has worked diligently to promote the sale of the Debtor's assets. IR1 Group's efforts will be described in greater detail in an "Auction Report" to be filed on the

docket after the Auction date, August 8, and before the Sale Approval Hearing.  By way of summary, IR1 Group has:  advertised the auction on certain trade web sites, in industry publications, and via press release; directly solicited interest by mailing or e-mail to approximately 50 operators, investors, and other potentially interested parties that are involved in the fuel ethanol industry; and responded to expressions of interest from potential parties who independently became aware of the bankruptcy case or the Auction sale.

16.    In response to those marketing efforts, IR1 Group has communicated with approximately 30 parties.  Twenty of these parties signed non-disclosure agreements and were given access to a virtual data room established by IR1 Group to assist with due diligence.  As of the filing of this motion, IR1 Group has led three plant tours for potential bidders.  A full account of IR1 Group's sale efforts and interest from potential buyers will be provided in the Auction Report.

17.    Pursuant to the Bidding Procedures, West Ventures submitted on July 15, 2013, an Asset Purchase Agreement (the "Credit Bid") which the Debtor and Committee deemed to be a "Qualified Bid" under the Bidding Procedures.  A copy of the Credit Bid is attached as Exhibit A.  On the same date, the Committee commenced and adversary proceeding (the "Committee Adversary Proceeding") by filing a complaint asserting grounds for avoiding, recharacterizing, or otherwise reducing the amount of West Ventures' prepetition claims and liens.  Three days later, the Committee brought a motion to deny West Ventures' credit bid right on the grounds that West Ventures' claims and liens are disputed in the Committee Adversary Proceeding.

18.    The Court held a hearing on the Committee's motion to deny West Ventures' credit bid on July 24, 2013.  In a recess during the hearing, the Debtor, the Committee, and West Ventures agreed on a compromise that would allow West Ventures to credit bid.  In general

terms, the parties agreed that West Ventures could credit bid up to $9.2 million in prepetition

debt (in addition to up to $2 million of postpetition debt under the DIP Loan that was never

disputed) and, in the event West Ventures is the buyer, the estate will have a lien in the

Purchased Assets[1] on account of the portion of the credit bid attributable prepetition

indebtedness pending the outcome of the Committee Adversary Proceeding. The specific terms

of the agreement have been memorialized in a stipulation filed as docket no. 146 and approved

by Court order filed as docket no. 147.

19.     The Credit Bid has the following basic terms:[2]

a.     **Purchase Price**. West Ventures has irrevocably credit bid $5 million of its
secured claims for the Purchased Assets (as defined in Section 2 of the
Credit Bid), to be paid first from the DIP Indebtedness as of the Closing
Date (which is not known today) and the remainder in Prepetition
Indebtedness, provided that any unfunded portion of the unpaid "Carve
Out" amount, as defined in the DIP Loan Agreement and DIP Order, as of
the Closing Date would be funded in cash at the Closing. In addition, West
Ventures would relieve the bankruptcy estate of other claims and liabilities
to it as DIP Lender under the DIP Order.

b.     **Purchased Assets**. The Purchased Assets under the Credit Bid include the
Debtor's interests in the ethanol plant and certain other assets, but
excludes avoidance actions, commercial tort claims and any proceeds of
the Debtor in insurance policies to the extent not covered by West
Ventures' non-avoidable liens, provided that the exclusion of such assets
under the Credit Bid does not affect, limit or impair any lien rights that
West Ventures may hold.

c.     **Assets Purchased Free and Clear**. The Credit Bid contemplates that
West Ventures, or its designee, would acquire the Purchased Assets free
and clear of all claims or interests to the full extent permitted by Section
363 of the Bankruptcy Code, provided that mechanics' liens or statutory
liens, if any, upon the Purchased Assets to the extent having priority over
West Ventures' liens under the DIP Loan Agreement and DIP Order
would not be extinguished by the Sale Order. Except for obligations under
the Assumed Executory Contracts, West Ventures will not be assuming
any obligations or liabilities of the Debtor.

---

[1] Capitalized terms not defined in this motion have the meaning ascribed to them in the Credit Bid.

[2] This summary does not include all of the terms and the Credit Bid. In the event of any conflict between this
summary and the Credit Bid, the terms of the Credit Bid are intended to control.

    d.    **Other Terms.** The Credit Bid contains other terms and conditions including representations and warranties and conditions to Closing.

20.    The Stipulation also provides that the deadline for general bids is extended from July 31, 2013 to August 5, 2013.  With that change and the agreement on West Ventures' ability to credit bid, the Debtor is proceeding with the auction in compliance with the Court-approved Bidding Procedures.  The auction will be held on August 8, 2013, and the Sale Approval Hearing will be held on August 15, 2013, to approve this motion and authorize the Debtor to sell assets free and clear of interests and to assume and assign certain contracts and leases.

## III.    Lienholders

21.    The proposed sale of the Debtor's assets will be a sale free and clear of all liens, claims, interests and encumbrances, except for Permitted Liens.  The following summarizes the nature, extent and amount of all such secured interests in the Debtors' property (unless otherwise subsequently challenged and/or determined by the Court to be invalid).

## A.    West Ventures' DIP Loan Indebtedness

22.    During the bankruptcy case West Ventures has provided at DIP facility to enable the Debtor to preserve its assets, conduct this sale, and administer the chapter 11 case.  The terms of the DIP Loan were approved on a final basis in the Court's order dated May 9, 2103, filed at docket no. 92.  The final forms of DIP Loan Documents are appended to the unsworn declaration filed on May 8, 2013, at docket no. 85.

23.    Under the DIP Loan, West Ventures obtained a senior lien on substantially all of the Debtor's pre and postpetition assets, including the Purchased Assets subject to a carve-out for professional fees and Court and U.S. Trustee fees.  The Debtor is authorized to borrow up to $2 million under the DIP Loan.  The Credit Bid provides that West Ventures is bidding in the indebtedness under the DIP Loan before its prepetition indebtedness.

**B.      West Ventures' Prepetition Indebtedness**

24.      As described in the Debtor's motion to approve DIP financing filed on April 1, 2013, at docket no. 14, West Ventures asserts a senior lien in substantially all of the Debtor's prepetition assets.  This lien is the subject of the Committee Adversary Proceeding, described above.  West Ventures asserts indebtedness of approximately $18.2 million dollars on account of prepetition lending.

**C.      Minnesota Energy**

25.      The Debtor is indebted to Minnesota Energy on account of money Minnesota Energy loaned to "seller finance" the Debtor's purchase of the business.  The indebtedness to Minnesota Energy is memorialized under a certain Loan Agreement; Mortgage, Fixture Filing, Security Agreement, and Assignment of Rents and Leases, and Second Priority Secured Promissory Note in the original principal amount of $5,470,000, all dated November 15, 2012.

**D.      Putative Mechanic's Liens**

26.      Several parties have asserted mechanic's liens in the Debtor's prepetition assets, including Beaver Creek Transport, BW Welding, K&S Millwrights, and M&G Services. As described in the summary of the Credit Bid above, mechanic's liens or statutory liens, if any, on the Purchased Assets would not be extinguished by the Sale Order approving the Credit Bid.to the extent they have priority over West Ventures' liens under the DIP Loan Agreement and DIP Order.

**IV.      Sale**

**A.      Sale of Substantially All Assets Free and Clear of Liens**

27.      The Debtor seeks to sell substantially all of its assets in the auction or, if the Credit Bid is the sole Qualified Bid, to West Ventures.  All assets are available for sale, though the Credit Bid contemplates a sale of the "Purchased Assets" described above.

28.     Furthermore, the Debtor has agreed that any sale agreement will include a requirement that the buyer enter into a confidentiality agreement with KATZEN International, Inc., the developer of part of the fermentation process employed by the ethanol plant.  The Credit Bid includes such a provision.

29.     In accordance with section 363(f) of the Bankruptcy Code, a debtor in possession may sell property under section 363 of the Bankruptcy Code "free and clear of any interest in such property of an entity other than the estate" if one of the following conditions is satisfied:

(1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)-(5).

30.     Because the Debtor expects it will satisfy one or more of the requirements of section 363(f) of the Bankruptcy Code with respect to the interests of West Ventures, it submits that approval of the sale of the Debtors' assets free and clear of all interests is warranted.

31.     Furthermore, the Debtor is not requesting to sell the assets free and clear of interests of creditors with valid mechanic's liens.  The Credit Bid provides that "Permitted Liens" will remain attached to the Purchased Assets.  Under the Credit Bid, the term "Permitted Liens" includes "non-avoidable liens and encumbrances arising by operation of law and senior in right with respect to any collateral to the Liens securing the DIP Indebtedness."  See Credit Bid section 1.  Thus to the extent that a putative mechanic's lienholder can substantiate the validity and priority of its claim and lien, that lien will transfer with the Purchased Assets.

**B.      Sale in Good Faith**

32.      The Debtor requests that an order approving the sale pursuant to the Credit Bid or any other higher and better bid include the protections as provided in section 363(m) of the Bankruptcy Code.  The Debtor submits, and will demonstrate in the Auction Report or at the Sale Approval Hearing, that the bidder submitting the highest and best bid does not have an interest clearly adverse to the Debtor, its estates, or their creditors.  The Debtor believes that the Successful Bidder, be that West Ventures or another buyer, will have acted with integrity during the sale process and will not have engaged in any fraud, collusion, or attempt to take grossly unfair advantage of any other bidders.

**V.      Request for Approval of the Assumption and Assignment of Leases and Contracts and Establishing Cure Costs**

33.      The Debtor is a party to a number of executory contracts and unexpired leases.  In accordance with the terms of the Credit Bid and, the Debtor anticipates, any asset purchase agreement of a different successful bidder, the Debtor will be required to assume and assign certain of those executory contracts and unexpired leases that are useful in the operation of the ethanol plant (collectively, the "Contracts and Leases").  A list of the Contracts and Leases is attached hereto as Exhibit B which sets forth the type of contract or lease, the counterparty and the proposed cure amounts owing (the "Cure Costs").

34.      The Debtor cautions that only a portion of its executory contracts or unexpired leases may be assumed and assigned to the successful bidder.  This Motion operates to: (i) identify substantially all the Contracts and Leases that may be assumed and assigned; (ii) provide adequate notice of the proposed Cure Costs to all counterparties to the Contracts and Leases; and (iii) allow all such counterparties the opportunity to dispute the amount of the Cure Costs.  The resulting process will ensure that the Debtor can timely address any Cure Costs and

other related issues on or before the Sale Approval Hearing — even if not all of the Contracts and Leases listed on Exhibit B will ultimately be assumed by the Debtor and assigned to the ultimate successful bidder.  All of the Contracts and Leases that will be assumed and assigned to the successful bidder will be identified on a schedule to the asset purchase agreement of such successful bidder.  The Debtor and/or the successful bidder reserve the right to remove any Contract or Lease off of any list of contracts or leases to be assumed and assigned up to the closing of the successful bidder's purchase of the assets.

35.    Pursuant to section 541 of the Bankruptcy Code, the Contracts and Leases constitute property of the Debtor's estate that may be sold consistent with section 363 of the Bankruptcy Code.  In accordance with the provisions of section 365 of the Bankruptcy Code, the Debtor may assume and assign the Contracts and Leases and recover value from such assets.  In pertinent part, section 365(f) of the Bankruptcy Code provides:

> (f)(1)   [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.
>
> • • •
>
> (2)    The trustee may assign an executory contract or unexpired lease of the debtor only if-
>
> (A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f).

36.    The Debtor believes cause exists to approve the sale and the assumption and assignment of the Contracts and Leases pursuant to sections 363 and 365(f) of the Bankruptcy

Code.  As noted previously, the Debtor has determined in the exercise of its sound business judgment that the sale of its business operations is in the best interests of the Debtor and its estate.  The successful bidder may determine, and the Debtor would concur, that the Contracts and Leases are an integral part of those business operations.

37.     The proposed assumption and assignment of the Contracts and Leases will comply with section 365 of the Bankruptcy Code.  Upon the assumption and assignment, the successful bidder (or Debtor if so negotiated) will pay the Cure Costs.  In addition, where required, the Debtor and/or the successful bidder will provide adequate assurance of future performance at the Sale Approval Hearing.

38.     Except as described in the following paragraph, Exhibit B sets forth all amounts the Debtor believes are owed to each counterparty to a Contract and Lease.  To the extent no objection is filed with respect to a particular Cure Cost, such Cure Cost shall be deemed binding on the applicable counterparty to the Contract and Lease.  The payment of the Cure Cost (or a different amount either agreed to by the Debtor and a counterparty or resolved by the Court as a result of a timely-filed objection filed by a counterparty) will be in full and final satisfaction of all the Debtor's obligations to cure defaults and compensate the counterparties for any pecuniary losses under such Contracts and Leases pursuant to section 365(b)(1) of the Bankruptcy Code.[3] Any Cure Costs disputed by a counterparty will be resolved by the Court at the Sale Approval Hearing.

39.     The Debtor and Northern Natural Gas have already begun discussions regarding the treatment of four contracts listed on Exhibit B.  The Debtor may file a pleading seeking

---

[3]  The Debtors reserve the right to argue (i) that any particular Contract and Lease is not truly executory in nature, or (ii) that cure is not a precondition to the transfer of assets to successful bidder.

approval of an agreement between the parties memorializing a final agreement that would define the terms of an assignment as assumption of the Northern Natural Gas contracts.

40.     Accordingly, the Debtor requests authority, pursuant to sections 363 and 365 of the Bankruptcy Code, for the sale, assumption and assignment of the Contracts and Leases to successful bidder.

## VI.     Request for Relief under Bankruptcy Rules 6004(g) and 6006(d)

41.     Bankruptcy Rules 6004(h) and 6006(d) provide, in substance, that an order authorizing the sale of a debtor's property or assumption/rejection of a lease or contract is stayed for a period of 14 days after entry of the order unless the court orders otherwise.  The Debtor requests that the order authorizing the sale and assumption and assignment of Contracts and Leases be effective immediately, by providing that the 14-day stay is inapplicable.  The Debtor needs to complete the asset disposition without waiting the period provided for under Bankruptcy Rules 6004(h) and 6006(d).  The Debtor's funding under the DIP Loan terminates on August 31, 2013 and the successful bidder will need assurance of the finality of the Court's order to move to closing within that short period after the Sale Approval Hearing.  The failure to consummate the sale before the Debtor's use of funds expires may prevent the Debtor from safeguarding the assets and result in irreparable harm to the assets that would diminish their value and jeopardize the closing at the amount bid at the Auction.

## VII.     Expedited Relief

42.     Fed. R. Bankr. P. 2002(a)(2) requires "21 days' notice by mail of a proposed use, sale, or lease of property of the estate other than in the ordinary course of business, unless the court for cause shown shortens the time or directs another method of giving notice."  Cause exists here to grant the motion on shortened notice.

43.     First, the filing of the Committee Adversary Proceeding on July 15, 2013 and motion to deny West Ventures' credit bid right heard on July 24, 2013 and finally resolved via stipulation on July 30, 2013, cast doubt on the Debtor's ability to maintain the auction schedule set forth in the Bidding Procedures, including the Sale Approval Hearing on August 15, 2013. Prudence and economy required the credit bidding issue be resolved before this motion was filed.  Waiting until after that resolution also eliminated any confusion among parties in interest that would have resulted from rescheduling the Sale Approval Hearing.

44.     Second, notwithstanding the recent resolution of the credit bidding issue, and for the reasons set forth in the Debtor's response to the Committee's motion to deny West Ventures' credit bid right filed at docket no. 143, the Debtor believes that maintaining the schedule set forth in the Bidding Procedures and the August 15 Sale Approval Hearing is critical to obtaining the highest value for the Purchased Assets.  After the August 31, 2013 maturity of the DIP Loan, the Debtor has no access to funding to preserve the Assets or operate under chapter 11.  Seasonality issues related to corn and natural gas would imperil a buyer's ability to return the ethanol plant to operations before the winter, which may cause additional delay and expense that would surely be reflected in a lower purchase price for the Purchased Assets.

45.     Finally, informal notice of a Sale Approval Hearing in mid-August has been given to key constituents in the case and potential bidders through the approval and circulation of the Bidding Procedures since June 2013.  And the Debtor will not object to any responses to this motion filed three days before the Sale Approval Hearing, lessening the impact of an expedited hearing on any parties who choose to respond to the motion.

46.     Given the events of the case and the condition of the Purchased Assets, cause exists to shorten the notice on this motion.

## VIII.   Conclusion

47.    The Debtor seeks authority to sell substantially all of its assets free and clear of liens, claims, interests and encumbrances and approval of the assumption and assignment of certain executory contracts and unexpired leases consistent with the Credit Bid or such other higher and better offer received at the auction.   In the exercise of its reasonable business judgment, the Debtor has determined that the prompt sale of assets will realize the highest value for the estate.  Thus the Debtor asks the Court to grant the relief requested in this motion.

48.    Pursuant to Local Rule 9013-2(a), this motion is accompanied by a memorandum of law, proposed orders, and proof of service.

49.    Pursuant to Local Rule 9013-2(c), the Debtor gives notice that it may, if necessary, call the Debtor's sales agent and consultant, Jeff Manternach and Joe Winckler, IR1 Group, LLC, 736 Whalers Way, Building G, Suite 100, Fort Collins, Colorado 80525, about the factual matters raised in and relevant to this motion.

WHEREFORE, the Debtor respectfully requests that the Court enter an order:

A.    Authorizing the Debtor to sell substantially all of its assets in accordance with the Bidding Procedures free and clear of all liens, claims, encumbrances and interests (except for the Assumed Liabilities and Permitted Liens), which liens, claims, encumbrances and interests will attach to the proceeds of sale in the same validity, extent priority and manner that existed prior to such sale;

B.    Authorizing the Debtor to establish Cure Costs and assume and assign certain Contracts and Leases designated by the successful bidder; and

C.      Granting such other and further relief as the Court may deem just and equitable.


Dated:  August 1, 2013                    _/e/ Douglas W. Kassebaum_____
                                          Clinton E. Cutler (#158094)
                                          Douglas W. Kassebaum (#386802)
                                          FREDRIKSON & BYRON, P.A.
                                          200 South Sixth Street, Suite 4000
                                          Minneapolis MN 55402
                                          (612) 492-7000
                                          (612) 492-7077  fax
                                          ccutler@fredlaw.com
                                          dkassebaum@fredlaw.com

                                          ATTORNEYS FOR DEBTOR


6950786.2

## <u>VERIFICATION</u>

I, Jeff Manternach, CFO of IR1 Group LLC, consultant to the Debtor, declare under penalty of perjury that the facts set forth in the preceding reply are true and correct to the best of my knowledge, information and belief.

Dated:  August 1, 2013              Signed:_____

                                    Jeff Manternach

6950786

# Exhibit A

## West Ventures' Credit Bid

[Execution Version]

---

**ASSET PURCHASE AGREEMENT**


**dated as of July 15, 2013**


**by and between**


**Purified Renewable Energy, LLC, Debtor-in-Possession,**


**and**


**West Ventures LLC**

---

## ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT** (this "<u>Agreement</u>") is dated as of July 15, 2013, by and between West Ventures LLC ("<u>West Ventures</u>" and together with its permitted assigns, the "<u>Buyer</u>"), and Purified Renewable Energy, LLC, Debtor-in-Possession ("<u>Seller</u>" or the "<u>Debtor</u>").  The Buyer and Seller are referred to collectively herein as the "<u>Parties</u>."

## RECITALS:

**WHEREAS**, on March 25, 2013 (the "<u>Petition Date</u>") Seller filed, in the United States Bankruptcy Court for the District of Minnesota (the "<u>Bankruptcy Court</u>"), a petition (the "<u>Petition</u>") in bankruptcy under Chapter 11 of the Bankruptcy Code (as defined below) and its bankruptcy proceedings are pending at this time;

**WHEREAS,** Seller has acknowledged that it is indebted to the Buyer in an amount equal to not less than $19,783,448.55 (the "<u>Buyer Debt</u>"), which Buyer Debt consists, as of the date hereof, of not less than $959,415.55 of DIP Indebtedness (as defined below) incurred pursuant to the DIP Order (as defined below) and not less than $18,824,033 incurred prior to the Petition (the "<u>Prepetition Indebtedness</u>");

**WHEREAS**, the Debtor has acknowledged in the DIP Loan Agreement (as detailed below) that the Prepetition Indebtedness of Buyer is secured by a perfected, unavoidable lien on substantially all of the assets of the Seller having the scope, dignity, priority and effects as set forth in the DIP Loan Agreement and the DIP Order;

**WHEREAS**, under the terms of the DIP Loan Agreement and the DIP Order (as each are defined below), the DIP Indebtedness (as defined below) is secured by a priming lien on the assets of the Debtor having the scope, dignity, priority and effect set forth in the DIP Loan Agreement and the DIP Order;

**WHEREAS**, The DIP Loan Agreement and the DIP Order provide that the Prepetition Indebtedness and the liens securing the same shall be allowed and shall be unavoidable, and West Ventures and certain related persons shall be released by the Debtor and the bankruptcy estate except to the extent that the Official Committee of Unsecured Creditors appointed in the Debtor's bankruptcy case (the "<u>Committee</u>") raises claims by commencing an adversary proceeding on or before July 15, 2013 (the "<u>Committee Investigation Period</u>"), which has been extended by subsequent stipulation;

**WHEREAS**, the Buyer represents that it is authorized to exercise all rights with respect to a Credit Bid (as defined below) of the Buyer Debt, including the Prepetition Indebtedness in connection with the transaction described herein, subject to certain conditions and limitations set forth herein;

**WHEREAS**, Seller has retained IR1 Group LLC (the "<u>Sales Agent</u>" or "<u>IR1</u>") to conduct a marketing process of the Debtor's assets, including its ethanol plant and related real and personal property assets pursuant to Section 363 of the Bankruptcy Code in accordance with the Bankruptcy Court's Sale Procedures Order (as defined below);

**WHEREAS**, pursuant to the Bidding Procedures (as defined below), and subject to the terms and conditions set forth herein, the Buyer desires to submit this Agreement as a Credit Bid for the Purchased Assets (as defined below) as contemplated by the Sale Procedures Order in accordance with 11 U.S.C. § 363(k), and further, the Seller accepts this as the submission of the Credit Bid that the Buyer is required to submit by July 15, 2013, in accordance with the terms of the Bidding Procedures; and

**WHEREAS**, if the Purchased Assets are to be sold to the Buyer pursuant to the Sale Procedures Order based upon this Agreement or any augmented purchase price bid by Buyer at the Auction (as defined below) for the Purchased Assets, the transaction shall be subject to the protections set forth in the Bankruptcy Court's Sale Order (as defined below) approving such sale under Section 363 of the Bankruptcy Code and such Sale Order will include provisions for the assumption and assignment of certain executory contracts, unexpired leases and liabilities thereunder as designated herein (or as amended by the Buyer at anytime prior to the consummation of the transactions contemplated herein) under Section 365 of the Bankruptcy Code and the terms and conditions of this Agreement.

<div align="center">

**AGREEMENTS:**

</div>

**NOW, THEREFORE**, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, the Parties agree as follows:

1.      Definitions.

"Affiliate" has the meaning set forth in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act.

 "Assumed Executory Contracts" means the Debtor's unexpired Equipment Leases and Executory Contracts listed on Schedule 2(a)(i)(E) hereto to be assumed by the Seller and assigned to Buyer or its designee under Section 365 of the Bankruptcy Code, as such Schedule may be amended from time to time prior to the Closing Date.

"Assumed Liabilities" means all of the (i) liabilities, responsibilities, obligations, costs and expenses of the Debtor under the Assumed Executory Contracts in respect of periods after the Closing and the Cure Amounts, if any, required by the 11 U.S.C. § 365; (ii) and all ad valorem and other property taxes assessed after the Closing with respect to the Purchased Assets; and shall not include any other liabilities or obligations unless otherwise expressly provided in this Agreement.

"Assumption Agreement" has the meaning set forth in Section 6(c) below.

"Auction" means the auction described in the Sale Procedures Order that will be conducted if the Sales Agent receives a Qualified Bid higher than the Credit Bid in the manner and by the time set forth therein, and which shall be subject to the rights of the Buyer.

"Avoidance Actions" means the Debtor's avoidance Causes of Action arising under Sections 544, 545, 547, 548, 549, and 550 and 551 of the Bankruptcy Code, and for the

<div align="center">

2

</div>

avoidance of doubt does not include Causes of Action that are otherwise property of the Debtor's bankruptcy estate and do not arise under the above avoidance powers provisions of the Bankruptcy Code.

"Bankruptcy Code" means the United States Bankruptcy Code, 11 U.S.C. § 101, et seq., as amended, or any successor thereto, and any rules and regulations promulgated thereunder.

"Bankruptcy Court" has the meaning set forth in the recitals of this Agreement.

"Bidding Procedures" means the Bidding Procedures approved in the Sale Procedures Order as amended from time to time in accordance therewith.

"Bill of Sale" has the meaning set forth in Section 6(c) below.

"Books and Records" means all books, files, documents and records owned by or in the control, custody or possession of Seller relating to the Business or the Purchased Assets (in whatever format they exist, whether in hard copy or electronic format), including customer lists, historical customer files, accounting records, test results, product specifications, plans, data, studies, drawings, diagrams, training manuals, engineering data, safety and environmental reports and documents, maintenance schedules and operating and production records, inventory records, business plans, credit records of customers, and marketing materials, but excluding corporate books and records, board minutes and organizational documents of Seller.

"Business" means the production, marketing and sales of ethanol conducted by the Seller at the Facility.

"Business Day" means any day other than Saturday, Sunday or other day that is designated as a federal holiday.

"Buyer" has the meaning set forth in the recitals of this Agreement.

"Buyer Debt" has the meaning set forth in the recitals of this Agreement.

"Carve Out" has the meaning set forth in the DIP Loan Agreement.

"Cash" means cash and cash equivalents (including marketable securities and short term investments) of Seller as determined in accordance with GAAP.

"Causes of Action" means all Claims and causes of action (of any kind or character and whether arising prior to, on or after the Petition Date) of the Debtor and its estate.

"Chapter 11 Case" means the voluntary case commenced in the Bankruptcy Court by Seller under Chapter 11 of the Bankruptcy Code.

"Claim" has the meaning given that term in Section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 2(g) below.

"Closing Date" has the meaning set forth in Section 2(g) below.

3

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" has the meaning set forth in the DIP Loan Agreement.

"Committee" has the meaning set forth in the recitals to this Agreement.

"Committee Lawsuit" means any adversary proceeding commenced by the Committee against the Buyer pursuant to the terms of that certain Stipulation between the Buyer and the Committee, dated July 1, 2013, and the Bankruptcy Court's Order Authorizing the Committee of Unsecured Creditors to Commence and Prosecute Certain Claims entered on July 2, 2013, as Bankruptcy Court docket no. 138.

"Confidential Information" means any information concerning the businesses and affairs of Seller that is not already generally available to the public.

"Credit Bid" means the bid of the Buyer consisting of a portion of the Buyer Debt for the purchase of the Purchased Assets pursuant to this Agreement or at the Auction that may be offset from the Purchase Price in accordance with Section 363(k) of the Bankruptcy Code.

"Credit Bid Amount" means a Credit Bid in an amount equal to or less than the Buyer Debt, initially in the amount of $5 million or such higher amount as may be bid by Buyer at the Auction, provided that (i) a portion of the Credit Bid equal to the "Carve Out" for professional fees under the DIP Loan Agreement that has not been paid through DIP advances or otherwise as of the Closing shall be funded in Cash by the Buyer at the Closing and (ii) as of the Closing the first portion of the Credit Bid shall be deemed to be made by credit bidding the outstanding amount of the DIP Indebtedness as of that date resulting in the complete satisfaction of the DIP Indebtedness.

 "Cure Amount" means such amount that is required to be paid by agreement or order of the Bankruptcy Court in connection with the assumption of any Assumed Executory Contract under Section 365 of the Bankruptcy Code.

"DIP Indebtedness" means indebtedness owing by the Debtor or the Debtor's estate to the Buyer pursuant to the DIP Loan Agreement, the DIP Order, or under the Bankruptcy Code as a result of the DIP Loan Agreement or the DIP Order, as of the date of determination, including the outstanding indebtedness for advances made by the Buyer pursuant to the First Interim Order and the Second Interim Order described in the DIP Loan Agreement, excluding the Pre-Petition Indebtedness.

"DIP Loan Agreement" has the meaning set forth in Exhibit A attached to the Unsworn Declaration of Douglas W. Kassebaum Regarding Final DIP Documents filed with the Bankruptcy Court on May 8, 2013, as Bankruptcy Court docket no. 85.

"DIP Order" means the Bankruptcy Court's Final Order Authorizing Debtor to Approve Post-Petition Financing and Use Cash Collateral entered by the Bankruptcy Court on May 9, 2013, as Bankruptcy Court docket no. 92.

"Employee Benefit Plan" means each "employee benefit plan" (as such term is defined in Section 3(e) of ERISA) and each other employee benefit plan, program or arrangement of any kind maintained, sponsored or contributed to by any Seller.

"Encumbrance" means any Lien, pledge, charge, Claim,  interest, security interest, option, right of first refusal, mortgage, easement, right of way, lease, sublease, license, sublicense, adverse claim, title defect, encroachment, other survey defect, or other encumbrance of any kind, including, with respect to the Real Property, any covenant or restriction relating thereto.

"Environmental Laws" means all applicable federal, state and local statutes, ordinances, rules, orders, judgments, junctions, decrees, regulations and other provisions having the force of law, all judicial and administrative orders and determinations, and all common law concerning pollution or protection of human health and the environment and natural resources, including all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control, exposure to or cleanup of any Hazardous Materials.

"Equipment Leases" means any unexpired "true lease" pursuant to which Seller leases equipment that the Buyer elects to assume pursuant to the terms of this Agreement.

"Excluded Assets" has the meaning set forth in Section 2(b) below.

"Excluded Executory Contracts" means any Executory Contract that is not listed on Schedule 2(a)(i)(E)  as an Assumed Executory Contract as of the Closing.

"Excluded Liabilities" means any liability of the Debtor that is not expressly assumed under the terms of this Agreement by the Buyer as of the Closing.

"Executory Contracts" means all of the executory contracts of the Debtor within the meaning of Section 365 of the Bankruptcy Code.

"Facility" means the ethanol production facility and all related equipment and improvements and other tangible assets located on the Real Property or used in connection therewith (or in connection with the transportation or sale of the Debtor's assets) to the extent of the Debtor's rights therein.

"Final Order" shall mean an order or judgment, the operation or effect of which is not stayed, and as to which order or judgment (or any revision, modification or amendment thereof), the time to appeal or seek review or rehearing has expired, and as to which no appeal or petition for review or motion for reargument has been taken or been made and is pending for argument.

"GAAP" means United States generally accepted accounting principles as in effect from time to time, consistently applied.

"Governmental Authorization" means any approval, consent, license, permit, waiver, or other authorization issued or granted by or under the authority of any Governmental Entity.

"Governmental Entity" means any court, administrative agency or commission or other governmental authority or instrumentality, domestic or foreign.

"Hazardous Materials" means any hazardous or toxic materials, substances or wastes or contaminant or pollutant regulated, monitored or otherwise creating liability under Environmental Laws, including (i) substances defined as "hazardous substances," "hazardous materials," "hazardous waste," "pollutant," "infectious waste," or "toxic substances," or words of similar meaning or regulatory effect under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. § 9601 et seq.) ("CERCLA"), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 et seq.) ("RCRA"), the Hazardous Materials Transportation Act (49 U.S.C. § 1801, et seq.), the Federal Water Pollution Control Act (33 U. S. C. § 1251, et seq.), the Clean Air Act (42 U. S. C. § 740 1, et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601, et seq.), the Refuse Act (33 U.S.C. § 407), Carpenter-Presley-Tanner Hazardous Substance Account Act, the Minnesota Environmental Rights Act (Minn. Stat. § 116B.01, et seq.) ("MERA"), and the Minnesota Environmental Response and Liability Act (Minn. Stat. §115B.01, et seq.)("MERLA"); (ii) any substance the presence of which at the Real Property causes, or threatens to cause, a nuisance and/or a trespass upon the Real Property, or to adjacent properties, or poses, or threatens to pose, a hazard to the health or safety of human beings; (iii) asbestos (including asbestos containing materials), petroleum and petroleum based products, urea formaldehyde foam insulation, polychlorinated biphenyls (PCBs), Freon and other chlorofluorocarbons, flammable, explosive, infectious, carcinogenic, mutagenic, or radioactive materials, petroleum or any substance containing or consisting of petroleum hydrocarbons (including gasoline, diesel fuel, motor oil, waste oil, grease or any other fraction of crude oil), paints and solvents, lead, cyanide, DDT, printing inks, acids, pesticides, ammonium compounds, polychlorinated biphenyls, radon and radon gas, and electromagnetic or magnetic materials, substances, or emissions; and (iv) those substances defined as any of the foregoing in the regulations adopted and publications promulgated pursuant to each of the aforesaid laws and regulations.

"Income Tax" means any federal, state, local, or foreign income tax measured by or imposed on net income, including any interest, penalty, or addition thereto, whether disputed or not.

"Income Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Income Taxes, including any schedule or attachment thereto.

"Intellectual Property" means all intellectual property of the Seller relating to the Facility and the Seller's operations, including (i) all registered and unregistered trademarks, service marks, and trade names, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations and renewals in connection therewith and (ii) all trade secrets, research and development, know-how, processes, methods, techniques, data, designs, drawings, specifications, supplier and vendor lists, pricing and cost information, and manuals.

"Knowledge" means actual knowledge of the officers, directors, and managers of the parties serving in such capacity as of the date hereof and as of the Closing Date.

6

"<u>Lien</u>" means any mortgage, pledge, lien, encumbrance, charge, or other security interest (and shall also have the meaning ascribed to "lien" in Section 101 of the Bankruptcy Code), other than: (i) liens for Taxes not yet due and payable or for Taxes that the taxpayer is contesting in good faith through appropriate proceedings; (ii) purchase money liens and liens securing rental payments under capital lease arrangements; and (iii) other liens arising after the date of the Petition in the Ordinary Course of Business and not incurred in connection with the borrowing of money or the acquisition of assets or services.

"<u>Material Adverse Effect</u>" or "<u>Material Adverse Change</u>" means any result, occurrence, fact, event, change or effect that has, or could reasonably be expected to have, a materially adverse effect on the Business or Purchased Assets or the ability of the Buyer as purchaser thereof to operate an ethanol plant at the Facility or to comply with any applicable laws or regulations relating thereto, including the cancelation or revocation of (or the disqualification of the Buyer to obtain) any material Permit or the imposition or proposed imposition of material fines on Seller or any other party relating to past operations at the Facility as to which the Sale Order does not protect the Buyer from any and all such fines.

"<u>Ordinary Course of Business</u>" An action taken by Seller will be deemed to have been taken in the ordinary course of business only if that action: (i) is taken in the ordinary course of the normal, day-to-day operations of such Seller subsequent to Seller's filing of the Petition; (ii) does not require authorization by the managers or members of the Seller and does not require any other separate or special authorization of any nature; and (iii) is similar in nature, scope and magnitude to actions customarily taken, without any separate or special authorization, in the ordinary course of the normal, day-to-day operations of other businesses that are in the same line of business as Seller.

"<u>Outside Closing Date</u>" means a date that is no more than thirty (30) days after all Conditions to Obligations to Close as set forth in Section 6 of this Agreement have been fully satisfied or waived in writing by Buyer; provided, however, that if Buyer extends the Closing beyond August 31, 2013, Buyer and Seller shall have also agreed to extend the deadline under the DIP Loan Agreement and the DIP Order in form and substance mutually acceptable to Seller and Buyer.

"<u>Party</u>" has the meaning set forth in the recitals of the Agreement.

"<u>Permitted Liens</u>" means (i) non-avoidable liens and encumbrances arising by operation of law and senior in right with respect to any collateral to the Liens securing the DIP Indebtedness and (ii) the non-avoidable liens and encumbrances on the Real Property on which the Facility is located that are identified on <u>Schedule 4(a)</u> hereto, if any.

"<u>Permits, Licenses and Registrations</u>" means all Governmental Authorizations, licenses, permits, consents, certificates, approvals, and clearances held by Seller in connection with the operation of the Business, together with any applications, proposed modifications and other filings with respect thereto, including the Permits, Licenses and Registrations described on <u>Schedule 4(g)</u> hereto, provided that "Permits, Licenses and Registrations" shall not include any licenses, permits or consents that are expressly excluded by the Buyer in a notice to the Debtor made at least two days prior to the Closing.

<div align="center">7</div>

"<u>Person</u>" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, any other business entity or a Governmental Entity.

"<u>Petition Date</u>" has the meaning set forth in the recitals to this Agreement.

"<u>Prepetition Indebtedness</u>" has the meaning set forth in the recitals to this Agreement.

"<u>Purchased Assets</u>" has the meaning set forth in <u>Section 2(a)</u> below.

"<u>Purchase Price</u>" has the meaning set forth in <u>Section 2(e)</u> below.

"<u>Qualified Bid</u>" has the meaning set forth in the Bidding Procedures approved by the Bankruptcy Court.

"<u>Real Property</u>" means the lands and premises described on <u>Exhibit A</u> hereto, together with (i) all buildings, fixtures, chattel property and improvements located at or thereon and (ii) all hereditaments and appurtenant rights, privileges and easements thereunto belonging or benefitting.

"<u>Released Parties</u>" means the Buyer and all of its Affiliates, but shall specifically exclude Minnesota Energy, Tensaska or any another person who may hold Permitted Liens on the Purchased Assets.

"<u>Retained Liabilities</u>" means all of the liabilities, obligations or indebtedness of any nature whatsoever of Seller other than the Assumed Liabilities.

"<u>Sale Hearing</u>" means one or more Bankruptcy Court hearings held to confirm the sale of the Purchased Assets to Buyer and its assignee or assignees pursuant to the Sales Procedures Order.

"<u>Sale Order</u>" means one or more orders of the Bankruptcy Court approving the sale of the Purchased Assets to Buyer or its assignee or assignees (including the assumption and assignment of the Assumed Executory Contracts) and the consummation of the transactions contemplated herein in the form of <u>Exhibit B</u> hereto, with only such modifications as may be acceptable to the Buyer.

"<u>Sale Proceeds</u>" means all property, whether tangible or intangible, received by the Seller in exchange for the Purchased Assets, excluding the extinguishment of indebtedness by reason of a Credit Bid.

"<u>Sale Procedures Order</u>" means the Bankruptcy Court's Order (I) Granting Expedited Relief and (II) Approving Bidding Procedures for the Disposition of All or Substantially All of the Debtor's Assets entered on May 31, 2013, as Bankruptcy Court docket no. 126.

"<u>Securities Exchange Act</u>" means the Securities Exchange Act of 1934, as amended.

"<u>Seller</u>" has the meaning set forth in the recitals of this Agreement.

"Straddle Period" shall have the meaning set forth in Section 8(n) below.

"Tax" or "Taxes" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code §59A), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

 2.  Purchase and Sale of the Assets Assumption of Liabilities.

  (a)  Purchased Assets.

    (i)  Subject to the conditions set forth herein, including that the offer evidenced by this Agreement is the highest and best bid for the Purchased Assets as determined in accordance with the Sale Procedures Order and entry by the Court of the Sale Order, then on the terms and subject to the other conditions set forth herein, on the Closing Date, Seller shall sell, transfer, assign, convey and deliver to the Buyer, and Buyer shall purchase and accept from Seller, free and clear from all claims (as set forth in the Sale Order and to the extent permitted by the Bankruptcy Code), interest and Liens, except for the Permitted Liens, all of Seller's right, title and interest in and to all Seller's assets and properties other than the Excluded Assets, including but not limited to the following (to the extent the same exist and are held by the Seller):

    (A)  All furniture, equipment (including all computer equipment) and other similar items of tangible personal property wherever located;

    (B)  All supplies and items of inventory (including all fuel purchased by Seller, warehouse inventory and other operational supplies for the Seller's operations at the Facility) located in or used in the Seller's Business;

    (C)  The Real Property and the Facility;

    (D)  All of Seller's right, title and interest in and to all of the raw materials stockpiles, work-in-process inventories and fluids, precipitate, warehouse inventories, machinery, processing plants, equipment, buildings, structures, supplies, water rights, easements, rights-of-way, prepaid expenses, rights to refunds, technical information, technical data and all other assets owned, used, or obtained in connection with the ownership or operation of the Facility, or any of the assets set forth in this Section 2(a), any other real or personal property held by Seller and all claims, rights or choses in action that Seller has or may have, now or in the future arising from or related to the Real Property, the Facility, and/or Seller's operation of the Business at the Facility against any Person, entity or company, with respect to or arising out of the purchase, construction, development, ownership or operation of

9

the Facility, including any warranty or contract rights, all statutory, legal or equitable claims or defenses in connection with Permitted Liens or otherwise, and any claims for damages, known or unknown, for intentional or negligent torts or torts involving strict liability and all rights to collect damages, including punitive damages, from contractors, engineers, insurers or other third parties in connection with the purchase, design, construction, maintenance or operation of the Facility;

(E)     All Assumed Executory Contracts listed on Schedule 2(a)(i)(E) (as such Schedule may be amended from time to time by the Buyer at the Buyer's sole discretion prior to the Closing Date);

(F)     All accounts receivable and notes receivable relating to the Business and/or the Purchased Assets;

(G)     All deposits, bonds and prepaid expenses of the Debtor including (i) all deposits related to the Assumed Executory Contracts, and (ii) all deposits, bonds and prepaid expenses relating to any permits, licenses and registrations (whether transferrable or not) including the Petroleum Surety Bond with the Minnesota Department of Revenue and the Distilled Spirits Bond with the U.S. Department of Treasury Alcohol and Tobacco Tax and Trade Bureau;

(H)     All Books and Records of the Business;

(I)     All phone numbers and listings for the Seller's Business;

(J)     All Permits, Licenses and Registrations;

(K)     All of the Intellectual Property;

(L)     All of the Seller's rights in, to and under third-party manufacturers' warranties;

(M)     All other assets owned or used by Seller wherever such assets are located necessary to the operation of the Seller's Business; and

(N)     All Debtor's other assets, including Claims and Causes of Action, as of the Closing constituting Collateral for the DIP Indebtedness or the Prepetition Indebtedness.

(O)     The assets and properties set forth in this section above are hereinafter collectively referred to as the "Purchased Assets."

(b)     Excluded Assets.  Excluded Assets shall refer to the assets and properties of the Debtor  specified below:

(i)     All Claims or Causes of Action that the Seller may have against or from any person or entity relating to the assets specifically listed below in this Section 2(b):

10

(A)    Commercial Tort Claims (as defined in Article 9 of the Uniform Commercial Code) held by the Debtor (except as against Released Parties) as of the Closing to the extent that the Buyer is determined not to hold a nonavoidable Lien therein in any adversary proceeding commenced by the Committee in accordance with the DIP Order;

(B)    The Debtor's corporate stock;

(C)    All Employee Benefit Plans and any trusts, insurance contracts or administrative service agreements pertaining thereto, and all employment agreements;

(D)    All Avoidance Actions held by the Debtor as of the Closing Date;

(E)    Cash or other Proceeds of the sale at the Closing including the unpaid Carve-Out amount that the Buyer is required to fund in Cash (except to the extent such Cash represents the proceeds of a deposit, bond or prepaid expense as set forth in Schedule 2(a)(i)(G) that is reduced to Cash prior to the Closing);

(F)    All insurance proceeds received by the Debtor after the date hereof to the extent that the Buyer is determined not to hold a nonavoidable security interest therein in any adversary proceeding commenced by the Committee in accordance with the DIP Order; and

(G)    All rights of the Seller under this Agreement or any other agreements or instruments otherwise delivered by Buyer to Seller pursuant to this Agreement.

(c)    Assumption and Assignment.

(i)    Effective as of the Closing Date, and subject to the entry of one or more orders of the Bankruptcy Court approving such assumption and assignment, Seller shall assign the Assumed Executory Contracts to Buyer;

(ii)    Effective as of the Closing Date, Buyer shall assume the Assumed Liabilities;

(iii)    Buyer agrees to cure all defaults under the Assumed Executory Contracts as of the Closing, if any, in the Cure Amount in compliance with the Bankruptcy Code to effectuate the valid assignment of the Assumed Executory Contracts, but the Seller shall cooperate with the Buyer in all respects;

(iv)    In the event a dispute exists as of the Closing between the Seller and any party to one or more Assumed Executory Contract as to the rights of Buyer to assume the same as to whether such agreement(s) constitutes a "true lease" (requiring cure of defaults and assumption and assignment) or a financing transaction, Seller agrees to assist the Buyer by seeking a determination by the Bankruptcy Court as requested by the Buyer with respect thereto. The Seller agrees to provide the Buyer with accurate information about all required Cure

11

Amounts owing under all Assumed Executory Contracts within fifteen (15) days of the hearing date; and

(v)     Buyer shall assume and thereafter in due course pay, fully satisfy, discharge and perform all of the obligations under the Assumed Executory Contracts arising on or after the Closing Date pursuant to Section 365 of the Bankruptcy Code and under the terms of the Assumed Executory Contracts, provided that the terms of the Assumed Executory Contracts are duly and fully disclosed to Buyer.

(d)     Retained Liabilities/ Nonassumption of Liabilities of the Debtor.  Except with respect to Assumed Executory Contracts, the Buyer is not assuming any of the liabilities of the Debtor, including any liabilities relating to contracts under which the Debtor holds rights and  Buyer shall not assume or agree to pay, satisfy, discharge or perform, or take or agree to take any of the Purchased Assets subject to, and shall not be deemed by virtue of the execution and delivery of this Agreement or any document delivered to Buyer at the Closing pursuant hereto, or as a result of the consummation of the transactions contemplated hereby, to have assumed, or to have agreed to assume, pay, satisfy, discharge or perform, or take, or to have agreed to take, any obligations of the Debtor or to pay any Claims of the Debtor. Without limiting the foregoing, nothing in this Agreement is intended by the Buyer to be an agreement to undertake any environmental obligations of the Debtor to any person or entity, except to the extent expressly agreed to by the Buyer in a separate writing, if any.

(e)     Purchase Price.   The purchase price for the Purchased Assets (the "Purchase Price") shall be the Credit Bid Amount and the Cure Amounts.  In satisfying the Credit Bid Amount, the Buyer shall be deemed first to have Credit Bid the DIP Indebtedness, in the amount of such DIP Indebtedness as of the Closing Date, and thereafter the balance of the Credit Bid in Prepetition Indebtedness, subject to the obligation of the Buyer to fund a portion of the Credit Bid as set forth in the definition thereof.

(f)     Tax Allocation of Purchase Price.  At or prior to the Closing, Buyer and Seller shall enter into an agreement reasonably allocating the Purchase Price among the Purchased Assets in accordance with Section 1060 of the Code and the applicable Treasury Regulations thereunder, including Treasury Regulation 1.1060-1 T.  Buyer and Seller shall report and file all of their respective Tax Returns (including amended Tax Returns and claims for refund) consistent with such allocation, and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any taxing authority or in any other proceedings).  Buyer and Seller shall cooperate in the filing of any forms (including Forms 8594) with respect to such allocation.  Notwithstanding any other provisions of this Agreement, the foregoing agreement shall survive the Closing Date.

(g)     Closing.  Subject to the satisfaction of the conditions set forth in Section 6(a) and Section 6(b) hereof (or the waiver thereof by the Party entitled to waive that condition): (i) so long as no objection or other challenge to Buyer's good faith has been made or asserted at or before the Sale Hearing and no appeal has been filed challenging or disputing any finding or decree, whether under Section 363(m) or 363(n) of the Bankruptcy Code or otherwise, by the Bankruptcy Court relating to Buyer's good faith, the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in herein shall

12

take place at 10:00 a.m. (Central time) on the Business Day selected by Buyer that is after entry of the Sale Order on the docket; or (ii) if any objection or other challenge to Buyer's good faith has been made or asserted at or before the Sale Hearing and an appeal has been filed challenging or disputing any finding or decree, whether under Section 363(m) or 363(n) of the Bankruptcy Code or otherwise, by the Bankruptcy Court relating to Buyer's good faith, the Closing shall take place at 10:00 a.m. (Central time) on the Business Day selected by Buyer that is after the Sale Order becomes a final order no longer subject to appeal or reconsideration; or (iii) if (A) any appeal is filed challenging or disputing any finding or decree, whether under Section 363(m) or 363(n) of the Bankruptcy Code or otherwise, by the Bankruptcy Court relating to Buyer's good faith but the Sale Order is not otherwise stayed, and (B) Buyer decides, in its sole and absolute discretion, to proceed with the Closing, the Closing shall take place at 10:00 a.m. (Central time) on the Business Day selected by Buyer after entry of the Sale Order on the docket.  The Closing shall take place at the offices of Maslon Edelman Borman & Brand, LLP (or at such other place as the Parties may designate in writing).  The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date."  In no event may the Closing occur after the Outside Closing Date unless agreed to by the parties.

(h)     Deliveries at Closing.  At the Closing, (i) Seller shall deliver to Buyer the various certificates, instruments, and documents referred to in Section 6(a) below, (ii) Buyer will deliver to Seller the various certificates, instruments, and documents referred to in Section 6(b) below, and (iii) Buyer will confirm the Credit Bid and will deliver the Cash portion thereof (in an amount not to exceed the unpaid Carve-Out amount), if any, into the account of the debtor-in-possession to be allocated in accordance with the orders of the Bankruptcy Court.

(i)     Hart-Scott-Rodino Antitrust Improvements Act of 1976.  Each of the Parties has made a determination that no notification or report forms are required to be filed under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

3.     Buyer's Representations and Warranties.  Buyer represents and warrants to Seller that the statements contained in this Section 3 are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Section 3).

(a)     Organization of Buyer Party.  Buyer is a limited liability company organized under the laws of the State of Delaware, and in good standing under the laws of the jurisdiction of its organization.

(b)     Authorization of Transaction.  Subject to entry of the Sale Order, Buyer has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder.  This Agreement constitutes the valid and legally binding obligation of Buyer, enforceable in accordance with its terms and conditions.  Buyer need not give any notice to, make any filing with, or obtain any Government Authorization, consent, or approval of any Governmental Entity in order to consummate the transactions contemplated by this Agreement.  The execution, delivery and performance of this Agreement and all other agreements contemplated hereby have been duly authorized by Buyer.

(c)     <u>Noncontravention</u>.   Neither  the  execution  and  the  delivery  of  this Agreement, nor the consummation of the transactions contemplated hereby, will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any Governmental Entity, or court to which Buyer is subject or any provision of its charter or bylaws or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Buyer is a party or by which it is bound or to which any of its assets is subject, except such conflicts as to which the Buyer has or reasonably expects to receive waivers or consents with respect thereto.

(d)     <u>Litigation</u>.   To the Buyer's Knowledge, there is no claim, litigation, action or legal proceeding before a Governmental Entity or, to the Buyer's Knowledge, threatened against the Buyer, adversely affecting the Buyer's ability to perform its obligations hereunder; provided that, the Committee has indicated that it intends to file an adversary complaint against the Buyer in the form previously disclosed to Seller and has further indicated that it will seek to limit Buyer's ability to Credit Bid all or a portion of the Prepetition Indebtedness in some manner inconsistent with this Agreement.  Other parties may also attempt to limit the ability of the Buyer to perform hereunder.  This Agreement is subject to the jurisdiction of the Bankruptcy Court and the Buyer's obligations hereunder are subject thereto.

(e)     <u>Assumed Executory Contracts</u>.   The Buyer is and will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f)(2) of the Bankruptcy Code with respect to the Assumed Executory Contracts to be assumed by Seller and assigned to Buyer.  Buyer will cooperate with Seller in providing evidence satisfactory to the Court of Buyer's ability to perform under the Assumed Executory Contracts.

(f)     <u>Brokers' Fees</u>.   Buyer has no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement, except for the Cash portion of the Credit Bid based upon the Carve Out.

(g)     <u>Closing</u>.   The Closing will result in complete satisfaction, waiver and release of all obligations of Debtor and estate under the DIP Loan Agreement and Buyer will have no claim arising thereunder or under the Bankruptcy Code as a result of the DIP Loan Agreement or the DIP Order.

4.     <u>Seller's Representations and Warranties</u>.   Seller represents, with respect to the Seller only, the following will be true and correct at the date of the Closing after giving effect to the Sale Order.

(a)     <u>Title to and Condition of Purchased Assets; Permitted Liens</u>.   On the date of the Closing, after giving effect to the Sale Order, (i) the Purchased Assets will be free and clear of all Liens (other than Permitted Liens), and (ii) the Purchased Assets shall be sold and assigned to the Buyer free and clear of all Liens other than Permitted Liens as set forth on <u>Schedule 4(a)</u>.

(b)     <u>Real Property</u>.

(i)      Seller does not own any real property other than the Real Property.

(ii)      Seller has not leased or conveyed any interest in the Real Property to any Person, except to the extent disclosed in writing to the Buyer prior to the date hereof.

(iii)      Seller has not received written notice of, and, to Seller's Knowledge, there is no threatened (i) condemnation, eminent domain, expropriation, or similar proceeding affecting the Real Property, (ii) proceeding to change the zoning classification of any portion of the Real Property, or (iii) imposition of any special assessments affecting the Real Property, which would, individually or in the aggregate, have a material adverse effect on the value of the Real Property or the ability of the Buyer to use the Facility for the production and sale of ethanol and related products.

(iv)      Seller is (i) except as set forth on Schedule 4(b)(iv) hereto, in compliance with all laws, ordinances, statutes, codes, rules and regulations of the United States and Minnesota relating to pollution, the protection or regulation of human health, natural resources, or the environment, or the emission, discharge, release or threatened release of pollutants, contaminants, chemicals, or industrial, toxic, or hazardous substances or waste or Hazardous Materials into the environment (including ambient air, surface water, groundwater, land, or soil), energy, motor vehicle safety, public utility, zoning, building and health codes, occupational health and safety, affirmative action, equal employment opportunity, employee documentation, terms and conditions of employment and wages and hours have been complied with by the Seller and (ii) has disclosed all known and potential future environmental hazards located in or on the Real Property.

(v)      Seller has disclosed to Buyer all material contracts and agreements to which Seller is a party or is bound relating to the Facility, including without limitation, to its right or Buyer's right to operate the Facility or to buy, sell or  transport inputs to the Facility or products therefrom.

(c)      Taxes.

(i)      Seller has timely filed all material Tax Returns required to be filed in all jurisdictions in which such Tax Returns are required to be filed (subject to any filing extension), and all Taxes due and payable have been paid.

(ii)      There is no pending, or, to Seller's Knowledge, threatened, audit or examination of any of Seller's Tax Returns.  No claim has been made in writing by any Governmental Entity in a jurisdiction where Seller does not file Tax Returns to the effect that such filings may be required with respect to the Business by that jurisdiction.

(d)      Employment Matters.

(i)      Schedule 4(d)(i) attached hereto contains a list of all of the employees of Seller as of the date hereof.

15

(ii)     There are no collective bargaining agreements to which Seller is a party relating to any of Seller's employees.   To Seller's Knowledge, there is no pending application for certification of a collective bargaining agent involving any of Seller's employees.

(iii)     There are no employee-benefit plans, as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), including each group insurance and self-insured health plan, severance-pay plan, non-qualified deferred-compensation plan and retirement plan intended to be qualified under Code Section 401(a), and that is maintained or contributed to by Seller for its employees engaged in the operation of the Business, former employees of the Business and/or dependents and beneficiaries of such employees and/or former employees (collectively, the "ERISA Plans"); and each trust fund maintained by the Sellers or any subsidiary in connection with any such ERISA Plan, and except as described in Schedule 4(d)(iii), Seller does not maintain any group life insurance or health-benefit coverage for former employees or directors of Seller, other than group life insurance or health-benefit coverage mandated by applicable Law.  Seller has timely complied with all of its "COBRA" obligations under ERISA Section 602, Code Section 4980B and applicable state insurance laws.

(e)     Assumed Executory Contracts.  With respect to each of the contracts that may become Assumed Executory Contracts, subject to the election of the Buyer hereunder or at anytime prior to the Closing Date, except to the extent disclosed in writing by Seller to Buyer prior to the date of this Agreement: (i) such potential Assumed Executory Contract is legal, valid, binding, enforceable, subject to applicable bankruptcy, reorganization, moratorium, and similar laws affecting creditors' rights and remedies generally and subject, as to enforceability, to general principles of equity, assuming such potential Assumed Executory Contract constitutes the legal, valid and binding agreement of the other party thereto; and (ii) Seller and, to Seller's Knowledge, no other party to the potential Assumed Executory Contract is in breach or default under such Assumed Executory Contract, and, to Seller's Knowledge, no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a breach or default, or permit the termination, modification or acceleration of payment under such Assumed Executory Contract.  True, correct and complete copies of all Assumed Executory Contracts, including all amendments or supplements thereto, have been delivered to Buyer.

(f)     No Material Violations.  Except as set forth in Schedule 4(f) hereto, Seller is not in violation of any applicable law, rule or regulation relating to the Purchased Assets that would reasonably be expected to have a material adverse effect on the Business, and, to the knowledge of Seller, there are no requests, claims, notices, investigations, demands, administrative proceedings, hearings or other governmental claims against Seller alleging the existence of any such violation.  Seller has maintained all governmental permit, licenses and registrations necessary to operate the Business and is in material compliance with all such permits, licenses and registrations except as set forth in Schedule 4(f) hereto.

(g)     Permits, Licenses and Registrations.  Seller has all necessary permits, licenses and registrations for the operation of the Facility as an ethanol production facility with a capacity of up to 15 million gallons per year, including the Permits, Licenses and

16

Registrations listed on Schedule 4(g) hereto and any other Permits, Licenses and Registrations (i) associated with the Facility including environmental permits for, among other things, air exhaust/emissions, water discharged, dust created and chemical waste; or (ii) associated with the Business including sales permits for, among other things, byproducts produced, feed stocks and chemicals purchased.  Except as set forth on Schedule 4(g), each such Permit has been duly obtained, is valid and in full force and effect, and is not subject to any pending or, to the Knowledge of Seller, threatened administrative or judicial proceeding to revoke, cancel, suspend or declare such Permit invalid in any respect.

(h)     Litigation.   Other than the Seller's bankruptcy case and all Claims asserted therein, or as otherwise set forth on Schedule 4(h), there are no actions, suits or proceedings pending or threatened against Seller or any of the Purchased Assets in any court or before any federal, state, municipal or other Governmental Entity or before any other private or public tribunal or quasi-tribunal which, (i) if decided adversely to Seller, would have a materially adverse effect upon the Business or the Purchased Assets, (ii) seek to restrain or prohibit the transactions contemplated herein or obtain any damages in connection therewith, or (iii) in any way call into question the validity of this Agreement or the other documents to be executed and delivered by Seller in connection with this Agreement.  Except as set forth on Schedule 4(h), Seller is not in default with respect to any order of any court or Governmental Entity entered against it in respect of the Business or the Purchased Assets.

(i)     Insurance Coverage.   Seller has policies of fire, liability, workers compensation, health and other forms of insurance presently in effect with respect to the Business and the Purchased Assets.  All such policies are valid, outstanding and enforceable policies and provide insurance coverage for the properties, assets and operations of Seller, of the kinds, in the amounts and against the risks provided for in such policies (which amounts and risks covered are reasonable for Seller's Business); and no such policy provides for or is subject to any currently enforceable retroactive rate or premium adjustment, loss sharing arranging or other actual or contingent liability arising wholly or partially out of events arising prior to the date hereof.  No notice of cancellation or termination has been received with respect to any such policy, and Seller no has knowledge of any act or omission which could result in cancellation of any such policy prior to its scheduled expiration date.  Seller has not been refused any insurance with respect to any aspect of the operations of the Business nor has any such coverage been limited by any insurance carrier to which it has applied for insurance or with which it has carried insurance during the last three years.  Seller has duly and timely made all claims it has been entitled to make under each policy of insurance.  Copies of such policies and any and all information with respect to such policies requested by Buyer shall be made available to Buyer upon Buyer's request.  All such policies provide "occurrence" as opposed to "claims made" coverage, and provide that they will remain in full force and effect through the Closing Date.

(j)     Environmental Matters.   Seller has provided or made available to Buyer true and complete copies of all information in the possession, custody or control of Seller relating to the presence, release or migration of Hazardous Materials on, in or under the Real Property, including true and correct copies of all environmental assessment reports (such as Phase I or Phase II reports) and any other environmental studies, and the compliance with, and potential liability under, Environmental Laws applicable to the Business or the Purchased Assets.  Except as set forth on Schedule 4(j) and except as would not be material, with respect

17

to the Business (i) the Seller and each of the Purchased Assets is and at all times during the past five (5) years (as to the best of Seller's knowledge with respect to that portion of the 5-year time period prior to Seller's acquisition of the Purchased Assets) has been in compliance with, and has no known liability under, any and all applicable Environmental Laws, (ii) the Seller and each of the Purchased Assets is in material compliance with all of their Permits, Licenses and Registrations issued under applicable Environmental Laws, (iii) all instances of material past non-compliance by Seller or any Purchased Asset with applicable Environmental Laws have been cured, settled and resolved in all material respects, (iv) there are no orders relating to Environmental Laws issued by any Governmental Entity to which Seller is a party or to which any Purchased Asset is subject, that are outstanding, (v) there are no actions, suits, claims, charges, prosecutions, proceedings or investigations to which Seller is a party, or to which any of the Purchased Assets are subject, that are pending or, to the Knowledge of Seller, threatened relating to the compliance of Seller or Purchased Asset with, or the liability of Seller under, any Environmental Laws, including without limitation any liability relating to alleged injury to Persons or damage to property associated with exposure to Hazardous Materials, and (vii) Seller is not party to any contract pursuant to which it is obligated to indemnify any other person with respect to, or be responsible for any liability pursuant to, or violation of, any Environmental Law.   Except as set forth on <u>Schedule 4(j)</u>, to the Knowledge of Seller, there are no circumstances which exist which could reasonably be expected to result in any such writs, injunctions, decrees, orders (including court and administrative orders), judgments, charges, prosecutions, actions, suits, claims, proceedings or investigations (pursuant to Environmental Laws).   Except as set forth on <u>Schedule 4(j)</u>, there are no material fines or penalties that have been imposed (pursuant to Environmental Laws) against Seller or, to Seller's Knowledge, any predecessor of Seller, or to which any Purchased Asset is subject, and all such fines, penalties, judgments, and charges have been paid in full.

(k)     <u>Disclosure</u>.   The representations and warranties contained in this <u>Section 4</u> do not contain any untrue or misleading statement of a material fact or omit to state any material fact necessary in order to make the statements and information contained in this <u>Section 4</u> not misleading.

(l)     <u>Disclaimer of Other Representations and Warranties</u>.   Except as expressly set forth in this <u>Section 4</u>, Seller makes no representation or warranty, express or implied, at law or in equity, in respect of Seller or any of their respective assets, liabilities or operations, including with respect to merchantability or fitness for any particular purpose, and any such other representations or warranties are hereby expressly disclaimed.     Buyer hereby acknowledges and agrees that, except to the extent specifically set forth in this <u>Section 4</u>, Buyer is purchasing the Purchased Assets on an "as-is, where-is" basis.   Buyer hereby acknowledges and agrees that any consequences arising solely from Seller's filing of the Chapter 11 Case in accordance with this Agreement shall not be deemed a breach of any of the representations or warranties set forth in this Agreement.

5.     <u>Additional Covenants</u>.

(a)     <u>General</u>.   Subject to the terms and conditions of this Agreement, any applicable Bankruptcy Order and the Bidding Procedures, each of the Parties will use its reasonable best efforts to take all action and to do all things necessary, proper, or advisable in

order to consummate and make effective the transactions contemplated by this Agreement (including satisfaction, but not waiver, of the Closing conditions set forth in <u>Section 6</u> below).

(b) <u>Filings</u>. Each Party shall cooperate with the other Party in obtaining all authorizations, consents, and Governmental Authorizations that may be or become necessary in connection with the consummation of the transactions contemplated by this Agreement, and to take all reasonable actions to avoid the entry of any order or decree by Governmental Entity prohibiting the consummation of the transactions contemplated hereby, and shall furnish to the other all such information in its possession as may be necessary for the completion of the notifications to be filed by the other; provided that, in complying with this <u>Section 5(c)</u> hereof, neither Buyer nor Seller shall be required to expend any out-of-pocket monies to obtain any approval or consent required hereunder, except for customary professional (including attorneys) fees and filing fees incident to the transactions contemplated hereby, or to become subject to any condition or requirement which would be adverse to such Party.

(c) <u>Conduct of Seller Prior to Closing</u>. During the period from the date of this Agreement is selected by the Seller as the highest and best bid pursuant to the Sale Procedures Order, if that occurs, to the Closing Date, Seller shall:

(i) operate in compliance with the terms of applicable Laws and in the Ordinary Course of Business; and

(ii) cooperate with each other and use all commercially reasonable efforts to obtain all necessary consents, approvals and authorizations of, and make all necessary filings and registrations with, any Governmental Entity under applicable Law.

(d) <u>Seller's Actions</u>. Between the date of this Agreement and the Closing Date, Seller will not:

(i) subject to a qualifying overbid in accordance with the Sale Procedures Order, sell, pledge, assign or transfer in any manner any interest in any of the Purchased Assets, or grant or issue any option, warrant or other right whatsoever to purchase or acquire any interest in the Purchased Assets; or

(ii) take any action that would cause Seller's representations and warranties to be untrue at the Closing or act or fail to act in any manner that would be a breach of any covenant or agreement of Seller under this Agreement.

(e) <u>Preservation of Records</u>. Seller shall take all reasonable steps to preserve and keep the records and activities of the Facility to the extent the same are in the possession of the Seller.

(f) <u>Access</u>.

(i) Seller will permit representatives of Buyer (including legal counsel and accountants) to have access to all premises, properties, personnel (including its information technology support personnel), books, landlords, suppliers, vendors, records (including Tax records), contracts, and documents of or pertaining to the Purchased Assets. Buyer will treat

19

and hold as such any Confidential Information it receives from Seller in the course of the reviews including any Confidential Information it received prior to the date hereof, will not use any of the Confidential Information except in connection with this Agreement, and, if this Agreement is terminated for any reason whatsoever, will return to Seller all tangible embodiments (and all copies) of the Confidential Information which are in its possession. Seller shall promptly deliver to Buyer copies of all pleadings, motions, notices, statements, schedules, applications, reports and other papers filed by Seller in its Chapter 11 Case as Buyer shall reasonably request.

(ii)     Seller will provide the Buyer with access to its business premises for the purpose of effecting the transition on the Closing Date.  Further, Seller will permit the Buyer to have access to its personnel prior to the Closing so that Buyer may train such personnel in the Buyer's business.  The Sale Order shall provide that Buyer shall have the access to Seller's premises, Books and Records and personnel as set forth in this Agreement.

(iii)     Buyer and its successors and assigns shall maintain all Books and Records after the Closing and shall permit Seller to have reasonable access to the Books and Records for so long as necessary for Seller to pursue Claims and wind up their affairs provided Seller agrees to keep any such information confidential.

(g)     Bankruptcy Court Approval and Related Matters.

(i)     This Agreement shall not be binding upon the Seller unless the bid evidenced by this Agreement or an overbid made by the Buyer at the Auction incorporating this Agreement is the prevailing bid as contemplated by the Bidding Procedures and the Sale Procedures Order and is approved by the Bankruptcy Court with the entry of the Sale Order and (a) such Sale Order becomes a Final Order, or (b) such Sale Order shall not have been stayed in connection with any appeal of the Sale Order. This Agreement shall not be binding on the Buyer if each and every one of the conditions set forth in Section 6(a) below are not met or waived by the Buyer.  Buyer acknowledges that the Sale Procedures Order approves of an auction and bidding process so that the sale of the Purchased Assets are subject to overbid; provided, that Buyer may increase its Credit Bid in accordance with the terms hereof and the Bidding Procedures at the Auction, subject to any applicable Bankruptcy Court order.

(ii)     Subject to the Seller's duties to conduct the Auction and the marketing process relating thereto in accordance with the Sale Procedures Order and the rights of the parties thereunder and under any subsequent order of the Bankruptcy Court, Seller, on the one hand, and Buyer, on the other hand, shall cooperate reasonably with the other and its representatives in connection with the Sale Procedures Order, the Sale Order and the bankruptcy proceedings in connection therewith.   Such cooperation shall include (subject to the Sale Procedures Order and the Bidding Procedures), but not be limited to, consulting with Buyer at Buyer's reasonable request concerning the status of such proceedings and providing Buyer with advance copies of pleadings, notices, proposed orders and other documents in connection with the Sale Procedures Order, the Sale Order and the bankruptcy proceedings in connection therewith as soon as reasonably available prior to any submission thereof to the Bankruptcy Court and shall promptly provide Buyer with copies of all papers so submitted to the Bankruptcy Court.  Nothing contained herein shall require either Party to agree to any

20

amendment of this Agreement, to expend any out-of-pocket funds (other than customary professional (including attorneys) fees and filing fees incident to such proceedings) or to agree to any condition or requirement adverse to such Party.

(iii)   If the Sale Procedures Order, the Sale Order or any other order of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto), Seller shall take all steps as may be reasonable and appropriate to defend against such appeal, petition or motion, and Buyer agrees to cooperate in such efforts, and each party hereto shall endeavor to obtain an expedited resolution of such appeal.   Nothing contained herein shall modify the termination rights set forth in Section 9 of this Agreement.

(iv)   Buyer agrees to cooperate with Seller in connection with furnishing information pertaining to the satisfaction of the requirement of adequate assurances of future performance as required under Section 365(f)(2)(B) of the Bankruptcy Code.

(h)   Further Action.   In case at any time after the Closing any further action is necessary to carry out the purposes of this Agreement, each of the Parties will take such further action (including the execution and delivery of such further instruments and documents) as any other Party may request, all at the sole cost and expense of the requesting Party.

(i)   Reservation of Rights Regarding Committee Lawsuit.   The Parties acknowledge that the Committee may commence a Cause of Action against the Buyer, asserting one or more Avoidance Actions on behalf of the bankruptcy estate to the extent permitted by the Stipulation, dated July 1, 2013, by and between the Buyer and the Committee as approved by the Bankruptcy Court in its Order Authorizing the Committee of Unsecured Creditors to Commence and Prosecute Certain Claims entered on July 2, 2013, as Bankruptcy Court docket no. 138.   Except to the extent that the Buyer Debt is reduced at the Closing by reason of the Credit Bid in accordance with this Agreement, nothing herein or in the Sale Order, shall affect, limit or impair any defenses, including any rights of recoupment or set off that the Buyer may hold, if any.

(j)   Reservation of Rights Relating to Permitted Liens.   The Real Property shall be sold subject to Permitted Liens, and nothing in this Agreement shall affect, limit or impair the rights of the Buyer to challenge any such liens after the Closing or the rights of the holders thereof to defend their rights as against the Buyer with respect thereto, and the Sale Order shall provide that the Bankruptcy Court shall retain jurisdiction over all disputes related to the Permitted Liens.   For the avoidance of ambiguity, by accepting the Purchased Assets subject to the Permitted Liens under this Agreement, the Buyer is not acknowledging that such Permitted Liens are enforceable against the Purchased Assets and reserves all defenses related thereto.

6.   Conditions to Obligation to Close.

(a)   Conditions to Buyer's Obligation.   Buyer's obligation to consummate the transactions to be performed by it in connection with the Closing is subject to satisfaction of the following conditions:

(i)     the representations and warranties set forth in <u>Section 4</u> above shall be true and correct in all material respects  as of the date of this Agreement and as of the Closing Date;

(ii)     Seller shall have performed and complied with all of its covenants hereunder in all material respects through the Closing;

(iii)     there shall not be any injunction, judgment, order, decree, ruling, or charge in effect preventing consummation of any of the transactions contemplated by this Agreement;

(iv)     The Permits, Licenses and Registrations shall have been transferred to the Buyer to the greatest extent possible under applicable law, Buyer shall be placed in possession of the Purchased Assets and Buyer shall have determined to its reasonable satisfaction that Buyer's intended operation of the Purchased Assets is in substantial compliance with applicable laws and regulations and the Permits, Licenses and Registrations and, to the greatest extent possible under applicable law, the Buyer shall be entitled to all rights and privileges afford to Seller under such Permits, Licenses and Registrations immediately prior to the transfer thereof;

(v)     the Bankruptcy Court shall have entered the Sale Order for this Agreement, not later than August 25, 2013, (unless such date is extended by Buyer) that is in all material respects in the form of <u>Exhibit B</u> hereto, and such Sale Order is a Final Order, or (b) such Sale Order is not stayed in connection with any appeal of the Sale Order.  Notwithstanding the foregoing, nothing in this Agreement shall preclude Buyer from consummating the transactions contemplated herein if Buyer, in its sole discretion, waives the requirement that the Sale Order shall have become a Final Order.  No notice of such waiver of this condition or any other condition to the Closing need be given except to Seller, it being the intention of the Parties that Buyer shall be entitled to, and is not waiving, the protection of Section 363(m) of the Bankruptcy Code, the mootness doctrine and any similar statute or body of law if the Closing occurs in the absence of the Sale Order becoming a Final Order;

(vi)     No order shall have been entered by the Bankruptcy Court, without the consent of the Buyer, limiting the right of Buyer to pay the Purchase Price through the Credit Bid as contemplated hereby;

(vii)     All actions to be taken by Seller in connection with consummation of the transactions contemplated hereby and all certificates, instruments, and other documents required to effect the transactions contemplated hereby will be reasonably satisfactory in form and substance to Buyer;

(viii)  No Material Adverse Change shall have occurred between the date of this Agreement and the Closing in the reasonable judgment of the Buyer;

(ix)     An order of the Bankruptcy Court shall not have been entered in the Committee Lawsuit or otherwise, without the consent of the Buyer, limiting the right of the Buyer to make or the Debtor to accept the Credit Bid in a manner that is inconsistent with the terms of this Agreement;

(x)    The Auction shall not have been cancelled by the Buyer in accordance with the Bidding Procedures or otherwise and shall not have been postponed without the consent of the Buyer;

(xi)    The Buyer shall have obtained a title policy for the Real Property in the amount of the Credit Bid with standard exceptions that is satisfactory to Buyer in its reasonable discretion; and

(xii)    The Buyer shall have entered into an agreement with KATZEN International, Inc. ("KATZEN") authorizing the Buyer to use and possess KATZEN's confidential and proprietary technology at the at the Facility in form and substance mutually acceptable to the Buyer and KATZEN.

Buyer may, in its sole discretion, waive any condition specified in this Section 6(a) if it executes a writing so stating at or prior to the Closing.

(b)    Conditions to Seller's Obligation.  Seller's obligation to consummate the transactions to be performed by it in connection with the Closing is subject to satisfaction of the following conditions:

(i)    The offer to purchase the Purchased Assets contemplated by this Agreement shall have been selected by the Debtor as the highest and best bid in accordance with the Sale Procedures Order and the Sale Order shall have been entered;

(ii)    the representations and warranties set forth in Section 3 above shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date;

(iii)    Buyer shall have performed and complied with all of its covenants hereunder in all material respects through the Closing;

(iv)    there shall not be any injunction, judgment, order, decree, ruling, or charge in effect preventing consummation of any of the transactions contemplated by this Agreement;

(v)    the Bankruptcy Court shall have entered the Sale Order and (a) such Sale Order is a Final Order, or (b) such Sale Order is not stayed by the Bankruptcy Court in connection with any appeal of the Sale Order; and an order of the Bankruptcy Court shall not have been entered in the Committee Lawsuit or otherwise, limiting the right of the Buyer to make or the Debtor accept the Credit Bid in a manner that is inconsistent with the terms of this Agreement;

(vi)    The Buyer shall apply the Credit Bid Amount (excluding the Cash portion thereof in an amount not to exceed the unpaid Carve-Out amount) to the Buyer Debt at the Closing and pay the unpaid Carve-Out amount in Cash; and

(vii)    The Buyer shall have entered into an agreement with KATZEN International, Inc. authorizing the Buyer to use and possess confidential and proprietary

23

technology and trade secrets of KATZEN at the Facility, in form and substance mutually acceptable to Buyer and Katzen.

(viii)  all actions to be taken by Buyer in connection with consummation of the transactions contemplated hereby and all certificates, instruments, and other documents required to effect the transactions contemplated hereby will be reasonably satisfactory in form and substance to Seller.

Seller may, in its sole discretion, waive any condition specified in this Section 6(b) if it executes a writing so stating at or prior to the Closing.

(c)     Deliveries at Closing.  At the Closing:

(i)     Buyer shall deliver to Seller the following items:

(A)     the Purchase Price in the form of the Credit Bid, including the Cash portion thereof in an amount not to exceed the unpaid Carve-Out amount;

(B)     a certificate to the effect that each of the conditions specified above in Section 6(b)(i)-(vii) are satisfied in all respects; and

(C)     an assumption agreement in the form attached hereto as Exhibit C (the "Assumption Agreement") pursuant to which Buyer shall be assigned and shall assume the performance of the Assumed Executory Contracts for periods after the Closing and the Assumed Liabilities from Seller, executed by Buyer.

(ii)     Seller shall deliver to Buyer the following items:

(A)     a certificate to the effect that each of the conditions specified above in Section 6(a)(i)-(xii) are satisfied in all respects;

(B)     warranty deed to the Real Property in the form attached hereto as Exhibit D, a general bill of sale and assignment in the form attached hereto as Exhibit E (each, a "Bill of Sale") with respect to the Purchased Assets, and evidence of effective transfers of all Permits, Licenses and Registrations to the Buyer, each executed by the applicable parties hereto, with all required consents or approvals, if any, and in form and substance satisfactory to the Buyer; and

(C)     the Assumption Agreement, executed by Seller.

7.     Termination.

(a)     Termination of Agreement.  Certain of the Parties may terminate this Agreement as provided below:

(i)     Buyer and Seller may terminate this Agreement by mutual written consent at any time prior to the Closing;

(ii)     Buyer may terminate this Agreement by giving written notice to Seller at any time prior to the Closing (A) in the event Seller shall have breached any material representation, warranty, or covenant contained in this Agreement in any material respect, Buyer has notified Seller of the breach, and the breach has continued without cure for a period of ten (10) days after the notice of breach or (B) if the Closing shall not have occurred on or before the Closing Date (unless the failure results primarily from Buyer itself breaching any representation, warranty, or covenant contained in this Agreement) and for the avoidance of ambiguity, each of the foregoing termination rights of Buyer will not be affected by Buyer's Knowledge acquired (or capable of being acquired) at any time, whether before or after the execution and delivery of this Agreement or before the Closing Date, with respect to the accuracy or inaccuracy of any representation, warranty or covenant of Seller;

(iii)     Buyer may terminate this Agreement by giving written notice to Seller at any time prior to Closing (A) in the event Seller has accepted or selected, and the Bankruptcy Court shall have approved, the bid or bids of any Person or Persons other than Buyer to purchase all or a significant portion of the Business or assets of Seller (whether or not any transaction contemplated by any such bid or bids shall be consummated) and such sale shall have been substantially consummated, or (B) if the Sale Order shall not have been entered by the Bankruptcy Court on or before August 15, 2013 (subject to extension by Buyer);

(iv)     Seller may terminate this Agreement by giving written notice to Buyer at any time prior to the Closing (A) in the event Buyer has breached any material representation, warranty, or covenant contained in this Agreement in any material respect, Seller has notified Buyer of the breach, and the breach has continued without cure for a period of ten (10) days after the notice of breach or (B) if the Closing shall not have occurred on or before August 31, 2013 (subject to extension by Buyer in compliance with the requirements of the Outside Closing Date), by reason of the failure of any condition precedent under Section 6(b) hereof (unless the failure results primarily from Seller breaching any representation, warranty, or covenant contained in this Agreement) or (C) upon the closing of a sale or other transfer by the Seller to a Person or Persons other than Buyer of a significant portion of the Purchased Assets, which sale or transfer was approved by the Bankruptcy Court.

(b)     Effect of Termination.  If any Party terminates this Agreement pursuant to Section 7(a) above, all rights and obligations of the Parties hereunder shall terminate without any liability of any Party to any other Party (except for any liability of any Party then in breach).

8.     Miscellaneous.

(a)     No Third-Party Beneficiaries.  This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

(b)     Entire Agreement.  This Agreement (including the documents referred to herein) constitutes the entire agreement among the Parties and supersedes any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.  For the avoidance of ambiguity, and

notwithstanding anything to the contrary set forth in this Agreement (i) Buyer shall have the right to terminate its obligations under this Agreement at any time prior to the Closing in the event that (a) Debtor breaches any material representation, warranty, or covenant contained in this Agreement in any material respect, Buyer has notified Seller of the breach, and the breach has continued without cure for a period of ten (10) days after the notice of breach, or (b) Buyer is unable to acquire the Purchased Assets in exchange for its Credit Bid of a portion of the Buyer Debt together with Cash in an amount not to exceed the unpaid Carve-Out amount; and (ii) upon the Closing, Buyer shall retain all of its Liens, Claims and Encumbrances, if any, with respect to the Excluded Assets not transferred to Buyer under this Agreement.

(c)     <u>Succession and Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns.  The Seller may not assign this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of Buyer.  The Buyer may assign this Agreement, and all of its rights and obligations hereunder, to any party in its sole discretion without the consent of the Seller or the Bankruptcy Court.

(d)     <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts (including by means of facsimile), each of which shall be deemed an original but all of which together will constitute one and the same instrument.  When delivered pursuant to this Agreement, facsimile signatures and digitally reproduced ("pdf" or "tiff") signatures of the parties on counterparts of this Agreement will be binding as if such signatures were originals.

(e)     <u>Headings</u>.  The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

(f)     <u>Notices</u>.  All notices, requests, demands, claims, and other communications hereunder will be in writing.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient, (ii) one Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), (iii) one Business Day after being sent to the recipient by facsimile transmission or electronic mail, or (iv) four Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

<u>If to Seller</u>:

Purified Renewable Energy, LLC
777 West Borden Street
Buffalo Lake, MN 55314

Copy to:

Clinton E. Cutler, Esq.
Douglas Kassebaum, Esq.
Fredrikson & Byron, P.A.

26

200 South Sixth Street, Suite 4000
Minneapolis, MN 55402-1425
ccutler@fredlaw.com
dkassebaum@fredlaw.com

If to Buyer:

West Ventures LLC
152 West 57th Street
New York, New York 10019

Copy to:

William M. Mower, Esq.
Maslon Edelman Borman & Brand, LLP
3300 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-4140
bill.mower@maslon.com

Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties notice in the manner herein set forth.

(g)    Governing Law.  This Agreement shall be governed by and construed in accordance with the domestic laws of the State of Minnesota without giving effect to any choice or conflict of law provision or rule (whether of the State of Minnesota or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Minnesota.

(h)    Amendments and Waivers.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Buyer and Seller. No waiver by any Party of any provision of this Agreement or any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

(i)    Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

(j)    Expenses.  Except as set forth in this Section 8(j), each of the Parties will bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.  Without limiting the generality of

27

the foregoing, all transfer, documentary, sales, use, stamp, registration and other such Taxes, and all conveyance fees, recording charges and other fees and charges (including any penalties and interest) incurred in connection with the consummation of the transactions contemplated by this Agreement shall be paid by Buyer when due, and Buyer shall, at its own expense, file all necessary Tax Returns and other documentation with respect to all such Taxes, fees and charges, and, if required by applicable law, the Parties will, and will cause their Affiliates to, join in the execution of any such Tax Returns and other documentation.

(k)    Construction.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.  Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  The word "including" shall mean including without limitation.

(l)    Incorporation of Schedules.  The Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

(m)    Tax Disclosure.  Notwithstanding anything herein to the contrary, each Party (and each Affiliate and Person acting on behalf of any such Party) agrees that each Party (and each employee, representative, and other agent of such Party) may disclose to any and all Persons, without limitation of any kind, the Tax treatment and Tax structure of the transaction and all materials of any kind (including opinions or other Tax analyses) that are provided to such Party or such Person relating to such Tax treatment and Tax structure, except to the extent necessary to comply with any applicable federal or state securities laws.  This authorization is not intended to permit disclosure of any other information including (i) any portion of any materials to the extent not related to the Tax treatment or Tax structure of the transaction, (ii) the identities of participants or potential participants in the transaction, (iii) the existence or status of any negotiations, (iv) any pricing or financial information (except to the extent such pricing or financial information is related to the Tax treatment or Tax structure of the transaction), or (v) any other term or detail not relevant to the Tax treatment or the Tax structure of the transaction.

(n)    Taxes Relating To Purchased Assets and Assumed Liabilities.  Buyer shall be liable for and pay all Taxes applicable to the Purchased Assets and Assumed Liabilities that are attributable to taxable years or periods beginning on the Closing Date and with respect to any Straddle Period, the portion of such Straddle Period beginning on the Closing Date.  For purposes of this Agreement, "Straddle Period" shall mean any taxable period beginning on, or before and ending after the Closing Date.

[Reminder of page left intentionally blank.]

IN WITNESS WHEREOF, the Parties hereto have executed this Asset Purchase Agreement as of the date first above written.

BUYER:

WEST VENTURES LLC

By: _____

      Name: Jed Latkin

      Title: Authorized Signatory

SELLER:

PURIFIED RENEWABLE ENERGY, LLC

By: _____

      Name:

      Title:

[Signature Page to Asset Purchase Agreement dated July 15, 2013]

<u>LIST OF SCHEDULES AND EXHIBITS</u>

<u>SCHEDULES</u>

| | |
|---|---|
| Schedule 2(a)(i)(E) | Assumed Executory Contracts |
| Schedule 4(a) | Permitted Liens |
| Schedule 4(b)(iv) | Compliance with Laws |
| Schedule 4(d)(i) | Employees |
| Schedule 4(d)(iii) | ERISA Plans |
| Schedule 4(f) | Material Violations |
| Schedule 4(g) | Permits, Licenses and Registrations |
| Schedule 4(h) | Litigation |
| Schedule 4(j) | Environmental Compliance |

<u>EXHIBITS</u>

| | |
|---|---|
| Exhibit A | Real Property |
| Exhibit B | Form of Sale Order |
| Exhibit C | Form of Assumption and Assignment Agreement |
| Exhibit D | Form of Warranty Deed |
| Exhibit E | Form of Bill of Sale |

[tentative][1] Schedule 2(a)(i)(E)

Assumed Executory Contracts

| Counter-Party | Contract / Lease Description | Date of Agreement | Expiration Date | Cure Amount |
|---|---|---|---|---|
| Ryan Buboltz | Lease for 7 acres of agricultural land in Hector Township, located on the west side of 520th street | 3/15/13 | | $0 |
| Northern Natural Gas | Transportation Agreement with Minnesota Energy for uninterruptible natural gas | | 2014 | ? |
| Northern Natural Gas | Transportation Agreement with Minnesota Energy for uninterruptible natural gas | | 2015 | ? |
| Twin Cities & Western Railroad Co. | Crossing Permit No. 500.1-951105 Lease with railroad for the regulated water discharge pipe under the railroad tracks to the Judicial Ditch 15 | 11/1/95 | | $0 |
| Twin Cities & Western Railroad Co. | Crossing Permit No. 488.8-951102 Lease with the railroad for the overhead pipe rack for the product loadout for rail transportation | 11/1/95 | | $0 |
| Burns & McDonnell Engineering Co. | Task Order 02 – Facility Evaluation Plan Implementation for engineering services | 2/27/13 | | ? |

---

[1]    Subject to finalization in form and substance satisfactory to the Parties.  To the extent the Parties do not agree on the final form for this Schedule 2(a)(i)(E) on or before July 19, 2013, at 5:00 p.m. CDT, either Party may terminate the Agreement.  This Schedule 2(a)(i)(E) is also subject to revision pursuant to the terms of the APA.

[tentative][2] Schedule 4(a)

Permitted Liens

1.    Easement for storm sewer purposes over that portion of the subject property described in an Easement dated January 5, 1996 and filed of record January 22, 1996 in Book 94 of Misc. Page 212.  (As to Tracts 1 and 2)

2.    Easement for highway purposes and other rights acquired by the State of Minnesota pursuant to Final Certificate dated December 22, 1930, recorded December 29, 1930 in Book S of Misc. Page 274.  (As to Tracts 1 and 2)

3.    Easement in favor of Northern States Power Company dated July 10, 1962, recorded July 18, 1962, in Book 138, Page 537.  (As to Tracts 1 and 2)

4.    Gas line easement in favor of Sheehan's Natural Gas, Inc. dated July 18, 1990, recorded September 26, 1990 in Book 229 of Deeds, Page 323 as Document No. 274762.  (As to Tracts 1 and 2)

5.    Easement for construction and maintenance of drainage tile by and between Minnesota Energy and Omer A. Leske dated May 25, 1995, recorded May 25, 1995 in Book 91 of Misc., Page 298, as Document No. 291494.  (As to Tracts 1 and 2)

6.    Rules and Regulation of Buffalo Creek Watershed District dated May 25, 1993, filed August 3, 1993, in Book 85 of Misc. at Page 9.  (As to all Tracts)

7.    Grant of Private Right-of-way for Gas Company Plant dated August 26, 2003, filed October 7, 2003, as Doc. Nos. 327987 and 327988 creating an easement 16.5 feet in width across a portion of the East Half of the Southeast Quarter.  (As to all Tracts)

8.    Easement in favor of Minnesota Energy for ingress and egress and above and below ground piping dated February 28, 2006, filed June 1, 2006 as Doc. No. 340215, as assigned.  (Tract 3 only)

9.    Any lease, grant, exception or reservation of minerals or mineral rights appearing in the public records.

10.    Pipe bridge encroachment unto Railroad Property without the benefit of an easement as depicted on the survey dated June 18, 2007, by Bonnema Surveys, Inc.

---

[2]    Subject to finalization in form and substance satisfactory to the Parties.  To the extent the Parties do not agree on the final form for this Schedule 4(a) on or before July 19, 2013, at 5:00 p.m. CDT, either Party may terminate the Agreement.

11.     A natural gas line easement without benefit of a recorded agreement for below ground piping over the eastern portion of Tract 2 extending to the Railroad Property, as identified in Crossing Permit No. 493.3-20080704, dated July 1, 2008.  (Tract 2 only)

12.     Assignment and Assumption of Easement Agreement dated November 15, 2012, filed November 19, 2012, as Document No. A366054.

13.     Unpaid real property taxes as of the Closing:

        As to Parcel 1:
        Taxes for the year 2013 in the amount of $42,094.00.  PIN: 29-01570-00. Non-Homestead. Market Value: $850,400.00.

        As to Parcel 2:
        Taxes for the year 2013 in the amount of $2,636.00.  PIN: 29-01556-00. Non-Homestead. Market Value: $50,200.00.

        As to Parcel 3:
        Taxes for the year 2013 in the amount of $314.00.  PIN: 14-00402-00. Non-Homestead. Market Value: $16,500.00.

2

[tentative][3] <u>Schedule 4(b)(iv)</u>

Compliance with Laws

1.    Settlement Agreement and Order and Notice to Affected Employees between Purified
Renewable Energy, LLC and Ken B. Peterson, Commissioner, Minnesota Department of
Labor and Industry, Docket No. 11451, Inspection No. 316914175, and related OSHA
citations described therein

---

[3]   Subject to finalization in form and substance satisfactory to the Parties.  To the extent
the Parties do not agree on the final form for this Schedule 4(b)(iv) on or before July 19, 2013, at
5:00 p.m. CDT, either Party may terminate the Agreement.

Schedule 4(d)(i)

Employees

| | |
|---|---|
| Noah Anderson | Operator |
| Greg Carr | Chief Boiler Operator |
| Brent Daak | Operation Supervisor |
| Brooks Gunderson | Electrical and Instrumentation |
| Christopher Link | Operator |
| Dayton McCabe | Operator |
| Kyle Peik | Vice President and Chief Production Manager |
| Troy Schulze | Maintenance Manager |
| Pamela Wiechman | Senior Administrator |

Schedule 4(d)(iii)

ERISA Plans

None

[tentative][4] <u>Schedule 4(f)</u>

Material Violations

1.      EPA / DOJ Consent Decree relating to MPCA Air Quality Permit

---

[4]   Subject to finalization in form and substance satisfactory to the Parties.  To the extent the Parties do not agree on the final form for this Schedule 4(f) on or before July 19, 2013, at 5:00 p.m. CDT, either Party may terminate the Agreement.

[tentative][5] Schedule 4(g)

Permits, Licenses and Registrations

Permits

| Permit ID | Agency or Authority | Type of Permit | Expiration Date |
|-----------|---------------------|----------------|-----------------|
| 12900036-12 | MN Pollution Control Agency (MPCA) | Air Quality Permit for dryer area, boiler room and process area (fermentation, milling, distillation) regulating air quality and emissions | |
| | Environmental Protection Agency / Dept. of Justice | 2002 Consent Decree to control Volatile Organic Compounds released to the atmosphere | |
| AST # 55445 | MPCA | Aboveground Storage Tanks (AST) Permit regulating the size and containment area required for spill protection of tanks | |
| MN0063151 | MPCA | National Pollutant Discharge Elimination System / State Disposal System (NPDES) Permit regulating water discharge to waters of the state | 6/30/13 |
| | Dept. of Natural Resources | Water Appropriation Permit for water well inspections and water use reporting regulations | |
| AFP-MN-20001 | U.S. Dept. of Treasury / Alcohol and Tobacco Tax and Trade Bureau (TTB) | Alcohol Fuel Producer Permit requirements for or regulations of the production and distribution of ethanol [not transferrable/bond related?] | |

Licenses

| License ID | Agency or Authority | Type of License | Expiration Date |
|------------|---------------------|-----------------|-----------------|
| 20140137 | State of MN | Commercial Feed License for the production, sale and transportation of feed stocks and by products from the ethanol production process [not transferrable?] | 12/31/13 |

---

[5]   Subject to finalization in form and substance satisfactory to the Parties.  To the extent the Parties do not agree on the final form for this Schedule 4(g) on or before July 19, 2013, at 5:00 p.m. CDT, either Party may terminate the Agreement.

| License ID | Agency or Authority | Type of License | Expiration Date |
|---|---|---|---|
| | State of MN | Distributors License (State equivalent to of the Alcohol Fuel Producers Permit) **[not transferrable / bond related?]** | 6/30/13 |
| MNR000057364 | State of MN | Hazardous Waste Generator License for generation of Industrial Hazardous Waste (Ethanol, Stillage, Lab Waste, etc.) | |
| 071812 550 42TU | US Dept. of Transportation - Pipeline / Hazardous Materials Administration | Hazardous Materials Registration License for the transportation of Hazardous Waste (Ethanol. Stillage, etc.) | 6/30/13 |

Registrations

| Registration ID | Agency or Authority | Type of Registration | Expiration Date |
|---|---|---|---|
| 11593856310 | Food & Drug Administration | Food & Drug Registration for feed stock production - Dried Distillers Grains, Wetcake, Stillage, Syrup | Feb. 2015 |
| 0021688726 | Federal Communications Commission | Hand Held Radios Registration for use of hand held radios for communication and safety throughout the facility | |
| | Dept. of Labor/ Industry | Pressure Vessel Registration for annual inspection of all pressure vessels throughout the facility (boilers, heat exchangers, air compressors, etc.) | Annual |

2

[tentative][6] <u>Schedule 4(h)</u>

Litigation

[to be completed]

---

[6]    Subject to finalization in form and substance satisfactory to the Parties.  To the extent the Parties do not agree on the final form for this Schedule 4(h) on or before July 19, 2013, at 5:00 p.m. CDT, either Party may terminate the Agreement.

[tentative][7] <u>Schedule 4(j)</u>

Environmental Compliance

1.      EPA / DOJ Consent Decree relating to MPCA Air Quality Permit

---

[7]    Subject to finalization in form and substance satisfactory to the Parties.  To the extent the Parties do not agree on the final form for this Schedule 4(j) on or before July 19, 2013, at 5:00 p.m. CDT, either Party may terminate the Agreement.

<u>Exhibit A</u>

## **<u>REAL PROPERTY</u>**

The Real Property located in the County of Renville, State of Minnesota, legally described as follows:

Tract 1:

That part of Outlots 9, 10, 11, 12 and 13 of Drache and Nellermoe's First Addition to the City of Buffalo Lake, Minnesota, lying North of Minnesota State Trunk Highway Number 212;

Tract 2:

That part of Outlot D of Borden's Rearrangement of Outlots 6, 7 and 8 of Drache and Nellermoe's First Addition to the City of Buffalo Lake, Minnesota, described as follows: Beginning at the Southwest corner of said Outlot D; thence North 00°01' 44" West, assumed bearing along the West line of said Outlot D, a distance of 462.54' to the Northwest corner of said Outlot D; thence S 81°39'06" East 327.61' along the North line of said Outlot D; thence South 00°01 '44" East 416.11' to the South line of said Outlot D; thence North 89°47'57" West 324.12' along the South line of said Outlot D to the point of beginning.

Tract 3:

That portion of the East Half of the Southeast Quarter of Section 25, Township 115, Range 32, Renville County, Minnesota, lying North of the present established center line of U.S. Trunk Highway No. 212 as now located and lying South of the railroad right-of-way, and which lies West of the East 300.00 feet of said East Half of Southeast Quarter as measured perpendicular to the East line of said East Half of the Southeast Quarter.

Exhibit B

**FORM OF SALE ORDER**

Exhibit C

**FORM OF ASSUMPTION AND ASSIGNMENT AGREEMENT**

This ASSUMPTION AND ASSIGNMENT AGREEMENT, dated as of August __, 2013 (this "Agreement"), by and between Purified Renewable Energy, LLC, Debtor and Debtor-in-Possession ("Seller") and West Ventures LLC ("Buyer").

**WITNESSETH**

WHEREAS, Buyer and Seller have entered into that certain Asset Purchase Agreement, dated as of July 15, 2013 (the "APA");

WHEREAS, capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the APA;

WHEREAS, pursuant to the APA, Buyer has agreed to assume from Seller the Assumed Liabilities upon the terms and subject to the conditions of the APA; and

WHEREAS, the parties desire to carry out the intent and purpose of the APA by Buyer's execution and delivery to Seller of this instrument evidencing the assumption of the Assumed Liabilities by Buyer, subject to the provisions of the APA.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

Section 1. As of the date hereof, Buyer, pursuant to, in the manner and to the extent set forth in Section 2(c) and 2(d) of the APA, hereby assumes and shall hereafter pay, perform and discharge when due the Assumed Liabilities, subject to the provisions of the APA and on the same terms and conditions as stated therein. For the avoidance of doubt, other than Assumed Liabilities, Buyer will not and does not assume any liability of any nature or kind whatsoever of Seller.

Section 2. Nothing in this Agreement, express or implied, is intended or shall be construed to confer upon, or give to, any Person, other than Seller, Buyer and their respective successors and assigns, any remedy or claim under or by reason of this instrument or any terms, covenants or conditions hereof, and all the terms, covenants and conditions, promises and agreements contained in this Agreement shall be for the sole and exclusive benefit of Seller, Buyer and their respective successors and assigns.

Section 3. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns, effective immediately upon its execution and delivery to Seller.

Section 4. This Agreement is executed and delivered pursuant to the APA. Nothing contained in this Agreement shall in any way supersede, modify, replace, amend, change or rescind the provisions of the APA, including the warranties, covenants, agreements, conditions,

or in general,, any rights, remedies or obligations of Seller or Buyer as set forth in the APA, and in the event of any conflict between the terms and conditions of the APA and the terms and conditions of this Agreement, the APA shall control.

<u>Section 5</u>. Section 8(g) of the APA is incorporated herein by reference and shall be deemed applicable to this Agreement mutatis mutandis.

<u>Section 6</u>. All actions and proceedings between Buyer and Seller arising out of or relating to this Agreement, including the resolution of any and all disputes hereunder, shall be heard and determined in the Bankruptcy Court, and Seller and Buyer hereby irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court in any such action or proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such action or proceeding. Sellers and Buyer hereby consent to service of process by mail (in accordance with Section 8(f) of the APA) or any other manner permitted by law.

<u>Section 7</u>. Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Agreement, or in the case of a waiver, by the party against whom the waiver is to be effective.

<u>Section 8</u>. This Agreement may be executed by facsimile signature and in two or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the party against whom enforcement is sought.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the undersigned has caused this Agreement to be executed by the signature of its duly authorized officer as of the date above first written.

BUYER:

WEST VENTURES LLC

By: _____

Its: _____

SELLER:

PURIFIED RENEWABLE ENERGY, LLC
Debtor and Debtor-in-Possession

By:_____

Its:_____

<u>Exhibit D</u>

## **FORM OF WARRANTY DEED**

STATE DEED TAX DUE HEREON: $_____

Date: _____, 2013

FOR VALUABLE CONSIDERATION, Purified Renewable Energy, LLC, a limited liability company under the laws of Minnesota, as Debtor and Debtor-in-Possession, Grantor, hereby conveys and warrants to West Ventures LLC, a limited liability company under the laws of Delaware, Grantee, that certain real property in Renville County, Minnesota, as more particularly described on  <u>Exhibit A</u> attached hereto,

Check here if part or all of the land is Registered (Torrens) □

together with all hereditaments and appurtenances belonging thereto, subject to the following exceptions:

Check box if applicable:
□ The Seller certifies that the Seller does not know of any wells on the described real property.
□ A well disclosure certificate accompanies this document.
□ I am familiar with the property described in this instrument and I certify that the status and number of wells on the described real property have not changed since the last previously filed well disclosure certificate.

<div align="right">

Grantor: Purified Renewable Energy, LLC,
a Minnesota limited liability company,
as Debtor and Debtor-in-Possession

</div>

By: _____
<div align="right">Name</div>

Its: _____
<div align="right">Title</div>

STATE OF MINNESOTA      )
                        )ss.
COUNTY OF HENNPIN       )

  The foregoing instrument was executed and acknowledged before me on this ___ day of August, 2013, by Purified Renewable Energy, LLC, a limited liability company under the laws of Minnesota, as Debtor and Debtor-in-Possession, on behalf of the company.


_____
Notary Public


(SEAL)


This instrument was drafted by:
Maslon Edelman Borman & Brand, LLP
3300 Wells Fargo Center
90 South 7th Street
Minneapolis, MN 55402-4104
(612) 672-8200


    Tax Statements for real property described in this instrument should be sent to:

    West Ventures LLC
    152 West 57th Street
    New York, New York 10019

<u>Exhibit A to Warranty Deed</u>

Legal Description

The Real Property located in the County of Renville, State of Minnesota, legally described as follows:

Tract 1:

That part of Outlots 9, 10, 11, 12 and 13 of Drache and Nellermoe's First Addition to the City of Buffalo Lake, Minnesota, lying North of Minnesota State Trunk Highway Number 212;

Tract 2:

That part of Outlot D of Borden's Rearrangement of Outlots 6, 7 and 8 of Drache and Nellermoe's First Addition to the City of Buffalo Lake, Minnesota, described as follows: Beginning at the Southwest corner of said Outlot D; thence North 00°01' 44" West, assumed bearing along the West line of said Outlot D, a distance of 462.54' to the Northwest corner of said Outlot D; thence S 81°39'06" East 327.61' along the North line of said Outlot D; thence South 00°01 '44" East 416.11' to the South line of said Outlot D; thence North 89°47'57" West 324.12' along the South line of said Outlot D to the point of beginning.

Tract 3:

That portion of the East Half of the Southeast Quarter of Section 25, Township 115, Range 32, Renville County, Minnesota, lying North of the present established center line of U.S. Trunk Highway No. 212 as now located and lying South of the railroad right-of-way, and which lies West of the East 300.00 feet of said East Half of Southeast Quarter as measured perpendicular to the East line of said East Half of the Southeast Quarter.

<u>Exhibit E</u>

**FORM OF BILL OF SALE**

This BILL OF SALE, dated as of August __, 2013 (this "<u>Bill of Sale</u>") is by and between Purified Renewable Energy, LLC, Debtor and Debtor-in-Possession ("<u>Seller</u>") and  West Ventures LLC ("<u>Buyer</u>"). Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in that certain Asset Purchase Agreement, dated as of July 15, 2013 (the "<u>APA</u>").

**WITNESSETH**

WHEREAS, Buyer and Seller entered into the APA, pursuant to which, Seller has agreed to sell, assign, convey, transfer and deliver all of their rights, title and interest in, to and under the Purchased Assets to Buyer, and Buyer has agreed to purchase and acquire all rights, title and interest in, to and under the Purchased Assets from Sellers, upon the terms and subject to the conditions of the APA; and

WHEREAS, the parties desire to carry out the intent and purpose of the APA by Seller's execution and delivery to Buyer of this instrument evidencing the vesting in Buyer of the Purchased Assets, subject to the provisions of the APA.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

<u>Section 1.</u>      As of the date hereof, Seller, pursuant to the APA and on the same terms and conditions as stated therein, hereby conveys, grants, sells, transfers, assigns, and delivers to Buyer, and its successors and permitted assigns, forever all of Seller's right, title and interest, as of the date hereof, in and to the Purchased Assets, free and clear of all Liens, Claims and Encumbrances (other than Permitted Liens of which the Sale Order does not provide for the Purchased Assets to be sold free and clear).

<u>Section 2.</u>      Seller hereby irrevocably designates, makes, constitutes and appoints Buyer, and its successors and assigns, as Seller's true and lawful attorney (and agent-in-fact), with full power of substitution, in Seller's name and stead, on behalf of and for the benefit of Buyer, and its successors and assigns, to: (a) demand and receive any and all of the Purchased Assets and to give receipts and releases for and in respect of the Purchased Assets, or any part thereof; (b) from time to time institute and prosecute in Seller's name, at the sole expense and for the benefit of Buyer, and its successors and assigns, any and all proceedings at Law, in equity or otherwise, which Buyer or its successors or assigns may deem proper in order to collect, assert or enforce any claim, right or title of any kind in or to any item of the Purchased Assets, to defend or compromise any and all actions, suits or proceedings in respect of any item of the Purchased Assets, and to do all such acts and things in relation thereto as Buyer shall deem advisable, including, without limitation, for the collection or reduction to possession of any of the Purchased Assets; (c) endorse Seller's name on any payment, instrument, notice, or other similar document or agreement relating to the Purchased Assets for the period commencing with the date

hereof that may come in to the possession of Buyer or under Buyer's control with respect to the Purchased Assets and (d) to collect the moneys which become due and payable at any time on or after the date hereof under every Acquired Asset.  Seller acknowledges that the foregoing powers are coupled with an interest and shall be irrevocable by Seller.

Section 3.      Seller hereby covenants that, from time to time after the delivery of this instrument, at Buyer's request, Seller will do, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered, without further consideration, such further acts, conveyances, documents, transfers, assignments, powers of attorney and assurances as Buyer may require to convey, transfer to and vest in Buyer, to put Buyer in possession of, any of the Purchased Assets, and to obtain the full benefit of this Bill of Sale.

Section 4.      Nothing in this instrument, express or implied, is intended or shall be construed to confer upon, or give to, any Person other than Seller or Buyer and their respective successors and permitted assigns, any remedy or claim under or by reason of this instrument or any terms, covenants or conditions hereof, and all the terms, covenants and conditions, promises and agreements contained in this instrument shall be for the sole and exclusive benefit of Seller, Buyer and their respective successors and permitted assigns.

Section 5.      This Bill of Sale shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns, effective immediately upon its execution and delivery to Buyer.

Section 6.      This Bill of Sale is executed and delivered pursuant to the APA.  Nothing contained in this Bill of Sale shall in any way supersede, modify, replace, amend, change or rescind the provisions of the APA, including the warranties, covenants, agreements, conditions, or in general, any rights, remedies or obligations of Seller or Buyer as set forth in the APA, and in the event of any conflict between the terms and conditions of the APA and the terms and conditions of this Bill of Sale, the APA shall control.

Section 7.      Section 8(g) of the APA is incorporated herein by reference and shall be deemed applicable to this Bill of Sale mutatis mutandis.

Section 8.      All actions and proceedings between Buyer and Seller arising out of or relating to this Bill of Sale, including the resolution of any and all disputes hereunder, shall be heard and determined in the Bankruptcy Court, and Seller and Buyer hereby irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court in any such action or proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such action or proceeding. Seller and Buyer hereby consent to service of process by mail (in accordance with Section 8(f) of the APA) or any other manner permitted by law.

Section 9.      Any provision of this Bill of Sale may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Bill of Sale, or in the case of a waiver, by the party against whom the waiver is to be effective.

Section 10.      This Bill of Sale may be executed by facsimile signature in two or more counterparts; each of which shall be deemed an original, and all of which together shall

2

constitute one and the same instrument. In proving this Bill of Sale, it shall not be necessary to produce or account for more than one such counterpart signed by the party against whom enforcement is sought.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the undersigned has caused this Bill of Sale to be executed by the signature of its duly authorized officer as of the date above first written.

BUYER:

WEST VENTURES LLC


By: _____

Its: _____



SELLER:

PURIFIED RENEWABLE ENERGY, LLC,
Debtor and Debtor-in-Possession


By: _____

Its: _____

## LIST OF SCHEDULES AND EXHIBITS

### SCHEDULES

| | |
|---|---|
| Schedule 2(a)(i)(E) | Assumed Executory Contracts |
| Schedule 4(a) | Permitted Liens |
| Schedule 4(b)(iv) | Compliance with Laws |
| Schedule 4(d)(i) | Employees |
| Schedule 4(d)(iii) | ERISA Plans |
| Schedule 4(f) | Material Violations |
| Schedule 4(g) | Permits, Licenses and Registrations |
| Schedule 4(h) | Litigation |
| Schedule 4(j) | Environmental Compliance |

### EXHIBITS

| | |
|---|---|
| Exhibit A | Real Property |
| Exhibit B | Form of Sale Order |
| Exhibit C | Form of Assumption and Assignment Agreement |
| Exhibit D | Form of Warranty Deed |
| Exhibit E | Form of Bill of Sale |

[tentative][1] Schedule 2(a)(i)(E)

Assumed Executory Contracts

| Counter-Party | Contract / Lease Description | Date of Agreement | Expiration Date | Cure Amount |
|---|---|---|---|---|
| Ryan Buboltz | Lease for 7 acres of agricultural land in Hector Township, located on the west side of 520th street | 3/15/13 | | $0 |
| Northern Natural Gas | Transportation Agreement with Minnesota Energy for uninterruptible natural gas | | 2014 | Unknown at this time |
| Northern Natural Gas | Transportation Agreement with Minnesota Energy for uninterruptible natural gas | | 2015 | Unknown at this time |
| Twin Cities & Western Railroad Co. | Crossing Permit No. 500.1-951105 Lease with railroad for the regulated water discharge pipe under the railroad tracks to the Judicial Ditch 15 | 11/1/95 | | $0 |
| Twin Cities & Western Railroad Co. | Crossing Permit No. 488.8-951102 Lease with the railroad for the overhead pipe rack for the product loadout for rail transportation | 11/1/95 | | $0 |
| Burns & McDonnell Engineering Co. | Task Order 02 – Facility Evaluation Plan Implementation for engineering services | 2/27/13 | | Approx. $63,000 |

---

[1]  This Schedule 2(a)(i)(E) is subject to revision pursuant to the terms of the APA.

Schedule 4(a)

Permitted Liens

1.    Easement for storm sewer purposes over that portion of the subject property described in an Easement dated January 5, 1996 and filed of record January 22, 1996 in Book 94 of Misc. Page 212.  (As to Tracts 1 and 2)

2.    Easement for highway purposes and other rights acquired by the State of Minnesota pursuant to Final Certificate dated December 22, 1930, recorded December 29, 1930 in Book S of Misc. Page 274.  (As to Tracts 1 and 2)

3.    Easement in favor of Northern States Power Company dated July 10, 1962, recorded July 18, 1962, in Book 138, Page 537.  (As to Tracts 1 and 2)

4.    Gas line easement in favor of Sheehan's Natural Gas, Inc. dated July 18, 1990, recorded September 26, 1990 in Book 229 of Deeds, Page 323 as Document No. 274762.  (As to Tracts 1 and 2)

5.    Easement for construction and maintenance of drainage tile by and between Minnesota Energy and Omer A. Leske dated May 25, 1995, recorded May 25, 1995 in Book 91 of Misc., Page 298, as Document No. 291494.  (As to Tracts 1 and 2)

6.    Rules and Regulation of Buffalo Creek Watershed District dated May 25, 1993, filed August 3, 1993, in Book 85 of Misc. at Page 9.  (As to all Tracts)

7.    Grant of Private Right-of-way for Gas Company Plant dated August 26, 2003, filed October 7, 2003, as Doc. Nos. 327987 and 327988 creating an easement 16.5 feet in width across a portion of the East Half of the Southeast Quarter.  (As to all Tracts)

8.    Easement in favor of Minnesota Energy for ingress and egress and above and below ground piping dated February 28, 2006, filed June 1, 2006 as Doc. No. 340215, as assigned.  (Tract 3 only)

9.    Any lease, grant, exception or reservation of minerals or mineral rights appearing in the public records.

10.    Pipe bridge encroachment unto Railroad Property without the benefit of an easement as depicted on the survey dated June 18, 2007, by Bonnema Surveys, Inc.

11.    A natural gas line easement without benefit of a recorded agreement for below ground piping over the eastern portion of Tract 2 extending to the Railroad Property, as identified in Crossing Permit No. 493.3-20080704, dated July 1, 2008.  (Tract 2 only)

12.    Assignment and Assumption of Easement Agreement dated November 15, 2012, filed November 19, 2012, as Document No. A366054.

13.    Unpaid real property taxes as of the Closing:

      As to Parcel 1:
      Taxes for the year 2013 in the amount of $42,094.00.  PIN: 29-01570-00. Non-Homestead. Market Value: $850,400.00.

      As to Parcel 2:
      Taxes for the year 2013 in the amount of $2,636.00.  PIN: 29-01556-00. Non-Homestead. Market Value: $50,200.00.

      As to Parcel 3:
      Taxes for the year 2013 in the amount of $314.00.  PIN: 14-00402-00. Non-Homestead. Market Value: $16,500.00.

14.    Any and all non-avoidable liens and encumbrances arising by operation of law and senior in right with respect to any collateral to the Liens securing the DIP Indebtedness.

<u>Schedule 4(b)(iv)</u>

Compliance with Laws

1.      Settlement Agreement and Order and Notice to Affected Employees between Purified
        Renewable Energy, LLC and Ken B. Peterson, Commissioner, Minnesota Department of
        Labor and Industry, Docket No. 11451, Inspection No. 316914175, and related OSHA
        citations described therein.

2.      Administrative Order dated December 6, 2012, issued by the Minnesota Pollution
        Control Agency to Minnesota Energy and Purified Renewable Energy.

3.      Notice of Violation – NPDES/SDS Permit No. MN0063151 and AQ File: 2835 dated
        February 5, 2013, issued by the Minnesota Pollution Control Agency to Minnesota
        Energy and Purified Renewable Energy.

<u>Schedule 4(d)(i)</u>

Employees

| | |
|---|---|
| Noah Anderson | Operator |
| Greg Carr | Chief Boiler Operator |
| Brent Daak | Operation Supervisor |
| Brooks Gunderson | Electrical and Instrumentation |
| Christopher Link | Operator |
| Dayton McCabe | Operator |
| Kyle Peik | Vice President and Chief Production Manager |
| Troy Schulze | Maintenance Manager |
| Pamela Wiechman | Senior Administrator |

<u>Schedule 4(d)(iii)</u>

ERISA Plans


None

Schedule 4(f)

Material Violations

1.      EPA / DOJ Consent Decree relating to MPCA Air Quality Permit

2.      Settlement Agreement and Order and Notice to Affected Employees between Purified
Renewable Energy, LLC and Ken B. Peterson, Commissioner, Minnesota Department of
Labor and Industry, Docket No. 11451, Inspection No. 316914175, and related OSHA
citations described therein.

3.      Administrative Order dated December 6, 2012, issued by the Minnesota Pollution
Control Agency to Minnesota Energy and Purified Renewable Energy.

4.      Notice of Violation – NPDES/SDS Permit No. MN0063151 and AQ File: 2835 dated
February 5, 2013, issued by the Minnesota Pollution Control Agency to Minnesota
Energy and Purified Renewable Energy.

Schedule 4(g)

Permits, Licenses and Registrations

Permits

| Permit ID | Agency or Authority | Type of Permit | Expiration Date |
|---|---|---|---|
| 12900036-12 | MN Pollution Control Agency (MPCA) | Air Quality Permit for dryer area, boiler room and process area (fermentation, milling, distillation) regulating air quality and emissions | |
| | Environmental Protection Agency / Dept. of Justice | 2002 Consent Decree to control Volatile Organic Compounds released to the atmosphere | |
| AST # 55445 | MPCA | Aboveground Storage Tanks (AST) Permit regulating the size and containment area required for spill protection of tanks | |
| MN0063151 | MPCA | National Pollutant Discharge Elimination System / State Disposal System (NPDES) Permit regulating water discharge to waters of the state | 6/30/13 |
| | Dept. of Natural Resources | Water Appropriation Permit for water well inspections and water use reporting regulations | |
| AFP-MN-20001 | U.S. Dept. of Treasury / Alcohol and Tobacco Tax and Trade Bureau (TTB) | Alcohol Fuel Producer Permit requirements for or regulations of the production and distribution of ethanol **[to the extent transferrable]** | |

Licenses

| License ID | Agency or Authority | Type of License | Expiration Date |
|---|---|---|---|
| 20140137 | State of MN | Commercial Feed License for the production, sale and transportation of feed stocks and by products from the ethanol production process **[to the extent transferrable]** | 12/31/13 |
| | State of MN | Distributors License (State equivalent to of the Alcohol Fuel Producers Permit) **[to the extent transferrable]** | 6/30/13 |
| MNR000057364 | State of MN | Hazardous Waste Generator License for generation of Industrial Hazardous Waste (Ethanol, Stillage, Lab Waste, etc.) | |

| License ID | Agency or Authority | Type of License | Expiration Date |
|---|---|---|---|
| 071812 550 42TU | US Dept. of Transportation - Pipeline / Hazardous Materials Administration | Hazardous Materials Registration License for the transportation of Hazardous Waste (Ethanol. Stillage, etc.) | 6/30/13 |

Registrations

| Registration ID | Agency or Authority | Type of Registration | Expiration Date |
|---|---|---|---|
| 11593856310 | Food & Drug Administration | Food & Drug Registration for feed stock production - Dried Distillers Grains, Wetcake, Stillage, Syrup | Feb. 2015 |
| 0021688726 | Federal Communications Commission | Hand Held Radios Registration for use of hand held radios for communication and safety throughout the facility | |
| | Dept. of Labor/ Industry | Pressure Vessel Registration for annual inspection of all pressure vessels throughout the facility (boilers, heat exchangers, air compressors, etc.) | Annual |
| | US EPA Dept. of Transportation and Air Quality | Fuel Additive Registration - 10% | |
| | US EPA Dept. of Transportation and Air Quality | Fuel Additive Registration - 15% | |

Schedule 4(h)

Litigation

1.      EPA / DOJ Consent Decree relating to MPCA Air Quality Permit

2.      Settlement Agreement and Order and Notice to Affected Employees between Purified
        Renewable Energy, LLC and Ken B. Peterson, Commissioner, Minnesota Department of
        Labor and Industry, Docket No. 11451, Inspection No. 316914175, and related OSHA
        citations described therein.

3.      Control Agency to Minnesota Energy and Purified Renewable Energy.

4.      Notice of Violation – NPDES/SDS Permit No. MN0063151 and AQ File: 2835 dated
        February 5, 2013, issued by the Minnesota Pollution Control Agency to Minnesota
        Energy and Purified Renewable Energy.

Schedule 4(j)

Environmental Compliance


1.     EPA / DOJ Consent Decree relating to MPCA Air Quality Permit

2.     Settlement Agreement and Order and Notice to Affected Employees between Purified
       Renewable Energy, LLC and Ken B. Peterson, Commissioner, Minnesota Department of
       Labor and Industry, Docket No. 11451, Inspection No. 316914175, and related OSHA
       citations described therein.

3.     Control Agency to Minnesota Energy and Purified Renewable Energy.

4.     Notice of Violation – NPDES/SDS Permit No. MN0063151 and AQ File: 2835 dated
       February 5, 2013, issued by the Minnesota Pollution Control Agency to Minnesota
       Energy and Purified Renewable Energy.

Exhibit A

**REAL PROPERTY**

The Real Property located in the County of Renville, State of Minnesota, legally described as follows:

Tract 1:

That part of Outlots 9, 10, 11, 12 and 13 of Drache and Nellermoe's First Addition to the City of Buffalo Lake, Minnesota, lying North of Minnesota State Trunk Highway Number 212;

Tract 2:

That part of Outlot D of Borden's Rearrangement of Outlots 6, 7 and 8 of Drache and Nellermoe's First Addition to the City of Buffalo Lake, Minnesota, described as follows: Beginning at the Southwest corner of said Outlot D; thence North 00°01' 44" West, assumed bearing along the West line of said Outlot D, a distance of 462.54' to the Northwest corner of said Outlot D; thence S 81°39'06" East 327.61' along the North line of said Outlot D; thence South 00°01 '44" East 416.11' to the South line of said Outlot D; thence North 89°47'57" West 324.12' along the South line of said Outlot D to the point of beginning.

Tract 3:

That portion of the East Half of the Southeast Quarter of Section 25, Township 115, Range 32, Renville County, Minnesota, lying North of the present established center line of U.S. Trunk Highway No. 212 as now located and lying South of the railroad right-of-way, and which lies West of the East 300.00 feet of said East Half of Southeast Quarter as measured perpendicular to the East line of said East Half of the Southeast Quarter.

Exhibit B

**FORM OF SALE ORDER**

Exhibit C

**FORM OF ASSUMPTION AND ASSIGNMENT AGREEMENT**

This ASSUMPTION AND ASSIGNMENT AGREEMENT, dated as of August __, 2013 (this "Agreement"), by and between Purified Renewable Energy, LLC, Debtor and Debtor-in-Possession ("Seller") and West Ventures LLC ("Buyer").

## WITNESSETH

WHEREAS, Buyer and Seller have entered into that certain Asset Purchase Agreement, dated as of July 15, 2013 (the "APA");

WHEREAS, capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the APA;

WHEREAS, pursuant to the APA, Buyer has agreed to assume from Seller the Assumed Liabilities upon the terms and subject to the conditions of the APA; and

WHEREAS, the parties desire to carry out the intent and purpose of the APA by Buyer's execution and delivery to Seller of this instrument evidencing the assumption of the Assumed Liabilities by Buyer, subject to the provisions of the APA.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

Section 1. As of the date hereof, Buyer, pursuant to, in the manner and to the extent set forth in Section 2(c) and 2(d) of the APA, hereby assumes and shall hereafter pay, perform and discharge when due the Assumed Liabilities, subject to the provisions of the APA and on the same terms and conditions as stated therein. For the avoidance of doubt, other than Assumed Liabilities, Buyer will not and does not assume any liability of any nature or kind whatsoever of Seller.

Section 2. Nothing in this Agreement, express or implied, is intended or shall be construed to confer upon, or give to, any Person, other than Seller, Buyer and their respective successors and assigns, any remedy or claim under or by reason of this instrument or any terms, covenants or conditions hereof, and all the terms, covenants and conditions, promises and agreements contained in this Agreement shall be for the sole and exclusive benefit of Seller, Buyer and their respective successors and assigns.

Section 3. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns, effective immediately upon its execution and delivery to Seller.

Section 4. This Agreement is executed and delivered pursuant to the APA. Nothing contained in this Agreement shall in any way supersede, modify, replace, amend, change or rescind the provisions of the APA, including the warranties, covenants, agreements, conditions,

or in general,, any rights, remedies or obligations of Seller or Buyer as set forth in the APA, and in the event of any conflict between the terms and conditions of the APA and the terms and conditions of this Agreement, the APA shall control.

Section 5. Section 8(g) of the APA is incorporated herein by reference and shall be deemed applicable to this Agreement mutatis mutandis.

Section 6. All actions and proceedings between Buyer and Seller arising out of or relating to this Agreement, including the resolution of any and all disputes hereunder, shall be heard and determined in the Bankruptcy Court, and Seller and Buyer hereby irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court in any such action or proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such action or proceeding. Sellers and Buyer hereby consent to service of process by mail (in accordance with Section 8(f) of the APA) or any other manner permitted by law.

Section 7. Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Agreement, or in the case of a waiver, by the party against whom the waiver is to be effective.

Section 8. This Agreement may be executed by facsimile signature and in two or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the party against whom enforcement is sought.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the undersigned has caused this Agreement to be executed by the signature of its duly authorized officer as of the date above first written.

BUYER:

WEST VENTURES LLC


By: _____

Its: _____



SELLER:

PURIFIED RENEWABLE ENERGY, LLC
Debtor and Debtor-in-Possession



By:_____

Its:_____

Exhibit D

**FORM OF WARRANTY DEED**

STATE DEED TAX DUE HEREON: $_____

Date: _____, 2013

FOR VALUABLE CONSIDERATION, PURIFIED RENEWABLE ENERGY, LLC, a limited liability company under the laws of Minnesota, as Debtor and Debtor-in-Possession, Grantor, hereby conveys and warrants to WEST VENTURES LLC, a limited liability company under the laws of Delaware, Grantee, that certain real property in Renville County, Minnesota, as more particularly described on  Exhibit A attached hereto,

Check here if part or all of the land is Registered (Torrens) □

together with all hereditaments and appurtenances belonging thereto, subject to the following exceptions:

Check box if applicable:
□ The Seller certifies that the Seller does not know of any wells on the described real property.
□ A well disclosure certificate accompanies this document.
□ I am familiar with the property described in this instrument and I certify that the status and number of wells on the described real property have not changed since the last previously filed well disclosure certificate.

<div style="margin-left: 40%;">

Grantor: PURIFIED RENEWABLE ENERGY, LLC,
a Minnesota limited liability company,
as Debtor and Debtor-in-Possession


By: _____
Name

Its: _____
Title

</div>

STATE OF MINNESOTA    )
                      )ss.
COUNTY OF HENNPIN     )

 The foregoing instrument was executed and acknowledged before me on this ___ day of August, 2013, by PURIFIED RENEWABLE ENERGY, LLC, a limited liability company under the laws of Minnesota, as Debtor and Debtor-in-Possession, on behalf of the company.


_____
Notary Public


(SEAL)


This instrument was drafted by:
Maslon Edelman Borman & Brand, LLP
3300 Wells Fargo Center
90 South 7th Street
Minneapolis, MN 55402-4104
(612) 672-8200


        Tax Statements for real property described in this instrument should be sent to:

        WEST VENTURES LLC
        152 West 57th Street
        New York, New York 10019

<u>Exhibit A to Warranty Deed</u>

Legal Description

The Real Property located in the County of Renville, State of Minnesota, legally described as follows:

Tract 1:

That part of Outlots 9, 10, 11, 12 and 13 of Drache and Nellermoe's First Addition to the City of Buffalo Lake, Minnesota, lying North of Minnesota State Trunk Highway Number 212;

Tract 2:

That part of Outlot D of Borden's Rearrangement of Outlots 6, 7 and 8 of Drache and Nellermoe's First Addition to the City of Buffalo Lake, Minnesota, described as follows: Beginning at the Southwest corner of said Outlot D; thence North 00°01' 44" West, assumed bearing along the West line of said Outlot D, a distance of 462.54' to the Northwest corner of said Outlot D; thence S 81°39'06" East 327.61' along the North line of said Outlot D; thence South 00°01 '44" East 416.11' to the South line of said Outlot D; thence North 89°47'57" West 324.12' along the South line of said Outlot D to the point of beginning.

Tract 3:

That portion of the East Half of the Southeast Quarter of Section 25, Township 115, Range 32, Renville County, Minnesota, lying North of the present established center line of U.S. Trunk Highway No. 212 as now located and lying South of the railroad right-of-way, and which lies West of the East 300.00 feet of said East Half of Southeast Quarter as measured perpendicular to the East line of said East Half of the Southeast Quarter.

<u>Exhibit E</u>

**FORM OF BILL OF SALE**

This BILL OF SALE, dated as of August __, 2013 (this "<u>Bill of Sale</u>") is by and between Purified Renewable Energy, LLC, Debtor and Debtor-in-Possession ("<u>Seller</u>") and West Ventures LLC ("<u>Buyer</u>"). Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in that certain Asset Purchase Agreement, dated as of July 15, 2013 (the "<u>APA</u>").

**WITNESSETH**

WHEREAS, Buyer and Seller entered into the APA, pursuant to which, Seller has agreed to sell, assign, convey, transfer and deliver all of their rights, title and interest in, to and under the Purchased Assets to Buyer, and Buyer has agreed to purchase and acquire all rights, title and interest in, to and under the Purchased Assets from Sellers, upon the terms and subject to the conditions of the APA; and

WHEREAS, the parties desire to carry out the intent and purpose of the APA by Seller's execution and delivery to Buyer of this instrument evidencing the vesting in Buyer of the Purchased Assets, subject to the provisions of the APA.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

<u>Section 1.</u>      As of the date hereof, Seller, pursuant to the APA and on the same terms and conditions as stated therein, hereby conveys, grants, sells, transfers, assigns, and delivers to Buyer, and its successors and permitted assigns, forever all of Seller's right, title and interest, as of the date hereof, in and to the Purchased Assets, free and clear of all Liens, Claims and Encumbrances (other than Permitted Liens of which the Sale Order does not provide for the Purchased Assets to be sold free and clear).

<u>Section 2.</u>      Seller hereby irrevocably designates, makes, constitutes and appoints Buyer, and its successors and assigns, as Seller's true and lawful attorney (and agent-in-fact), with full power of substitution, in Seller's name and stead, on behalf of and for the benefit of Buyer, and its successors and assigns, to: (a) demand and receive any and all of the Purchased Assets and to give receipts and releases for and in respect of the Purchased Assets, or any part thereof; (b) from time to time institute and prosecute in Seller's name, at the sole expense and for the benefit of Buyer, and its successors and assigns, any and all proceedings at Law, in equity or otherwise, which Buyer or its successors or assigns may deem proper in order to collect, assert or enforce any claim, right or title of any kind in or to any item of the Purchased Assets, to defend or compromise any and all actions, suits or proceedings in respect of any item of the Purchased Assets, and to do all such acts and things in relation thereto as Buyer shall deem advisable, including, without limitation, for the collection or reduction to possession of any of the Purchased Assets; (c) endorse Seller's name on any payment, instrument, notice, or other similar document or agreement relating to the Purchased Assets for the period commencing with the date

hereof that may come in to the possession of Buyer or under Buyer's control with respect to the Purchased Assets and (d) to collect the moneys which become due and payable at any time on or after the date hereof under every Acquired Asset. Seller acknowledges that the foregoing powers are coupled with an interest and shall be irrevocable by Seller.

Section 3.     Seller hereby covenants that, from time to time after the delivery of this instrument, at Buyer's request, Seller will do, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered, without further consideration, such further acts, conveyances, documents, transfers, assignments, powers of attorney and assurances as Buyer may require to convey, transfer to and vest in Buyer, to put Buyer in possession of, any of the Purchased Assets, and to obtain the full benefit of this Bill of Sale.

Section 4.     Nothing in this instrument, express or implied, is intended or shall be construed to confer upon, or give to, any Person other than Seller or Buyer and their respective successors and permitted assigns, any remedy or claim under or by reason of this instrument or any terms, covenants or conditions hereof, and all the terms, covenants and conditions, promises and agreements contained in this instrument shall be for the sole and exclusive benefit of Seller, Buyer and their respective successors and permitted assigns.

Section 5.     This Bill of Sale shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns, effective immediately upon its execution and delivery to Buyer.

Section 6.     This Bill of Sale is executed and delivered pursuant to the APA. Nothing contained in this Bill of Sale shall in any way supersede, modify, replace, amend, change or rescind the provisions of the APA, including the warranties, covenants, agreements, conditions, or in general, any rights, remedies or obligations of Seller or Buyer as set forth in the APA, and in the event of any conflict between the terms and conditions of the APA and the terms and conditions of this Bill of Sale, the APA shall control.

Section 7.     Section 8(g) of the APA is incorporated herein by reference and shall be deemed applicable to this Bill of Sale mutatis mutandis.

Section 8.     All actions and proceedings between Buyer and Seller arising out of or relating to this Bill of Sale, including the resolution of any and all disputes hereunder, shall be heard and determined in the Bankruptcy Court, and Seller and Buyer hereby irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court in any such action or proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such action or proceeding. Seller and Buyer hereby consent to service of process by mail (in accordance with Section 8(f) of the APA) or any other manner permitted by law.

Section 9.     Any provision of this Bill of Sale may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Bill of Sale, or in the case of a waiver, by the party against whom the waiver is to be effective.

Section 10.     This Bill of Sale may be executed by facsimile signature in two or more counterparts; each of which shall be deemed an original, and all of which together shall

2

constitute one and the same instrument. In proving this Bill of Sale, it shall not be necessary to produce or account for more than one such counterpart signed by the party against whom enforcement is sought.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the undersigned has caused this Bill of Sale to be executed by the signature of its duly authorized officer as of the date above first written.

BUYER:

WEST VENTURES LLC


By: _____

Its: _____



SELLER:

PURIFIED RENEWABLE ENERGY, LLC,
Debtor and Debtor-in-Possession


By:_____

Its:_____

# Exhibit B

# Executory Contracts and Unexpired Leases that may be Assumed and Assigned

| Counter-Party | Contract / Lease Description | Date of Agreement | Expiration Date | Cure Amount |
|---|---|---|---|---|
| Ryan Buboltz | Lease for 7 acres of agricultural land in Hector Township, located on the west side of 520th street | 3/15/13 | | $0 |
| Northern Natural Gas | Transportation Agreement No. 113101 with Minnesota Energy for uninterruptible natural gas | | 10/31/2013 | $3,740.59* |
| Northern Natural Gas | Transportation Agreement No. 112782 with Minnesota Energy for uninterruptible natural gas | | 10/31/2013 | $80,748.59* |
| Northern Natural Gas | Transportation Agreement No. 112781with Minnesota Energy for uninterruptible natural gas | | 10/31/2014 | $5,004.85* |
| Northern Natural Gas | Transportation Agreement No. 112714 with Minnesota Energy for uninterruptible natural gas | | 11/30/2106 | $61,930.97* |
| Twin Cities & Western Railroad Co. | Crossing Permit No. 500.1-951105 Lease with railroad for the regulated water discharge pipe under the railroad tracks to the Judicial Ditch 15 | 11/1/95 | | $0 |
| Twin Cities & Western Railroad Co. | Crossing Permit No. 488.8-951102 Lease with the railroad for the overhead pipe rack for the product loadout for rail transportation | 11/1/95 | | $0 |
| Burns & McDonnell Engineering Co. | Task Order 02 – Facility Evaluation Plan Implementation for engineering services | 2/27/13 | | Approx. $63,000 |

* Cure amounts and the terms of contract assumption are currently being negotiated between the Debtor and counterparty and the result of that negotiation will supersede the descriptions set forth above.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:

Purified Renewable Energy, LLC,

Debtor.

Case No. 13-41446

Chapter 11 Case

---

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ORDER (I) GRANTING EXPEDITED RELIEF, (II) AUTHORIZING DEBTOR TO SELL ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES TO BUYER IN ACCORDANCE WITH ASSET PURCHASE AGREEMENT; (III) APPROVING THE ASSUMPTION AND ASSIGNMENT OR REJECTION OF CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS; AND (IV) GRANTING OTHER AND FURTHER RELIEF**

---

The above-captioned debtor and debtor in possession (the "Debtor") submits this Memorandum of Law in support of it motion to sell substantially all of its assets.  The Debtor requests that the Court grant the relief requested in the Motion for Order (I) Granting Expedited Relief, (II) Authorizing Debtor to Sell Assets Free and Clear of Liens, Claims, Interests and Encumbrances to Buyer in Accordance with Asset Purchase Agreement; (III) Approving the Assumption and Assignment or Rejection of Certain Unexpired Leases and Executory Contracts; and (IV) Granting Other and Further Relief (the "Sale Motion").

## BACKGROUND

The facts in support of the relief requested are set forth in the verified Sale Motion and in the Auction Report that will be filed prior to the Sale Approval Hearing.  All capitalized terms have the meaning ascribed to them in the Sale Motion.

<u>**ARGUMENT**</u>

I.   **THE SALE IS IN THE BEST INTEREST OF THE DEBTOR'S ESTATE AND ITS CREDITORS.**

A.   <u>**The Sale is Supported by Sound Business Justifications.**</u>

Section 363(b)(1) of the Bankruptcy Code requires court approval, after notice and hearing, for sales outside of the ordinary course of business.  <u>See</u> 11 U.S.C. § 363(b)(1).  In interpreting section 363(b)(1), courts have held that a transaction involving property of the estate generally should be approved so long as the debtor can demonstrate "some articulated business justification for using, selling, or leasing the property outside the ordinary course of business." <u>In re Continental Airlines, Inc.</u>, 780 F.2d 1223, 1226 (5th Cir. 1986); <u>accord Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)</u>, 107 F.3d 558, 567, n. 16 (8th Cir. 1997); <u>In re Lionel Corp.</u>, 722 F.2d 1063, 1071 (2d Cir. 1983); <u>In re LeBlanc Inc.</u>, 299 B.R. 546, 557 (Bankr. N.D. Iowa 2003).   A bankruptcy court should give deference to a debtor's application of its sound business judgment in the use, sale or lease of property.  <u>See</u> <u>In re LeBlanc</u>, 299 B.R. at 552; <u>In re Moore</u>, 110 B.R. 924, 928 (Bankr. C.D. Cal. 1990); <u>In re Canyon Partnership</u>, 55 B.R. 520, 524 (Bankr. S.D. Cal. 1985); <u>In re Curlew Valley Assocs.</u>, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981).

Many courts have set forth factors to consider when approving a sale outside of the ordinary course, and most courts start with the factors set forth by the Second Circuit in <u>In re Lionel</u>.  Those factors are:

> the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value.

In re Lionel, 722 F.2d at 1071.

Other courts have simplified the factors to include, *inter alia*, the consideration to be paid, the financial condition and needs of the debtor, the qualifications of the buyer, and whether a risk exists that the assets proposed to be sold would decline in value if left in the debtor's possession.  Equity Funding Corp. of America v. Financial Assocs. (In re Equity Funding Corp.), 492 F.2d 793, 794 (9th Cir. 1974); In re Titusville Country Club, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991) (setting forth four elements of a "sound business purpose" test: (1) a sound business reason, (2) accurate and reasonable notice, (3) adequate price, and (4) good faith).

In light of plain language of 11 U.S.C. § 363(b)(1), which only requires "notice and hearing" before a sale and does not set out factors to consider, the Second Circuit in Lionel observed that:

> A bankruptcy judge must not be shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the Code.  As justice Holmes once said in a different context, '[s]ome play must be allowed for the joints of the machine…'.

Lionel, 722 F.2d at 1069 (quoting Missouri, Kansas & Texas Ry. Co. v. May, 194 U.S. 267 (1904)); see also Wintz v. American Freightways, Inc. (In re Wintz Cos.), 219 F.3d 807, 812 (8th Cir. 2000) ("[The] bankruptcy courts have wide discretion in structuring sales of assets.").

In the instant case, the Debtor has accepted the Credit Bid as a Qualified Bid and application of the Lionel factors to the proposed sale of the Debtor's assets leads to the conclusion that a sale should be approved.  It is the Debtor's business judgment that a sale to West Ventures pursuant to the Credit Bid or the ultimate successful bidder providing the highest and best offer represents the maximum return for the estate.

The Debtor has no source of funding to preserve the assets after the DIP Loan matures on August 31, 2013.  The Debtor does not believe any other party would be willing to provide

funding after that date under the current circumstances.  Moreover, in order to maximize the value of the plant due to weather considerations and availability of inputs such as corn, the plant must be sold as soon as possible to obtain the highest price.  The longer the Debtor's case remains in bankruptcy, the greater the costs to all parties in interest.  It is in the best interests of all parties that the case be brought to conclusion quickly.  The proposed sale is the largest step toward that result.

The proposed sale should be approved based on the factors set forth above.  The Debtor has determined, after careful evaluation of its business prospects, that a sale to West Ventures or the successful bidder will yield the greatest return.  The Debtor, with the assistance of IR1 Group, has marketed and will continue to market the Debtor's assets to prospective buyers up to the General Bid Deadline.

Generally, "the best way to determine the market value of property is to expose the property to the marketplace."  In re Mama's Original Foods, Inc., 234 B.R. 500, 504 (Bankr. C.D. Cal. 1999) (citing Bank of America Nat. Trust and Sav. Ass'n v. 203 North LaSalle Street Partnership, 526 U.S. 434, 457 (1999)).  The Debtor was able to negotiate the Credit Bid in good faith with West Ventures.  A number of potential purchasers have expressed an interest in some or all of the Debtor's assets.  The Bidding Procedures approved to the Court have encouraged a competitive bidding process, one that will yield the highest price possible for these assets, which may be reflected by the Credit Bid or determined at the conclusion of the auction.  The Bidding Procedures have provided an additional procedural safeguard that will test the value of the Debtor's assets and the opportunity for a competitive bidding process and provide potentially interested parties with another opportunity to step forward and provide greater value to the Debtor.  Finally, the Bidding Procedures have encouraged active interest from parties who

possess the financial and operation capacity to purchase the Debtor's assets if they believe the purchase price in the Credit Bid is too low.

The proposed sale is supported by sound business justifications. The Bidding Procedures and the auction should result in the highest price for the assets to be sold. All aspects of this transaction have been undertaken in good faith and provide for adequate disclosure to interested parties. Accordingly, the sale should be approved.

**B.      The Court Should Authorize the Debtor to Assume and Assign Certain Unexpired Executory Contracts and Unexpired Leases to the Successful Bidder.**

Section 365(a) of the Bankruptcy Code provides, in relevant part, that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." In re James Cable Partners, L.P., 27 F.3d 534, 537 (11th Cir. 1994); In re Family Snacks, Inc., 257 B.R. 884, 905 (B.A.P. 8th Cir. 2001) ("[D]ecision to assume or reject a contract or lease under section 365 must be approved by the court.") Courts routinely approve motions to assume, assume and assign, or reject executory contracts upon a showing that a debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment. See In re Crystalin, L.L.C., 293 B.R. 455, 463-64 (B.A.P. 8th Cir. 2003); See also, In re Chira, 367 B.R. 888, 898 (S.D. Fla. 2007) (citing In re Orion Pictures Corp., 4 F.3d 1095, 1099 (2d Cir. 1993)). In other words, the assumption or rejection of an executory contract by a debtor is subject to review under the business judgment standard. If a debtor has exercised sound business judgment, a bankruptcy court should approve the proposed assumption or rejection. As a result, courts generally will not second-guess a debtor's business judgment concerning the assumption or rejection of an executory contract or unexpired lease. See In re Crystalin, 293 B.R. at 463-64 (holding that once a business judgment showing is made, the court "should not interfere with the debtor-in-possession's business judgment"); In re Condominium Ass'n of Plaza Towers South, Inc., 43 B.R. 18, 22 (Bankr. S.D. Fla. 1984) (when applying section 365, a court will not "second

guess" a debtor's business judgment unless there is a showing that such judgment is clearly erroneous).  The "business judgment" test is not a strict standard, however; it merely requires a showing that either assumption or rejection of the executory contract or unexpired lease will benefit a debtor's estate.  See In re Crystalin, 293 B.R. 463-64 (Eighth Circuit requires a showing of a benefit to the estate);  In re Prime Motors Inns, 124 B.R. 378, 381 (Bankr. S.D. Fla. 1991). "Where the trustee's request is not manifestly unreasonable or made in bad faith, the court should normally grant approval…." In re Food Barn Stores, 107 F.3d at 567, n.16.

The Debtor, in its business judgment, has determined that the assumption and assignment of the Contracts and Leases to West Ventures or the ultimate successful bidder is in the best interests of the Debtor's estates.  Put more simply – the Debtor may not be able to close the sale without the benefit of assuming and the assigning the Contracts and Leases because a party may reasonably conclude that they are critical to the ability to continue to operate the plant.

It is a condition of the sale under the Credit Bid that the costs to cure any executory contracts or unexpired lease the successful bidder wishes to assume to be paid by West Ventures. In addition, pursuant to section 365(k) of the Bankruptcy Code, the Debtor's estate will have no liability under the Contracts and Leases following the assignment of the Contracts and Leases to West Ventures or the successful bidders.  Having the Contracts and Leases assumed and assigned is key to obtaining the highest and best price for the assets and assumption of the Contracts and Leases is necessary to sell the business assets.

Bankruptcy Code section 365(f)(2) provides the authority for the trustee, or debtor in possession, to assign executory contracts and leases as follows:

The trustee may assign any executory contract or unexpired lease of the debtor only if –

(A)      the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B)     adequate assurance of future performance by the assignee of such contract or lease is provided…

11 U.S.C. § 365(f)(2).

Whether there exists "adequate assurance of future performance" as required under section 365(b)(1) of the Bankruptcy Code involves a factual inquiry, requiring case-by-case consideration.  <u>Richmond Leasing Co. v. Capital Bank, N.A.</u>, 762 F.2d 1303, 1309-10 (5th Cir. 1985).  In the event the other parties to unexpired executory contracts challenge the West Ventures' or the successful bidder's ability to provide adequate assurance of future performance, the buyer will provide such parties and/or the Bankruptcy Court with supplemental evidence of its financial ability to perform under the Contracts and Leases to be assumed and assigned.

## C.     Establishment and Payment of Cure Costs

The Sale Motion sets forth the amounts of Cure Costs in accordance with amounts listed in the Debtor's books and records or preliminary discussions with the counterparties.  Section 365(b)(1) of the Bankruptcy Code requires that the Debtor cure, or provide adequate assurance that it promptly will cure, any outstanding defaults under the Contracts and Leases in connection with the assumption and assignment.  <u>See</u> 11 U.S.C. § 365(b)(1).  Moreover, section 365(f)(2)(B) of the Bankruptcy Code requires that the assignee of an executory contract or unexpired lease must provide counterparties with adequate assurance of future performance.  <u>See</u> 11 U.S.C. § 365(f)(2)(B).

Accordingly, West Ventures or a proposed purchaser will be responsible for providing evidence of "adequate assurance of future performance" to the extent required in connection with the assumption and assignment of the Contracts and Leases.  The meaning of "adequate assurance of future performance" for the purpose of the assumption of executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  <u>See</u> <u>In re</u>

7

Tama Beef Packing, Inc., 277 B.R. 407, 411 (Bankr. N.D. Iowa 2002) (citing In re Prime Motor

Inns, 166 B.R. at 997).  At the Sale Approval Hearing, the Debtor will provide the Court with

evidence demonstrating that all Cure Costs will be paid.  Likewise, the Debtor will demonstrate

that West Ventures or the ultimate successful bidder will be able to provide the adequate

assurance of future performance to counterparties to the Contracts and Leases.

## II.    DEBTOR CAN SELL THE ASSETS FREE AND CLEAR OF LIENS

The Debtor seeks to sell its assets free and clear of all liens, claims and interests of all

claimants and lienholders. Section 363(f) of the Bankruptcy Code provides:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of
> any interest in such property of an entity other than the estate, only if –
>
> (i)     applicable nonbankruptcy law permits sale of such property
>          free and clear of such interest;
>
> (ii)    such entity consents;
>
> (iii)   such interest is a lien and the price at which such property
>          is to be sold is greater than the aggregate value of such
>          interest;
>
> (iv)    such interest is in bona fide dispute; or
>
> (v)     such entity could be compelled, in a legal or equitable
>          proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

The Debtor submits that several of the grounds for relief under section 363(f) can be

satisfied.  First, approval of the sale of the assets to a proposed purchaser satisfies section

363(f)(2) in that creditors asserting valid interests in or against the assets either already have

consented, or prior to the sale hearing will consent (or otherwise not object), to the sale of the

assets.

8

Section 363(f)(5) also provides a means to sell the Debtor's assets free and clear of all interests over the objection of a party asserting a lien.[1] Section 363(f)(5) of the Bankruptcy Code permits such a sale if the party asserting the lien and objecting to the sale "could be compelled, in a legal or equitable proceeding, to accept a money satisfaction." Satisfaction of the standard requires only that a party *could* be compelled, not that it is being, or going to be, compelled to accept a money satisfaction. See In re Gulf States, 285 B.R. at 508 ("the phrase 'could be compelled' only requires 'that the interest in question be subject to final satisfaction on a hypothetical basis, not that there be an actual payment in satisfaction of the interest from the proceeds of the sale in question'") (citations omitted) (citing In re Healthco Int'l, Inc., 174 B.R. 174, 176 (Bankr. D. Mass. 1994); see also In re PW, LLC, 391 B.R. 25, 43-44 (B.A.P. 9th Cir. 2008). Some courts have construed the "money satisfaction of such interest" language in 363(f)(5) to mean a payment constituting less than the full payment of the underlying debt. See In re Healthco Int'l, Inc., 174 B.R. at 176. Hence, section 363(f)(5) does not require that the sale price for the assets to be sold exceed the value of the claims against it. See, e.g., In re Gulf States, 285 B.R. at 508 (citing In re Grand Slam, U.S.A., Inc., 178 B.R. 460, 462 (E.D. Mich. 1995)). Rather, section 363(f)(5) requires only that a mechanism exist to address extinguishing the interest without paying such interest in full. Id.

Any one of five conditions, including the "consent" of the lienholders, provides authority to sell free and clear of liens. See Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988). To the extent a secured creditor or lienholder that receives notice does not file a written objection to the Sale Motion, such party should be deemed to have

---

[1]   The Debtor at this time will not address the provision of section 363(f)(3). To satisfy section 363(f)(3) of the Bankruptcy Code, the purchase price for the Debtor's assets would have to be substantial enough to satisfy the interests of all existing secured claimants. While it is too early in the sale process to determine if the Debtor's assets will yield a high enough amount, it remains a possibility that section 363(f)(3) can be satisfied if there is aggressive bidding at the auction.

9

consented to the sale.  See Veltman v. Whetzal, 93 F.3d 517, 521 n.5 (8th Cir. 1996); In re

Congoleum Corp., Case No. 03-51524, 2007 WL 1428477, at *1 (Bankr. D.N.J. 2007).

Notwithstanding the Debtor's request to sell its assets free and clear of liens, the Credit

Bid provides that the Purchased Assets will be sold subject to Permitted Liens, which include

mechanics' liens or statutory liens, if any, upon the Purchased Assets to the extent having

priority over West Ventures' liens under the DIP Loan Agreement and DIP Order would not be

extinguished by the Sale Order.

The Debtor believes that each of the secured creditors with an interest in the assets to be

sold have or will consent to such a sale or will hold a Permitted Lien that will not be affected by

the sale.  In any event, the sale of Debtor's assets may occur over their objections, or any other

secured creditors' objection, so long as their respective liens attached to the sale proceeds or

there are sufficient sale proceeds to pay such secured claims in full.

## III.    GOOD FAITH PURCHASER DESIGNATION

Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m).

While the Bankruptcy Code does not define "good faith," the Third Circuit in In re Abbotts

Dairies of Pennsylvania, Inc., has stated that:

> [t]he requirement that a purchaser act in good faith…speaks to the
> integrity of his conduct in the course of the sale proceedings.
> Typically, the misconduct that would destroy a purchaser's good
> faith status at a judicial sale involves fraud, collusion between the
> purchaser and other bidders or the trustee, or an attempt to take
> grossly unfair advantage of other bidders.

788 F.2d 143, 147 (3d Cir. 1986) (quoting In re Rock Indus. Machry Corp., 572 F.2d 1195, 1198

(7th Cir. 1978); see also In re Burgess, 246 B.R. 352, 356 (B.A.P. 8th Cir. 2000); In re Lorraine

Brooke Assoc., Inc., Case No. 07-12641-BKC-AJC, 2007 WL 2257608, at * 4 (Bankr. S.D. Fla.

2007).  Moreover, at least one Court of Appeals has indicated that a party would have to show

fraud or collusion between the buyer and the debtor in possession or trustee or other bidders in

order to demonstrate a lack of good faith.  See In re Colony Hill Assocs., 111 F.3d 269, 276 (2d

Cir. 1997) (finding that the moving party did not adequately show fraud or collusion).

The Debtor intends to make an appropriate showing in the Auction Report or at the Sale

Approval Hearing that the Credit Bid or any asset purchase agreement with the ultimate

successful bidder is the result of a negotiated, arms' length transaction, in which the purchaser

acted in good faith.  The Debtor thus requests that, upon such showing, the Court find that West

Ventures or the ultimate successful bidder acted in good faith within the meaning of section

363(m) of the Bankruptcy Code.

## IV.      WAIVER OF BANKRUPTCY RULES 6004(H) AND 6006(D)

The Debtor further requests that the 14-day stay that would otherwise be imposed by

Rules 6004(h) and 6006(d) of the Bankruptcy Rules be lifted to permit the proposed sale and

related assumptions and assignments to close as soon as possible upon the entry of an order

granting the Sale Motion. The Debtor's funding under the DIP Loan terminates on August 31,

2013 and the successful bidder will need assurance of the finality of the Court's order to move to

closing within that short period after the Sale Approval Hearing.  The failure to consummate the

sale before the Debtor's use of funds expires may prevent the Debtor from safeguarding the

assets and result in irreparable harm to the assets that would diminish their value and jeopardize

the closing at the amount bid at the auction.  The Debtor requests, therefore, that the Court order

that the 14-day stay that would otherwise be imposed by Rules 6004(h) and 6006(d) of the Bankruptcy Rules be lifted.

## V.      EXPEDITED RELIEF

Fed. R. Bankr. P. 2002(a)(2) requires "21 days' notice by mail of a proposed use, sale, or lease of property of the estate other than in the ordinary course of business, unless the court for cause shown shortens the time or directs another method of giving notice." Cause exists here to grant the motion on shortened notice.

First, the filing of the Committee Adversary Proceeding on July 15, 2013 and motion to deny West Ventures' credit bid right heard on July 24, 2013 and finally resolved via stipulation on July 30, 2013, cast doubt on the Debtor's ability to maintain the auction schedule set forth in the Bidding Procedures, including the Sale Approval Hearing on August 15, 2013. Prudence and economy required the credit bidding issue be resolved before this motion was filed. Waiting until after that resolution also eliminated any confusion among parties in interest that would have resulted from rescheduling the Sale Approval Hearing.

Second, notwithstanding the recent resolution of the credit bidding issue, and for the reasons set forth in the Debtor's response to the Committee's motion to deny West Ventures' credit bid right filed at docket no. 143, the Debtor believes that maintaining the schedule set forth in the Bidding Procedures and the August 15 Sale Approval Hearing is critical to obtaining the highest value for the Purchased Assets. After the August 31, 2013 maturity of the DIP Loan, the Debtor has no access to funding to preserve the Assets or operate under chapter 11. Seasonality issues related to corn and natural gas would imperil a buyer's ability to return the ethanol plant to operations before the winter, which may cause additional delay and expense that would surely be reflected in a lower purchase price for the Purchased Assets.

Finally, informal notice of a Sale Approval Hearing in mid-August has been given to key constituents in the case and potential bidders through the approval and circulation of the Bidding Procedures since June 2013.  And the Debtor will not object to any responses to this motion filed three days before the Sale Approval Hearing, lessening the impact of an expedited hearing on any parties who choose to respond to the motion.

Given the events of the case and the condition of the Purchased Assets, cause exists to shorten the notice on this motion.

## CONCLUSION

For the foregoing reasons, the Debtor respectfully requests that this Court enter an order granting the Debtor the relief sought in the Sale Motion.

Dated:  August 1, 2013

_/e/ Douglas W. Kassebaum_____
Clinton E. Cutler (#158094)
Douglas W. Kassebaum (#386802)
FREDRIKSON & BYRON, P.A.
200 South Sixth Street, Suite 4000
Minneapolis MN 55402
(612) 492-7000
(612) 492-7077  fax
ccutler@fredlaw.com
dkassebaum@fredlaw.com

ATTORNEYS FOR DEBTOR

7061173_1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:

Purified Renewable Energy, LLC,                              Case No. 13-41446 (KAC)

                    Debtor.                                   Chapter 11 Case

---

**ORDER (I) AUTHORIZING DEBTOR, TO SELL ASSETS FREE AND CLEAR OF
LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES TO BUYER IN ACCORDANCE
WITH ASSET PURCHASE AGREEMENT; (II) APPROVING THE ASSUMPTION AND
ASSIGNMENT OR REJECTION OF CERTAIN UNEXPIRED LEASES AND
EXECUTORY CONTRACTS; AND (III) GRANTING OTHER AND FURTHER RELIEF**

---

This case came before the Court on the Debtor's Motion for Order (I) Authorizing
Debtor, to Sell Assets Free and Clear of Liens, Claims, Interests and Encumbrances;
(II) Authorizing Assumption and Assignment or Rejection of Unexpired Leases and Executory
Contracts; and (III) Granting Other and Further Relief ("Sale Motion").[1]  Appearances were noted
on the record.

Based on the Sale Motion, the arguments of counsel, all the files, records and proceedings
herein, the Court being advised in the premises, and for those reasons stated orally and recorded in
open court following the close of evidence:

**IT IS FOUND THAT**:[2]

A.     This Court has jurisdiction to hear and determine the Sale Motion pursuant to
28 U.S.C. §§ 157 and 1334 and Local Rule 1070-1.

---

[1]   All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the
      APA (as defined in paragraph I hereof) or the Sale Motion, as applicable.

[2]   Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings
      of fact when appropriate.  See Bankruptcy Rule 7052.

B.      Venue of this case (the "Chapter 11 Case") in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).

C.      Determination of the Sale Motion is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (N).  The statutory predicates for the relief requested herein are sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014.

D.      This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

E.      On May 31, 2013, the Court entered its Order (I) Granting Expedited Relief and (II) Approving Bidding Procedures for the Disposition of Substantially All of the Debtor's Assets (the "Sale Procedures Order").  The Debtor and the Buyer have complied with the Sale Procedures Order in all respects.

F.      Pursuant to the Sale Procedures Order, the Debtor timely received a $5 million Credit Bid from West Ventures on July 15, 2013, and [__] Qualified Bids on or before July 31, 2013, and an auction (the "Auction") was conducted on August 8, 2013 by the Debtor in consultation with its sales agent, IR1 Group, LLC ("IR1"), and the Committee.  The Sale Procedures Order set August 13, 2013, as the date of the hearing for an order to approve, among other things, the sale of the Purchased Assets (the "Sale Approval Hearing").

2

G.      On July __, 2013, the Debtor filed the Sale Motion and served copies of the Sale Motion in compliance with Local Rule 9013-3(a)(2) and upon all counter-parties to the Assumed Executory Contracts.

H.      Based upon the foregoing and the certificates of service filed with the Court, due, proper, timely, adequate and sufficient notice of the Sale Motion, the Auction, the Sale Approval Hearing, the sale (the "Sale") of the Purchased Assets to West Ventures LLC (collectively, with its designated affiliates, as applicable, the "Buyer") pursuant to that certain Asset Purchase Agreement by and between Purified Renewable Energy, LLC, Debtor and Debtor-In-Possession and West Ventures LLC dated as of July 15, 2013 (as the same may be amended by the Parties at any time prior to the Closing Date, the "APA"), and the proposed assumption and assignment or rejection of the Assumed Executory Contracts has been provided in accordance with section 102(1), section 363(b) and section 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014 and Local Rules 2002-1, 2002-4, 6004-1, 9013-2 and 9013-3, and in compliance with the Sale Procedures Order.  No other or further notice of the Sale Motion, the Auction, the Sale Approval Hearing, the Sale, the proposed assumption and assignment or rejection of the Assumed Executory Contracts or the entry of this order (the "Sale Order") is required or necessary.

I.      The Sale Motion provided that the non-Debtor parties to the Assumed Executory Contracts had until _____ days before the Sale Approval Hearing (the "Contract Objection Deadline") to file an objection to (i) the proposed assumption and assignment of such Assumed Executory Contracts and/or (ii) the proposed Cure Amount as set forth in the Sale Motion (a "Contract Objection").  To the extent that any party did not timely file a Contract Objection by the Contract Objection Deadline, such party shall be deemed to have consented to (i) the

3

assumption and assignment of the Assumed Executory Contract, and (ii) the proposed Cure Amount.

J.        All parties in interest, including, without limitation, all parties who claim an interest in, a claim against or lien upon the Purchased Assets, all creditors and shareholders of the Debtor, all federal, state and local environmental authorities, all asbestos, silica and other tort claimants, and all Governmental Entities who have, or as a result of the Sale of Purchased Assets may have, claims, contingent or otherwise against the Debtor, have been given a reasonably opportunity to object and be heard regarding the relief requested in the Sale Motion and the Sale. All objections to the Sale Motion and the Sale were resolved, withdrawn or overruled at the Sale Approval Hearing.

K.        As demonstrated by the testimony and/or other evidence proffered or adduced at the Sale Approval Hearing: (a) the offer from the Buyer embodied in the APA constitutes the highest and best offer for the Purchased Assets; [(b) the Debtor conducted an Auction in accordance with, and have otherwise complied in all respects with, the Sale Procedures Order; (c) the auction process set forth in the Sale Procedures Order afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Purchased Assets; and (d) the Auction was duly noticed and conducted in a non-collusive, fair, and good faith manner and a reasonable opportunity has been given to any interested party to make a higher and better offer for the Purchased Assets.]

L.        In accordance with the Sale Procedures Order, the Bidding Procedures [and the auction procedures adopted by IR1 for the Auction], the Buyer was deemed a Qualified Bidder (as defined in the Bidding Procedures) and the Buyer's bid for the Purchased Assets (the "Buyer's Bid") was deemed a Qualified Bid (as defined in the Bidding Procedures) and was

eligible to participate at the Auction.  Buyer's status as an "insider" of Debtor (as such term is defined in the Bankruptcy Code) was fully disclosed to all participants at the Auction.

M.      The Credit Bid under the APA constitutes the highest and best offer for the Purchased Assets, and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative.  The Debtor's determination that the APA constitutes the highest and best offer for the Purchased Assets constitutes a valid and sound exercise of the Debtor's business judgment.

N.      The APA represents a fair and reasonable offer to purchase the Purchased Assets under the circumstances of this Chapter 11 Case.  No other person or entity or group of entities has offered to purchase the Purchased Assets for greater economic value to the Debtor's estate than the Buyer.

O.      The consideration provided by the Buyer for the Purchased Assets (i) exceeds the liquidation value of the Purchased Assets and (ii) is fair and reasonable, and constitutes fair consideration and reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code) under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.  Approval of the APA and the Sale of the Purchased Assets in accordance with this Sale Order and the APA are in the best interests of the Debtor's estate, its creditors and other parties in interest.  The terms of the APA were negotiated at arms'-length and are fair and reasonable.

P.      The APA was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession or the District of Columbia.  Neither the Debtor nor the Buyer is entering

into the transactions contemplated by the APA fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims.

Q.      The Debtor has demonstrated compelling circumstances, good, sufficient and sound business purposes for the Sale of the Purchased Assets pursuant to section 363(b) of the Bankruptcy Code outside of a plan of reorganization and that the Sale of the Purchased Assets pursuant to the APA constitutes a reasonable and sound exercise of the Debtor's business judgment, in that, among other things:

a.      To maximize the value of the Purchased Assets, a sale must be accomplished within the time constraints set forth in the APA, the Sale Procedures Order and the Bidding Procedures because the value of the Purchased Assets may decrease during the time it would otherwise take to propose and confirm a plan of reorganization, and, in any event, a plan may not be necessary or confirmable in this Chapter 11 Case;

b.      Claims against the Debtor's estate will be minimized as a result of the prompt consummation of a Sale of Purchased Assets.  The Buyer will be assuming certain Assumed Liabilities.  To the extent that the Buyer assumes the Assumed Liabilities, the holders of such Assumed Liabilities will have no further recourse against the Debtor or its estate and the rights of the holders of such claims to pursue the Debtor or its estate for liability arising from such Assumed Liabilities will be extinguished; and

c.      The Sale does not constitute a de facto plan of reorganization or liquidation or an element of such a plan for any of the Debtor, as it does not and does not propose to:  (i) impair or restructure existing debt of, or equity interests in, the Debtor; (ii) impair or circumvent voting rights with respect to any future plan proposed by the Debtor; (iii) circumvent chapter 11 plan safeguards, such as those set forth in sections 1125 and 1129 of the Bankruptcy Code;  or (iv) classify claims or equity interests, compromise controversies or extend debt maturities.

R.      The Debtor (i) has full corporate or other power to execute, deliver and perform its obligations under the APA and all other documents contemplated thereby or entered into in connection therewith, and the Sale of the Purchased Assets by the Debtor has been duly and validly authorized by all necessary corporate or similar action, and (ii) has taken all action necessary to authorize and approve the APA and such other documents contemplated thereby and the consummation by them of the transactions contemplated thereby or entered into

connection therewith.  No further approvals (including but not limited to third-party approvals), other than those expressly provided for in the APA, if any, are required for the Debtor to consummate such transactions.

S.      The Debtor is authorized and directed to sell and transfer the Purchased Assets free and clear of all Liens, Claims, Encumbrances and Interests (as that term is defined in paragraph 9 hereof) because they have satisfied the requirements of section 363(f) of the Bankruptcy Code.

T.      Except for the Assumed Liabilities and the Permitted Liens expressly provided for in the APA, the transfer of the Purchased Assets to the Buyer, and assumption and assignment to the Buyer of the Assumed Executory Contracts, will not subject the Buyer to any Lien, Claim, Encumbrance and Interest whatsoever with respect to the operation of the Debtor's business prior to the Closing Date, including, without limitation, any liability arising from any of the following: (i) any employment or labor agreements, consulting agreements, severance arrangements, change in control agreements or other similar agreements to which the Debtor is or was a party, (ii) any pension, welfare, compensation or other employee benefit plans, agreements, practices, and programs, including without limitation, any pension plan of the Debtor, (iii) the cessation of the Debtor's operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation or other employee benefit plans, agreements, practices and programs and any obligations with respect thereto that arise from the Employee Retirement Income Security Act of 1974, the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964, the Age Discrimination and Employment Act of 1967, the Federal Rehabilitation Act of 1973, the National Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act of 1985 or the Worker Adjustment and Retraining Notification Act,

7

(iv) workmen's compensation, occupational disease or unemployment or temporary disability insurance claims, (v) environmental liabilities, debts, claims or obligations which may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation and Liability Act, the Minnesota Environmental Rights Act or any other environmental, health and safety requirements, (vi) any bulk sales or similar law, (vii) any litigation by or against the Debtor and (viii) the laws of the United States, any state, territory or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, in any theory of law or equity, including without limitation, any theory of equitable law, including without limitation, any theory of antitrust or successor or transferee liability.

U.     Those holders of Liens, Claims, Encumbrances and Interests against the Debtor, its estate or in respect of any of the Purchased Assets who did not object, or who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code.  The Debtor has met the requirements, in each instance, of one or more of the standards set forth in section 363(f) of the Bankruptcy Code with respect to all other holders of Liens, Claims, Encumbrances and Interests.

V.     The Buyer would not have entered into the APA and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtor, its estate and its creditors, if the sale of the Purchased Assets to the Buyer, the assumption of liabilities and obligations as set forth in the APA by the Buyer and the assignment of the Assumed Executory Contracts were not free and clear of all Liens, Claims, Encumbrances and Interests including, but not limited to, successor liability.

W.     The APA was negotiated, proposed and entered into by the parties in good faith, from arms' length bargaining positions and without collusion.  The Debtor has followed in good

faith the procedures for notice and sale of the Purchased Assets as set forth in the Sale Procedures Order. Neither the Debtor nor the Buyer have engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application of section 363(n) of the Bankruptcy Code to the Sale and the transactions contemplated by the APA, and the aggregate price paid by Buyer for the Purchased Assets was not controlled by any agreement among the bidders. The Buyer is entitled to the full protections afforded under section 363(m) of the Bankruptcy Code because (a) except as set forth in the Sale Procedures Order, the Buyer recognized that the Debtor was free to deal with any other party interested in acquiring the Purchased Assets; (b) the Buyer complied with the provisions in the Sale Procedures Order; (c) the Buyer agreed to subject its Credit Bid to the competitive bidding procedures set forth in the Sale Procedures Order; (d) the Debtor's chapter 11 filing was authorized by a majority of the Debtor's independent managers or directors; (e) all consideration to be provided by the Buyer in connection with the Sale have been disclosed; and (f) the negotiation and execution of the APA was at arms' length and in good faith.

X.      IR1 acted as the Debtor's advisor for the sale of the Purchased Assets and worked with the Debtor and the Buyer to negotiate and finalize the APA and the conveyance of the Purchased Assets to the Buyer pursuant hereto. To the extent that IR1 or any other Person is entitled to any fees in connection with negotiation and consummation of the Sale, Buyer shall not be liable in any way for such fees. The Debtor and its estate shall be solely liable to IR1 or any other Person for any such fees.

Y.      In the absence of a stay pending appeal if the Closing occurs at any time after entry of this Sale Order, then, with respect to the APA, the Buyer, as a purchaser in good faith of

9

the Purchased Assets, shall be entitled to the protections of section 363(m) of the Bankruptcy Code if this Sale Order or any authorization contained herein is reversed or modified on appeal.

Z.      The Debtor is the sole and lawful owner of the Purchased Assets.  Effective as of the Closing, the transfer of the Purchased Assets is or will (i) constitute legal, valid and effective transfer of property of the Debtor's estate to the Buyer, as more particularly set forth in the APA, and (ii) vest the Buyer with all right, title, and interest of the Debtor and the Debtor's estate in and to the Purchased Assets free and clear of all Liens, Claims, Encumbrances and Interests under sections 363(f) and 105 of the Bankruptcy Code.

AA.      Adequate notice and opportunity to be heard was provided to parties to Assumed Executory Contracts to be assumed and assigned or rejected pursuant to this Sale Order.  Further, parties received adequate notice and an opportunity to object to the Cure Amount owed by the Debtor's estate on account of the Assumed Executory Contracts to be assumed and assigned to the Buyer under the APA.

BB.      The Debtor has demonstrated that it is an exercise of its sound business judgment to assume and assign the Assumed Executory Contracts, as defined in the APA and described on Schedule 2(a)(i)(E) to the APA, including any amendments or modifications to such Schedule as agreed to by the Debtor and Buyer pursuant to the APA, in connection with the consummation of the Sale of Purchased Assets, and the assumption and assignment of the Assumed Executory Contracts is in the best interests of the Debtor, its estate, its creditors and its equity holders. The Assumed Executory Contracts being assigned to the Buyer as set forth in the APA are an integral part of the Debtor's business being purchased by the Buyer and, accordingly, such assumption and assignment of the Assumed Executory Contracts is reasonable, enhances the value of the Debtor's estate, and does not constitute unfair discrimination.

10

CC.     All amounts which the Debtor or Buyer are required to pay in connection with the assumption and assignment of the Assumed Executory Contracts are as follows:  The Debtor has obtained a waiver or the Buyer has paid or will pay the Cure Amounts, if any, set forth in the Sale Motion and due or owing under sections 365(b)(1)(A) and (B) and 365(f)(2)(A) of the Bankruptcy Code to (i) cure any defaults under each of the Assumed Executory Contracts that is not removed from Schedule 2(a)(i)(E) in accordance with Section 2(a)(i)(E) of the APA and (ii) pay all actual or pecuniary losses that have resulted from such defaults.  Accordingly, the Debtor has satisfied the requirements of sections 365(b)(1)(A) and (B) and section 365(f)(2)(A) of the Bankruptcy Code. The Assumed Executory Contracts are unexpired leases or executory contracts within the meaning of the Bankruptcy Code.  The promises of Buyer to pay the Cure Amounts and the Buyer's promise to perform the obligations under the Assumed Executory Contracts after the Closing Date shall constitute adequate assurance of the Buyer's future performance under the Assumed Executory Contracts being assigned to it within the meaning of sections 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code.

DD.     The assumption and assignment of the Assumed Executory Contracts is integral to the APA and is in the best interests of the Debtor and its estate, creditors and equity holders and represents the exercise of the Debtor's sound business judgment.  Any objections to the assumption and assignment of any of the Assumed Executory Contracts to the Buyer are overruled.  Any objections to the Cure Amounts associated with such Assumed Executory Contracts are overruled, resolved or withdrawn as set forth in this order.  To the extent that any counterparty to any of the Assumed Executory Contracts failed to timely object to (i) the proposed assumption and assignment of the applicable Assumed Executory Contract or (ii) the Cure Amount associated with the applicable Assumed Executory Contract, such counterparty is

deemed to have consented to such Cure Amount and the assumption and assignment of its respective Assumed Executory Contract to the Buyer.

EE.     The Debtor has demonstrated that it is an exercise of its sound business judgment to reject the Excluded Executory Contracts, including any amendments or modifications as agreed to by the Debtor and Buyer pursuant to the APA (the "Rejected Contracts"), in connection with the consummation of the Sale of the Purchased Assets, and rejection of the Rejected Contracts is in the best interest of the Debtor, the estate, the creditors and the equity holders.

FF.     Unless such liabilities expressly constitute Permitted Liens or Assumed Liabilities of the Buyer pursuant to the APA or this Sale Order, the transfer of the Purchased Assets does not and will not subject the Buyer to any liability for Liens, Claims, Encumbrances and Interests under the laws of the United States, any state, commonwealth, territory or possession thereof or the District of Columbia applicable to such transactions by reason of such transfer of the Purchased Assets.

GG.     Neither the Buyer nor its affiliates shall be deemed, as a result of any action taken in connection with the purchase of the Purchased Assets, to: (1) be a successor (or other such similarly situated party) to the Debtor (other than with respect to the Assumed Liabilities as expressly stated in the APA); (2) have, *de facto* or otherwise, merged with or into the Debtor; (3) be a mere continuation of the Debtor or its estate (and there is no continuity of enterprise between the Buyer and the Debtor); or (4) be holding itself out to the public as a continuation of the Debtor.  The Buyer is not acquiring or assuming any liability, warranty or other obligation of the Debtor, except as expressly set forth in the APA with respect to the Assumed Liabilities.  The Debtor and its estate release and forever discharge the Buyer and any of its affiliates, designees,

successors and assigns from any and all claims, causes of action, obligations, liabilities, demands, losses, costs and expenses of any kind, character or nature whatsoever, known or unknown, fixed or contingent, relating to the Auction and the Sale, except for liabilities and obligations under the APA.

HH.     The Debtor has good, valid and marketable title to all of the Purchased Assets.  At Closing, the Purchased Assets shall be transferred free and clear of any and all Liens, Claims, Encumbrances and Interests.  All of the Purchased Assets are, or will on the date of Closing, be owned by the Debtor and will be transferred under the APA.

**IT IS ORDERED:**

## General Provisions

1.     The Sale Motion is granted to the extent provided herein.

2.     All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled, including all reservations of rights included therein, which are not otherwise provided for by this Sale Order, are overruled on the merits.

3.     Notice of the Sale Approval Hearing was fair and equitable under the circumstances and complied in all respects with the Sales Procedures Order and with sections 102(1), 105, 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014 and Local Rules 2002-1, 2002-4, 6004-1, 9013-2 and 9013-3.

## Approval of the APA

4.     Each and every term of the APA and all other ancillary documents is hereby approved.

5.      The Sale of the Purchased Assets to Buyer pursuant to the APA is authorized under sections 363 and 365 of the Bankruptcy Code and the entry of the Debtor into the APA is approved.

6.      The Debtor, through any corporate officer, is authorized and directed to execute and deliver, and empowered to fully perform under, consummate, implement and close the APA, together with all additional instruments and documents that may be reasonably necessary or desirable to implement such agreements, including taking any actions that otherwise would require further approval by shareholders or the Debtor's boards of directors (or any equivalent thereof) (without the need of obtaining such approvals) and to take all further actions as may be reasonably requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer, or reducing to possession, any or all of the Purchased Assets, or as may be necessary or appropriate to the performance of the obligations of the Debtor under the APA, including effectuating amendments to the APA in furtherance thereof.   Any Persons necessary to effect the transactions contemplated by the APA are hereby ordered to execute any and all documents necessary to effect such transactions.  If any such Person fails to comply with the provisions of this paragraph 6 prior to the Closing Date, such Person shall nonetheless be deemed bound to any and all documents necessary to effect the transactions contemplated under the APA.

7.      The Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the APA or any other Sale-related document.  The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Sale Order.

14

8.      The Buyer shall have no obligation to proceed with the Closing until all conditions precedent in the APA to its obligation to do so have been met, satisfied or waived in accordance with the terms of the APA.

**Transfer of the Purchased Assets**

9.      Except to the extent set forth in the APA, pursuant to 11 U.S.C. §§ 105, 363 and 365, the Purchased Assets shall be transferred to the Buyer, in accordance with the APA, and such transfer shall constitute a legal, valid, binding, and effective transfer of such Purchased Assets and shall vest Buyer with title to the Purchased Assets, free and clear of all Liens (as defined in the section 101(37) of the Bankruptcy Code) excluding the Permitted Liens, Claims (as defined in section 101(5) of the Bankruptcy Code) and Encumbrances (as defined in the APA), including Claims of equity security holders (as defined in Section 101(17) of the Bankruptcy Code), security interests, financing statements, mortgages, demands, guaranties, options, rights (including, but not limited to, rights of first refusal, rights of way and rights of recovery), contractual commitments, pledges, restrictions (including, but not limited to, any restriction on the use, transfer, receipt of income or other exercise of any attributes of ownership of the Purchased Assets and all debts arising in any way in connection with any acts of the Debtor), easements, causes of action, counterclaims, defenses, personal injury and other tort claims (including without limitation (i) with respect to exposure to asbestos, crystalline silica or other hazardous materials or (ii) with respect to any products sold by the Debtor or their affiliates), covenants, defects, hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, conditional sale or other title retention agreements, options, contracts, offsets, recoupment, rights of recovery, judgments, orders, and decrees of any court or Governmental Entity, interests, successor, transferee, products liability, environmental, tax (including but not

15

limited to taxes arising under or out of, in connection with, or in any way relating to Purchased

Assets or the operation of the Debtor' businesses prior to the Closing Date) and other liabilities,

obligations and claims of any kind or nature, including, without limitation, any claims arising

under the Employee Retirement Income Security Act of 1974, the Fair Labor Standard Act, Title

VII of the Civil Rights Act of 1964, the Age Discrimination and Employment Act of 1967, the

Federal Rehabilitation Act of 1973, the National Relations Act, the Consolidated Omnibus

Budget Reconciliation Act of 1985 or the Workers Adjustment Restraining and Notification Act,

29 U.S.C. § 2101, et seq., or any collective bargaining agreements or other applicable law,

whether arising prior to or subsequent to the commencement of the Chapter 11 Case, whether

arising in connection with the transactions authorized by this Sale Order, and whether imposed

by agreement, understanding, law, equity or otherwise, whether secured or unsecured, choate or

inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or

unrecorded, contingent or non-contingent, liquidated or unliquidated, matured or unmatured,

disputed or undisputed, or known or unknown (the foregoing collectively referred to as "Liens,

Claims, Encumbrances and Interests" herein, *provided, however*, the term "Liens, Claims,

Encumbrances and Interests" shall not include Assumed Liabilities or Permitted Liens), except

as otherwise set forth in the APA.  All such Liens, Claims, Encumbrances and Interests released,

terminated and discharged as to the Purchased Assets shall attach to the sale proceeds with the

same validity, force and effect which they now have as against the Debtor, its estate or the

Purchased Assets.  The sole and exclusive right and remedy available to purported creditors,

equity holders, including, without limitation, equity holders of the Debtor, holders of any other

Liens, Claims, Encumbrances and Interests, and parties in interest shall be a right to assert Liens,

Claims, Encumbrances and Interests against the Debtor's estate.

16

10.     All persons and entities (including, but not limited to, the Debtor, the Committee creditors, equity holders, including, without limitation, employees, former employees and shareholders, administrative agencies, Governmental Entities, secretaries of state, federal, state and local officials) and their respective successors or assigns and any trustees thereof, shall be and are hereby permanently and forever barred, restrained and enjoined from commencing or continuing in any manner any action or other proceeding of any kind against the Purchased Assets or the Buyer and its successors or assigns as alleged successor or otherwise with respect to any Liens, Claims, Encumbrances and Interests of any kind and nature with respect to the Purchased Assets arising prior to the Closing Date.  If the proposed Sale fails to close for any reason, then Liens, Claims, Encumbrances and Interests shall continue against the Purchased Assets unaffected by this Sale Order.  As of the Closing, the Buyer shall have any and all rights, claims, defenses and offsets held by Debtor and the estate with respect to Assumed Liabilities and Permitted Liens.

11.     Except for Assumed Liabilities and Permitted Liens as set forth in the APA, the transfer of the Purchased Assets pursuant to this Sale Order shall not subject the Buyer to any liability with respect to any obligations incurred in connection with, or in any way related to the Purchased Assets, prior to the date of Closing or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable subordination or successor or transferee liability.  The sole and exclusive right and remedy available to any Person who asserts any Liens, Claims, Encumbrances and Interests or other liability with respect to any obligations in connection with, or in any way related to the Purchased Assets, and incurred or otherwise arising prior to the date

of Closing or by reason of the Sale shall be a right to assert such Liens, Claims, Encumbrances

and Interests or other liability against the Debtor's estate.

## Assumption and Assignment to Buyer of Assumed Executory Contracts

12.       Pursuant to 11 U.S.C. §§ 105(a) and 365, and subject to and conditioned upon the

Closing of the Sale, the Debtor's assumption and assignment to the Buyer, and the Buyer's

assumption on the terms set forth in the APA, of the Assumed Executory Contracts is approved,

and the requirements of 11 U.S.C. §§ 365(b)(1) and 365(f)(2) with respect thereto are deemed

satisfied.

13.       The Debtor is authorized and directed in accordance with 11 U.S.C. §§ 105(a) and

365 to (a) assume and assign to Buyer, effective upon the Closing of the Sale, the Assumed

Executory Contracts free and clear of all Liens, Claims, Encumbrances and Interests, other than

the Assumed Liabilities, and (b) execute and deliver to the Buyer such documents or other

instruments as may be necessary to assign and transfer the Assumed Executory Contracts to the

Buyer; *provided, however,* that prior to the Closing, the Buyer may identify any Assumed

Executory Contract as one that the Buyer no longer desires to have assigned to it and such

contract shall be deemed to be an Excluded Asset.

14.       With respect to the Assumed Executory Contracts:  (a) each Assumed Executory

Contract is an unexpired lease or executory contract under section 365 of the Bankruptcy Code;

(b) the Debtor may assume each of the Assumed Executory Contracts in accordance with section

365 of the Bankruptcy Code; (c) the Debtor may assign each Assumed Executory Contract in

accordance with sections 363 and 365 of the Bankruptcy Code, and any provisions in any

Assumed Executory Contract that prohibit or condition the assignment of such Assumed

Executory Contract or allow the party to such Assumed Executory Contract to terminate,

recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Assumed Executory Contract, upon the assignment of the same, constitute unenforceable anti-assignment provisions which are void and of no force and effect; (d) all other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtor and assignment to Buyer of each Assumed Executory Contract have been satisfied; (e) the Assumed Executory Contracts shall be transferred and assigned to the Buyer and, following the Closing, shall remain in full force and effect for the benefit of Buyer, notwithstanding any provision in any such Assumed Executory Contract (including those of the type described in sections 365(b)(2), (c)(1)  and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code, the Debtor shall be relieved from any further liability with respect to the Assumed Executory Contracts after such assignment to and assumption by Buyer; and (g) upon Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, Buyer shall be fully and irrevocably vested in all right, title and interest of each Assumed Lease and Acquired Contract.

15.     Each of the Assumed Executory Contracts shall, upon assignment to the Buyer, be deemed to be valid and binding on the Buyer and in full force and effect and enforceable in accordance with its terms, and following such assignment, the Debtor and the estate shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any liability for any breach of such Assumed Executory Contracts occurring after such assignment.

16.     Each non-Debtor party to an Assumed Executory Contract is barred and enjoined from asserting against the Buyer, the Debtor or the Debtor's estate (a) any default existing as of the date of the Sale Approval Hearing if such default was not raised or asserted in a timely

manner prior to the entry of the Sale Order, (b) any objection to the assumption and assignment

of such non-Debtor party's Assumed Executory Contract or the Cure Amount, if any, of which

the non-Debtor party was given notice prior to the Sale Approval Hearing or (c) any assignment

fee, breach, claim or pecuniary loss existing as of the Closing Date or arising by reason of the

Closing.  The assignment of each such Assumed Executory Contract to the Buyer will not cause

a default or otherwise allow the non-Debtor party thereto to terminate or adversely affect the

Buyer's rights thereunder.  Unless expressly provided in the APA, in no event shall the Buyer be

liable for any pre-Closing liabilities arising from or related to any Assumed Executory Contract

with the exception of the Assumed Liabilities.

17.    All defaults or other obligations of the Debtor under the Assumed Executory

Contracts arising or accruing prior to the satisfaction of the terms and conditions of the APA and

the Closing (without giving effect to any acceleration clauses or any default provisions of the

kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured by the Buyer or the

Debtor (in accordance with the APA) by payment of the applicable Cure Amounts (such amounts

as established in accordance with the Sale Motion and the APA or by mutual agreement among

the Debtor, the Buyer and the non-Debtor party to such Assumed Executory Contract) at the

Closing or as soon thereafter as practicable, and the Buyer shall have no other liability or

obligation with respect to defaults, breaches or other obligations incurred, arising or accruing

prior to the Closing Date, except as otherwise expressly provided herein or in the APA.  The

payment of the applicable Cure Amounts, in accordance with the APA, shall (a) effect a cure of

all defaults existing thereunder as of the date that such Assumed Executory Contract is assumed

and (b) compensate for any actual pecuniary loss to such non-Debtor party resulting from such

default.  To the extent that any counterparty to an Assumed Executory Contract did not object

timely to the assignment of such Assumed Executory Contract and/or to the applicable Cure Amount as set forth in the Sale Motion, such counterparty is deemed to have consented to such Cure Amount and the assignment of its respective Assumed Executory Contract to the Buyer.

18.     There shall be no rent accelerations, assignment fees, increases or any other fees charged to the Buyer or the Debtor as a result of the assumption, assignment and/or transfer of any Assumed Executory Contract.

19.     The Buyer's promise to pay the Cure Amounts (to the extent obligated to do so under the APA) and to perform the obligations under the Assumed Executory Contracts after the Closing Date shall constitute adequate assurance of its future performance under the Assumed Executory Contracts being assigned to it within the meaning of sections 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code.

20.     Upon assignment of the Assumed Executory Contracts to the Buyer at or subsequent to the Closing, no default shall exist under any Assumed Executory Contract and no non-Debtor party to any Assumed Executory Contract shall be permitted to declare a default by or against the Buyer under such Assumed Executory Contract or otherwise take action against the Buyer as a result of such assignment or the Debtor's financial condition, bankruptcy or failure to perform any of its obligations under the Assumed Executory Contract.  Upon entry of this Sale Order and assumption and assignment of the Assumed Executory Contracts, the Buyer shall be deemed in compliance with all terms and provisions of the Assumed Executory Contracts

21.     Notwithstanding anything to the contrary in this Sale Order, no executory contract or unexpired lease will be assumed and assigned pursuant to this Sale Order until the Closing.

22.     The failure of the Debtor or Buyer to enforce at any time one or more terms or conditions of any Assumed Executory Contract shall not be a waiver of such terms or conditions, or of the Debtor's and Buyer's rights to enforce every term and condition of the Assumed Executory Contracts.

**Rejection of Rejected Contracts**

23.     The Rejected Contracts shall be deemed rejected by the Debtor as of the date of Closing of the Sale pursuant to section 365 of the Bankruptcy Code.

24.     Any person or entity that asserts a Claim against the Debtor's estate arising from the rejection of any of the Rejected Contracts shall be required to file a proof of claim with the Bankruptcy Court on or before thirty (30) days following service of this Sale Approval Order, or be forever barred from asserting such a Claim.

25.     Buyer shall not have any liability or other obligation arising from the Rejected Contracts or the rejection thereof. Any party to a Rejected Contract shall be forever and permanently enjoined, barred and estopped from asserting against the Buyer, any of its affiliates, its successors or assigns, their property or the Acquired Assets, any claim, lien or interest on account of any Rejected Contract or the rejection thereof.

**Additional Provisions**

26.     The transaction contemplated by the APA is undertaken by the Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale to the Buyer.  The Buyer is a purchaser in good faith of the Purchased Assets, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

27.     The consideration provided by the Buyer for the Purchased Assets under the APA (i) shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and under the other laws of the United States, any state, territory, possession or the District of Columbia and (ii) is fair and reasonable and may not be avoided under section 363(n) or any other provision of the Bankruptcy Code, or otherwise.

28.     Neither the Buyer nor its affiliates shall be deemed, as a result of any action taken in connection with the purchase of the Purchased Assets, to: (1) be a successor (or other such similarly situated party) to any of the Debtor (other than with respect to the Assumed Liabilities as expressly stated in the APA), including a "successor employer" for the purposes of the Internal Revenue Code of 1986 or the Employee Retirement Income Security Act of 1974; (2) have, *de facto* or otherwise, merged with or into any of the Debtor; (3) be a mere continuation of the Debtor or its estate (and there is no continuity of enterprise between the Buyer and the Debtor); or (4) be holding itself out to the public as a continuation of the Debtor.

29.     Each holder of Liens, Claims, Encumbrances and Interests in, against or upon the Purchased Assets (excluding holders of the Permitted Liens) is hereby authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release such holder's Liens, Claims, Encumbrances and Interests in, against or upon the Purchased Assets, if any, as such Liens, Claims, Encumbrances and Interests may have been recorded or may otherwise exist.  If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing any purported Liens, Claims, Encumbrances and Interests in, against or upon the Purchased Assets (excluding the Permitted Liens) prior to the Closing Date of the Sale, and has not executed termination

statements, instruments of satisfaction or releases, in form and substance satisfactory to the Buyer, of all Liens, Claims, Encumbrances and Interests which such person or entity has or purports to have with respect to the Purchased Assets, then on the Closing Date, or as soon as possible thereafter, (a) the Debtor is hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Purchased Assets and (b) the Buyer is hereby authorized on behalf of each of the Debtor's creditors, to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Liens, Claims, Encumbrances and Interests in, against, or upon the Purchased Assets (excluding the Permitted Liens) of any kind or nature whatsoever.

30.     All entities that are presently, or on the Closing Date may be, in possession of some or all of the Purchased Assets are hereby directed to surrender possession of the Purchased Assets to the Buyer on the Closing Date, or as otherwise directed by Buyer, with the Liens, Claims, Encumbrances and Interests of such entity to be satisfied solely from the proceeds of the Sale.

31.     To the greatest extent available under applicable law, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration and Governmental Authorization or approval of the Debtor with respect to the Purchased Assets, and all such licenses, permits, registrations and Governmental Authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Buyer as of the Closing Date.

32.     The Buyer is not a successor to the Debtor or any of its affiliates or the estate by reason of any theory of law or equity.  The Buyer and its employees, officers, directors, advisors,

affiliates, owners, successors and assigns shall have no liability or responsibility for any liability

or other obligation of the Debtor or the estate arising under or related to the Purchased Assets or

other assets, operations, activities, or businesses of Debtor other than for the Assumed Liabilities

or Permitted Liens.  Without limiting the generality of the foregoing, and except as otherwise

specifically provided for herein and in the APA, the Buyer and its employees, officers, directors,

advisors, affiliates, owners, designees, successors and assigns shall not be liable for any Liens,

Claims, Encumbrances and Interests, including but not limited to under any theory of successor

or vicarious liability, antitrust, environmental or labor law, *de facto* merger or substantial

continuity, of any kind or character whether known or unknown as of the Closing Date, now

existing or hereafter arising, whether fixed or contingent, with respect to the Sale, the Debtor or

the estate or any obligations of the Debtor or the estate arising prior to the Closing Date,

including but not limited to, liabilities arising, accruing, or payable under, out of, in connection

with, or in any way relating to the Purchased Assets or the Business or the other assets,

operations, activities, or businesses of the Debtor.

33.      This Sale Order (a) is and shall be effective as a determination that, at Closing, all

Liens, Claims, Encumbrances and Interests (excluding the Permitted Liens) existing as to the

Purchased Assets prior to the Closing Date have been and hereby are unconditionally released,

discharged and terminated as to the Purchased Assets, and that the conveyance described in this

Sale Order has been effected, (b) is and shall be effective to cause all Liens, Claims,

Encumbrances and Interests to attach to and be perfected in the proceeds of the Sale of the

Purchased Assets, in the order of their priority, with the same validity, force and effect which

they now have as against the Purchased Assets, without the need to file any financing statements

or other evidence of perfection, and (c) is and shall be binding upon and govern the acts of all

entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, Governmental Entities, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.

34.     The Debtor or the Buyer and any agent or representative of either of them, are each authorized and empowered to serve upon all filing and recording officers a notice when filing or recording any instruments of transfer (including, without limitation. deeds, leases, and assignments, modifications and terminations of leases) in accordance with this Sale Order and the APA to evidence and implement this paragraph of the Sale Order.  All filing and recording officers are hereby directed to accept, file and record all instruments of transfer including, without limitation, deeds, leases, and assignments, modifications and terminations of leases (if any) to be filed and recorded pursuant to and in accordance with this Sale Order or the APA and the various documents related thereto.

35.     All persons and entities are prohibited and enjoined from taking any action to adversely effect or interfere with the ability of the Debtor to transfer the Purchased Assets to the Buyer in accordance with the APA and this Sale Order.

36.     This Court retains exclusive jurisdiction to (i) interpret, enforce and implement the terms and provisions of the APA, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith, (ii) compel delivery of the Purchased Assets to the Buyer, (iii) resolve any disputes arising under or related to the APA and related agreements, except as otherwise provided therein, (iv) enjoin and adjudicate the

assertion of any Liens, Claims, Encumbrances and Interests against the Buyer or in respect of the Purchased Assets, (v) interpret, implement and enforce the provisions of this Sale Order, and (vi) resolve any and all disputes relating to the Permitted Liens on the Purchased Assets that are transferred to the Buyer in accordance with the APA.

37.     As of the Closing, all agreements and all orders of this Court entered prior to the date hereof shall be deemed amended or modified solely to the extent required to permit the consummation of the transactions contemplated by this Sale Order and the APA.

38.     Nothing contained (i) in any plan of reorganization (or liquidation) confirmed in the Chapter 11 Case, (ii) the order of confirmation confirming any plan of reorganization (or liquidation), (iii) any order dismissing the Chapter 11 Case or converting it to a chapter 7 case or (iv) any order appointing an examiner or trustee in the Chapter 11 Case shall conflict with or derogate from the provisions of the APA or the terms of this Sale Order and no such plan or order shall discharge the obligations of the Debtor under this Sale Order or the APA or any documents or agreements delivered in connection therewith.

39.     The terms and provisions of the APA, together with the terms and provisions of this Sale Order, shall be binding in all respects upon, and inure to the benefit of, the Buyer and all affiliates, designees, successors and assigns of the Buyer, the Debtor, the Debtor's estate, any of Debtor's affiliates, successors and assigns, the Committee, all of the Debtor's known and unknown creditors and equity holders, including, without limitation, minority equity holders of the Debtor, and other third parties, including, but not limited to any Person asserting any Liens, Claims, Encumbrances and Interests in respect of the Debtor's estate or any of the Purchased Assets or any Person that is a party to any of the Assumed Executory Contracts and their respective successors and assigns.  If a trustee or examiner is subsequently appointed in the

27

Chapter 11 Case, such trustee or examiner shall likewise be bound, in all respects, to the terms and provisions of this Sale Order.  This Sale Order and the APA shall not be subject to rejection pursuant to section 365 of the Bankruptcy Code or otherwise.

40.    The APA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court, provided that any such modification, amendment or supplement is not materially less favorable to the Debtor.  In the event a modification is materially less favorable to the Debtor, the Debtor shall file and serve a notice of such modification.  If no party-in-interest filed a written objection with the Court within five (5) business days, such modification shall be deemed approved without further order of the Court, but the Court may enter any such further order as may be necessary.

41.    The failure specifically to include any particular provisions of the APA in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety.

42.    Upon Closing, the Debtor and its estate shall be deemed without further action or order of the Court to have released and discharged the Buyer and its affiliates, and their respective officers, directors, principals, members, representatives, agents, attorneys, investment bankers, and professionals, of and from any causes of action, legal or equitable, suits, debts, covenants, contracts, agreements, judgments, executions, claims, and demands whatsoever whether known or unknown, including in connection with the APA, the Auction and the Sale of the Purchased Assets, except for (i) obligations arising hereunder or under the APA and (ii) any Avoidance Actions or other claims that the Committee may assert in an adversary proceeding commenced on behalf of the Debtor's estate to the extent permitted by the Stipulation, dated July

1, 2013, by and between the Buyer and the Committee as approved by the Court in the Order Authorizing the Committee of Unsecured Creditors to Commence and Prosecute Certain Claims entered on July 2, 2013.

43.     Notwithstanding anything to the contrary set forth in this Sale Order, (i) Buyer shall have the right to terminate its obligations under the APA at any time prior to the Closing in the event that (a) the Debtor breaches any material representation, warranty, or covenant contained in the APA in any material respect, Buyer has notified Seller of the breach, and the breach has continued without cure for a period of ten (10) days after the notice of breach, or (b) Buyer is unable to acquire the Purchased Assets in exchange for its Credit Bid of a portion of the Buyer Debt together with Cash in an amount not to exceed the unpaid Carve-Out amount and Cure Amounts if any; and (ii) upon the Closing, Buyer shall retain all of its Liens, Claims and Encumbrances, if any, with respect to the Excluded Assets not transferred to Buyer under the APA.

44.     The provisions of Bankruptcy Rule 6004(h) and 6006(d) staying the effectiveness of this Order for fourteen (14) days are hereby waived, and this Order shall be effective immediately upon entry thereof.

45.     To the extent that this Sale Order is inconsistent with any prior Order or pleading with respect to the Sale Motion in the Chapter 11 Case, the terms of this Sale Order shall govern.

Dated:                                                    _____

                                                          Katherine A. Constantine
                                                          United States Bankruptcy Judge

978597v5